1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
2
HOUSTON DIVISION

3
****************************************************************

4
SARACEN LLC, ET AL                4:18-CV-03714

5
VS.                               HOUSTON, TEXAS
6

7
SYLVAIN ROSS, ET AL               FEBRUARY 25, 2020

8
****************************************************************
9

10
DAY 5
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE LEE H. ROSENTHAL
11
UNITED STATES DISTRICT JUDGE

12
****************************************************************

13
APPEARANCES:

14

15
FOR THE PLAINTIFFS:          MR. CHARLES BRUCE WALKER, JR
MR. JEFFREY PAUL KITCHEN
16
MR. JAIME STARK
Norton Rose Fulbright US LLP
17
1301 McKinney
Suite 5100
18
Houston, Texas 77010-3095

19

20
FOR THE DEFENDANTS:          MR. JOHN MICHAEL SHUMAKER
MR. CABRACH JOHN CONNOR
21
MS. JENNIFER TATUM LEE
MR. SERGIO DAVILA
22
Connor Kudlac Lee
609 Castle Ridge Road
23
Suite 450
Austin, Texas 78746
24

25

1    Official Court Reporter:          Lanie M. Smith, CSR, RMR, CRR
                                       Official Court Reporter
2                                      United States District Court
                                       Southern District of Texas
3                                      515 Rusk
                                       Room 8004
4                                      Houston, Texas 77002

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
         Proceedings recorded by mechanical stenography,
25    transcript produced via computer.

1                          EXAMINATION INDEX

2                                                      PAGE NO.

3    Neil Kelley

4          Direct Examination by Mr. Walker................   7
           Cross-Examination by Mr. Connor.................  18
5          Redirect Examination by Mr. Walker.............  40

6
      Plaintiffs Rest.......................................  51
7

8    Kevin Kelley

9          Direct Examination by Mr. Connor...............  51
           Cross-Examination by Mr. Walker................  72
10

11   Shams Siddiqi

12         Direct Examination by Ms. Lee..................  74
           Cross-Examination by Mr. Kitchen............... 117
13
     Igor Kliakhandler
14
           Direct Examination by Mr. Connor............... 127
15         Cross-Examination by Mr. Walker................ 166
           Redirect Examination by Mr. Connor............. 190
16
     Rawad Al-Awar
17
           Direct Examination by Mr. Connor............... 195
18         Cross-Examination by Mr. Kitchen............... 207
           Redirect Examination by Mr. Connor............. 215
19
     Kristopher Dages
20
           Direct Examination by Mr. Connor............... 217
21         Cross-Examination by Mr. Walker................ 227
           Redirect Examination by Mr. Connor............. 231

22

23

24

25

<u>**P R O C E E D I N G S**</u>

M O R N I N G   S E S S I O N

(February 25, 2020)

1

2

3

4      THE COURT:  I understand we have a few things to go

5  over.  The jury is lining up.

6      MR. CONNOR:  Yes, we have one issue that relates to

7  discovery, but it affects proceedings today.  We have been

8  requesting updated contracts for new users of Panorama since

9  the close of discovery, and we thought we were going to try it

10  last year.  Last month when this got on the docket and multiple

11  times since then, including through last night, we don't have

12  it.

13      THE COURT:  What's outstanding?

14      MR. CONNOR:  Apparently there are contracts that have

15  not -- there's some newer contracts some of which concern

16  Panorama, some of which do not; and the issue is whether any of

17  the witnesses today, especially the third-party witnesses, are

18  going to be testifying about the operation of Panorama.  And I

19  told Mr. Walker they're not.

20      MR. WALKER:  Two issues.  I'm glad we have that on the

21  record.

22          The second is I do understand one of their

23  witnesses today is going to talk about the contracts, including

24  the new customers that have been added.

25      THE COURT:  Are they going to talk about them?

1          MR. CONNOR:  Only if they're asked.  We're not going to

2     ask them.

3          THE COURT:  All right.

4          MR. CONNOR:  You can ask him.  It's Mr. Rawad Al-Awar.

5          THE COURT:  Okay.

6          MR. WALKER:  I'd still like to get the contracts.

7          THE COURT:  What's the reason not to disclose them?

8     Don't they affect the damages claim?

9          MR. CONNOR:  No.  They have that information.  They

10    have all the numbers.  They're asking for the underlying

11    documentation.

12         THE COURT:  Why do you need that if there's no dispute

13    as to the numbers?

14         MR. WALKER:  It is related to which are going to our

15    competitors, our primary competitors.  There's been testimony

16    already that some of the customers for Panorama line up with --

17         THE COURT:  If there's a dispute about it, then I will

18    order the production.  If it's not disputed or you can

19    establish it just through the witnesses testimony and it's not

20    controverted, I don't think you need it.

21         MR. WALKER:  Can we at least get the names of the new

22    customers?

23         THE COURT:  Well, is there any reason why --

24         MR. CONNOR:  I think they're already up on the screen

25    and --

1          THE COURT:  Are there any beyond those that have

2    already been disclosed and displayed?  Are there any more new

3    customers?  If so, who are they?

4          MR. CONNOR:  Sure.  I can get the names.

5          THE COURT:  All right.

6          MR. WALKER:  Thank you.

7          THE COURT:  Okay.  Ready for the jury?

8          MR. WALKER:  Yes.  Is it all right if we bring our next

9    witness up?

10          THE COURT:  Please.

11          And I will have a draft of the revised

12    instructions, I hope, later this morning.  They're still in

13    progress.

14          THE COURTROOM MANAGER:  All rise for the jury.

15               (The jury entered the courtroom.)

16          THE COURT:  Sir, be careful.  The floor slopes.  Can

17    somebody help him?

18               You may all be seated.

19               Raise your right hand, please, sir.

20                 (The oath was administered.)

21          THE COURT:  Please be seated.

22               Again, can somebody help him?  Are you okay?

23          MR. NEIL KELLEY:  Yes.

24          THE COURT:  All right.  Lean forward if you can.  That

25    mic does not pick up from a distance, so pull it to you and

1    lean forward to it and we'll be fine.

2         THE WITNESS:  All right.

3         THE COURT:  Thank you, sir.

4         Go ahead.

5                        **NEIL KELLEY**,

6    having been first duly sworn, testified as follows:

7                   **DIRECT EXAMINATION**

8    **BY MR. WALKER:**

9    Q.   Would you please introduce yourself to the jury.

10   A.   Good morning.  My name is Neil Kelley.

11   Q.   And how are you connected to this case?

12   A.   I'm the CEO and founder of Saracen.

13        THE COURT:  Hang on one second, Mr. Kelley.

14        His microphone is not working.

15        THE WITNESS:  It's not working?

16        THE COURT:  That's better.  It's working.

17   A.   I'm the CEO and founder of Saracen Energy.

18   **BY MR. WALKER:**

19   Q.   Would you give us a brief overview of your background

20   before you founded Saracen.

21   A.   I was born in the Midwest, Ohio.  I went to school in

22   Boston and London.  I worked for Mobile Oil after college.

23   Then I joined an international trading company, a physical

24   financial trading company that was based out of London; but I

25   was in the New York office.  I started at the bottom scheduling

1    ships.   Ultimately I was put -- responsible for all the

2    Americas, North America, South America.

3         And at a point in time, I decided to leave the company

4    because I traveled constantly for my job.  I traveled two weeks

5    a month and I had kids and so I needed to be home.

6         So I left the company called Vitol, V-I-T-O-L; and I

7    started my own company, Saracen.

8    Q.    And when did you start Saracen?

9    A.    And Saracen was started in 2004; and we had about ten

10   different strategies that we were trading, maybe 15, and had

11   about 125 employees at the peak.  We were managing lots of

12   capital.

13   Q.    Give us a brief overview of Saracen after the start and

14   the strategies.

15   A.    Pardon?

16   Q.    Could you give us a brief overview of the history of

17   Saracen since it started?

18   A.    Well, Saracen started as a small company, a single

19   strategy.  I grew that into multiple strategies, so we had a

20   lot of people in the office, almost 125, I think, at the peak,

21   or 150.  I forget the number.  I was in a car accident.  I was

22   in a coma for three weeks, recovery for almost a year.  I

23   subsequently developed other issues and neuropathy and I had a

24   back problem, had an operation and the hospital messed up.  I

25   had to have another operation because it was infected, so --

1    Q.    How did that affect the business at Saracen?

2    A.    So then the business itself since I was out for a year and

3    I could not really maintain it the same way, so I shut down all

4    of the strategies, commercial strategies, trading strategies

5    and kept one strategy, FTRs, which we're talking about today,

6    which is a very unique part of the market, pretty specialized;

7    and we were very, very successful at it.  So I kept that and I

8    grew that since the accident.

9         So Saracen was 2004, my accident was 2009.  2010, '11, I

10   then was shut down.  I've grown it since then to 2020.

11   Q.    What lasting effects has the car accident had on you

12   today?

13   A.    I have a few physical deficits.  I don't walk perfectly.

14   Well, I think I do, but maybe not.  You've seen me walk in

15   today, physical issues.  And my speech, I slur my words quite a

16   bit; so if I don't speak clearly or I speak too quickly, please

17   ask me to slow down.  I feel sorry for you --

18        THE COURT:  It's not a shy group.

19   BY MR. WALKER:

20   Q.    Does it have any lasting effects on your memory?

21   A.    No, it does not.

22   Q.    Are there any effects that affect your ability to testify

23   here today truthfully?

24   A.    No, it did not.

25   Q.    Has Saracen been successful in its FTR operations?

1    A.    Yes, we have.  We've been very successful because it's a

2    very unique part of the market, the way it's sorted out where

3    all of what we do, the positions that we purchase, we are in a

4    public auction.  So you compete for positions and the

5    settlement of those positions is done by independent -- the ISO

6    and Texas is ERCOT, so completely unbiased.  They set the

7    prices, so they set the realizations.  So we know our numbers,

8    we know everybody's numbers in the market.  And we are, I would

9    say, the most successful -- there's another company, so we're

10   one of the top two companies in the world who does this.  And

11   we know how they're doing, too; so it's very intermeshed.

12   Q.    What do you credit for the success of Saracen in the FTR

13   business?

14   A.    There's a lot of things, of course; but ultimately this is

15   a business where the assets are the people, as it's your way of

16   approaching business, the way you structure the office, and how

17   you analyze the market and analyze your positions.  It's very,

18   very highly technical.

19         So we have people, we have systems and we have IT systems;

20   and that's our assets.  That's what we do.

21   Q.    Are you familiar with VisualNode?

22   A.    Yes, I am.

23   Q.    How does VisualNode relate to the success of Saracen?

24   A.    VisualNode is a unique way that we use to analyze the

25   market positions.  And it provides answers to us quicker than

1    we would do it in other cost models, et cetera, and it's

2    visual, which is very unique so you can visualize what is going

3    on.  I'm trying to introduce you to the FTR markets; but it's

4    really the power lines, all the power lines.  You know, it's

5    like spaghetti.  You can see -- walk out the door and see all

6    the power lines.  And power needs to get to the customer -- it

7    has to get to the customer any day, any time.  And when you put

8    electricity on the wires, you cannot send it to a location.  It

9    goes -- it just goes least resistance.  It just goes out.  So

10   when it goes out, it goes into the wires.  You've got to be

11   able to model where it goes.  It's very, very, very

12   complicated; and to have a visual look at that we found to be

13   very important to us.

14   Q.   Does Saracen continue to invest in the development of

15   VisualNode?

16   A.   Yes.  We started with a somewhat rudimentary program.

17   Someone we hired brought that with him.  We have since been --

18   during the period of time this individual was with us,

19   Mr. Ross, who I'm sure you'll talk a little bit about later, we

20   invested a lot of money, a lot of time, because we had all the

21   traders, analysts in the office making suggestions on what they

22   wanted, what they needed.

23        Well, they needed different ways to look at the market,

24   they needed the location, they needed things -- we made many,

25   many additions, adjustments to the model so that we had a model

1    that we were most happy with.

2    Q.    Let's move forward to Mr. Ross.

3          Were you involved when Mr. Ross resigned from Saracen?

4    A.    Yes, I was involved.

5    Q.    What concerns, if any, did you have about Sylvain Ross

6    leaving the company?

7    A.    When any employee leaves the company -- and not many do,

8    because I invest so much time and effort to the employees, the

9    culture, the atmosphere at the office, because I want to make

10   the people happy, make them want to work for us.  They're more

11   productive in that environment.

12         But when anyone does resign, I sit with my counsel, I sit

13   with all the senior people at the company and we go through

14   what's up.

15         What are we concerned about?

16         Are we concerned about the competition?

17         Are we concerned about secrets?

18         Are we concerned about him competing in the market against

19   us?  Because we have the capability to noncompete the

20   individual for up to six months.  It wasn't one year, no.  It

21   was six months.  During that period of time of the noncompete,

22   I need to pay them 150 percent of their salary.  So it's a high

23   cost to us to noncompete, so we evaluate that closely.

24         With respect to Sylvain, we evaluated that and we had

25   decided -- he had told us he was going to build his own

1  software company, but I knew that before I sat with him.  But

2  he told us he was not going to another competitor, he is not

3  going to trade.  He was trading for us at Saracen.  He started

4  as a junior trader, an IT analyst and a junior trader; and he

5  wasn't successful at trading.  So he resigned because he

6  wanted -- he said, quote, I am more alpha in the software

7  market.

8       He thinks he's a better coder than trader, so he wanted to

9  go do that.  So we didn't noncompete him; but we reminded him

10 constantly during the meeting we had during the exit interview

11 about confidential information, because that's so important to

12 us and he had brought the rudimentary program and built it up

13 with all of your input and all of our time and money and I

14 wanted to make sure he didn't take that with him.  So --

15 Q.   When you say, take that with him, what are you referring

16 to?

17 A.   Either the code itself, any notes, any thought about how

18 to present it -- I mean, what he can take with him is obviously

19 physical stuff; but I was concerned about him taking knowledge

20 with him, what our positions were, who were the best traders,

21 who were the best analysts.  And our systems, whether it was

22 VisualNode -- we have many other systems that provide

23 information for us as well.  I was very concerned about him

24 relaying that to our competitors.

25      He assured me he absolutely was not going to do that, and

1    I offered to help him.  I said if you want to start a

2    company -- I offered to help him because I know it's very, very

3    difficult to start a company, especially a start-up.

4        And so I offered to help him, but then we departed on

5    amicable terms.

6    Q.    Did you have subsequent contact with Mr. Ross after he

7    left Saracen?

8    A.    Yes.  A while later, six months to a year -- I don't know

9    the exact date -- he contacted me and said he has developed a

10   program that was in our space and that he has a potential new

11   customer, which was my brother, one of my older brothers who

12   had worked for me and was I concerned about him selling the

13   program to Kevin, Kevin Kelley -- sorry -- my brother.

14   Q.    Why would that be a sensitive issue?

15   A.    Sensitive because I had hired Kevin in 2007 or '8, before

16   my accident; and he was to develop a new strategy for us, a

17   private equity strategy.  When I was in a car accident and out

18   of touch completely initially, literally in a coma in the

19   hospital, et cetera, Kevin, Mr. Kelley, my brother, operated on

20   my behalf as the president of the company, which was very

21   assuring to me because it would be my brother.  With money

22   going around -- not that I worried about my employees doing

23   anything wrong, but it's just good that my brother was there.

24       Subsequently after I got in reasonable enough shape, I

25   wanted to reengage at the office.  After about a year, I came

1    in the office more day-to-day, and it became very clear that I

2    was butting heads with Kevin because you can't have two cooks

3    in the kitchen.  It doesn't work well.  So I disengaged.  I let

4    Kevin go with it.  He basically ran the business, and I stayed

5    out.  I operated just on the periphery a little bit.

6         Then one of my senior -- my most senior trader, a very

7    close friend, resigned.  I was astonished to hear that, and I

8    reached out and he -- he resigned completely without any notice

9    to me, just the top guy just resigns.

10        So I met with him after he resigned.

11        Why did you resign?  I can't believe you resigned.

12        He said he just could not work with Kevin.  He was too

13   difficult.  He was not the same kind of person that I am as far

14   as -- well, I'll leave it at that.

15        And so I subsequently interviewed every senior member of

16   the office, went to lunch with them, went to dinner with them

17   in a nice environment, not the office so that it would be more

18   comfortable and forthcoming.  And every single one of them,

19   half of them, unprompted, said they did not like working for

20   Kevin.  He's a problem.

21        And I was disappointed.  I had not been informed of this

22   before, but I thought that they didn't give me news of my

23   brother because they wanted to be sensitive.  They didn't want

24   to disappoint me.

25        So I let Kevin go.  And it was a difficult process for

1   Kevin because he worked for me for a period of time.  It was

2   hugely difficult, it was the most difficult thing I had ever

3   done, fire a brother; but I did.  And it was the right decision

4   because we were much more successful, the people were much

5   happier, our investor was happier.  Everyone was happier and we

6   made more money.  We expanded further after he left, we made

7   more money, we made more money after he left.  I'll leave it at

8   that.

9   Q.    Let's get back to the issue that Sylvain Ross raised to

10  you.  He wanted to know if he could do this work with Mr. Kevin

11  Kelley.  What was your response?

12  A.    My response was -- and it's universal to anybody that

13  comes in -- is that you are free, I'm happy.  I wanted Kevin to

14  be successful.  I wanted him -- I'm concerned about him and his

15  family.  I want him to do well.  But I reminded Sylvain, as

16  long as you're not selling anything that is our property and

17  our property is confidential information and intellectual

18  property.  So I'm not saying specifically to a program.  I'm

19  saying generally don't sell my secrets and specifically do not

20  sell him VisualNode.

21       And he said he would not do that.  He affirmed that he

22  would not.  He would respect the confidential information

23  policy.

24  Q.    Whose decision was it to bring this lawsuit against

25  Mr. Sylvain Ross?

1    A.    I did.

2    Q.    How did you come to that decision?

3    A.    Well, we started to get feedback from the market, our

4    traders, that there was a competing -- that Sylvain -- Mr. Ross

5    had created a competing product that was -- looked similar to

6    VisualNode.

7         We contacted Mr. Ross to say can you show us what you have

8    to ensure that you did not conflict with us?  We asked him

9    several times.  We had meetings with him, but they said they

10   were going to.  We went to Austin to see him at one point in

11   time and he did not -- he would not.

12        So ultimately I had to make a decision do I sue or not.

13   And I know what lawsuits are about and it's expensive and it

14   never takes enough time.  It's like building a house.  It's

15   going to be later and over budget.  That's the way it goes in

16   the courtroom.  It's always going to be late.  It's going to

17   cost us a lot of money.  And I didn't think there's any reward

18   in it other than getting back my property and making sure our

19   competitors did not have this, what we do because our people

20   are sought after very, very highly in the market.  They want to

21   know what our secret is, how we go about it because everyone

22   knows our success.

23        So I said we've got to sue him.  We've got to stop it.

24   We've got to get VisualNode back.

25             MR. WALKER:  Thank you.  That's all the questions I

1    have.

2          THE COURT:  Cross-examination?

3                         **CROSS-EXAMINATION**

4    **BY MR. CONNOR:**

5    Q.    Good morning, Mr. Kelley.

6    A.    Good morning.

7    Q.    Are you comfortable?

8    A.    No.

9    Q.    You said a moment ago that you're seeking to get your

10   property back?

11   A.    I said, yes.

12   Q.    That's what this is all about?

13          THE COURT:  Louder, please.  Mic.  Thank you.

14          MR. CONNOR:  Yes, Your Honor.

15   **BY MR. CONNOR:**

16   Q.    That's what this is all about?

17   A.    Yes, it is.

18   Q.    Are you aware that the damages expert that you hired who

19   testified yesterday said that Saracen is seeking all of the

20   profits from Mr. Ross's company?

21   A.    That's correct, all the profits of selling VisualNode,

22   yes, not the company, VisualNode.

23   Q.    Are you aware that he testified that Saracen is, in fact,

24   requesting -- demanding through this lawsuit all of the profits

25   of the entire company?

1    A.    I believe the only product they have is VisualNode.  I was

2    giving you the benefit of the doubt and saying we want

3    VisualNode back and the profits of selling VisualNode.  If that

4    is the entire company, then the entire company, yes.

5    Q.    So the answer is yes?  You are aware that you're seeking

6    in this lawsuit all of the profits that Mr. Ross's company has

7    made?

8    A.    No, I did not say that.  I said all of the profits of

9    VisualNode.  If he has other sources of revenue in the company

10   that I'm unaware of, I don't have any party to that.

11   Q.    You said that Mr. Ross was an unsuccessful trader.  Do you

12   remember saying that?

13   A.    I do remember that.

14   Q.    Do you recall that Mr. Ross as a trader at Saracen made

15   $2 million for you?

16   A.    I knew he had made money, yes; but he was not successful

17   working for us in the trading world.  Yes, success is a lot

18   more than money.

19   Q.    Let's talk about your background a little bit.  So you're

20   the director for U.S. Venture, Incorporated, correct?

21   A.    Yes, I am.

22   Q.    And your family owns 3.3 percent of U.S. Venture, right?

23   A.    Correct.

24   Q.    And the U.S. Venture is in a multitude of businesses --

25   auto parts, lubricants, many different things other than FTR

1  trading, correct?

2  A.   Yes, they are.

3  Q.   And as for your work at Saracen you sporadically trade

4  energy, correct?

5  A.   Be more specific.

6  Q.   Well, you trade in FTRs like the other traders you employ,

7  but you do that sporadically, off and on?

8  A.   Who is you?

9  Q.   You, sir.

10 A.   You, the company; or you, the individual?

11 Q.   You, the individual.

12 A.   I personally do not trade, no.  Trade is much too

13 complicated.  I'm not qualified to be a trader for me.

14 Q.   So your testimony today is that do you not trade energy at

15 Saracen on behalf of Saracen Group of Companies?

16 A.   You said do I trade FTRs.  I do not trade FTRs.  I may

17 have traded sporadically other commodities.  I don't recall

18 when it was natural gas, but I have been a trader from my

19 history so I know that market.

20 Q.   So it's fair to say that you trade off and on in energy?

21 A.   No, it's not fair to say that.  I've not done a trade in

22 at least three years.  So sporadically would be -- I'm just

23 trying to be complete and say I may have done a trade over the

24 last ten years.  I don't recall it.

25 Q.   You don't recall it.

1      You've never used VisualNode, have you?

2    A.    I've never -- I've never used VisualNode for trading, no,

3    I have not.

4          THE COURT:  Could you keep your voices up, please, both

5    of you?

6          MR. CONNOR:  Yes, Your Honor.

7    **BY MR. CONNOR:**

8    Q.    But you've seen VisualNode?

9    A.    Yes, I've seen it.

10   Q.    And the trading capital that your company uses is provided

11   by an entity called Mackenzie Investment Offerings, or MIO,

12   something to that effect; is that correct?

13   A.    That is correct.

14   Q.    And the gentleman whom you interface with at MIO, at

15   Mackenzie, is Arthur White?

16   A.    That is correct.

17   Q.    And you mentioned a few minutes ago that this is a very

18   expensive undertaking for your company, this litigation,

19   bringing this case against Mr. Ross and Marginal Unit; is that

20   correct?

21   A.    Yes, it is.

22   Q.    And it's accounted for as an expense at Saracen?

23   A.    Yes, it is.

24   Q.    And you provide to Mr. White your budget every year,

25   including your anticipated expenses, correct?

1    A.    Yes, I do.

2    Q.    And so Mr. White has known about this case for some time?

3    A.    I informed Mr. White before we sued Mr. Ross that we were

4    going to do that, only for informational purposes.  I try to

5    keep -- one of my bosses is transparency.  I want everybody to

6    know everything, so to speak, while they're in the circle.

7    Q.    You didn't provide a demonstration of VisualNode or show

8    Mr. White what you're contending are similarities between

9    VisualNode and Panorama, did you?

10   A.    We did not do that because we don't know what Panorama is.

11   Q.    You haven't seen Panorama?

12   A.    No, I have not.

13   Q.    You haven't seen any of the screenshots that we've been

14   looking at the last four days?

15   A.    No, I have not.

16   Q.    So you don't have a sense of how dissimilar VisualNode and

17   Panorama are?

18   A.    I'm not qualified to do that.

19   Q.    And so I take it you haven't discussed that with

20   Mr. White, who's paying for all of this; is that true?

21   A.    Is what true what?  Discuss what?

22   Q.    The dissimilarities.

23   A.    Specifically?

24   Q.    The dissimilarities between Panorama and VisualNode or

25   even what Panorama looks like, that's not something that you've

1    discussed with Mr. White, have you?

2    A.    Well, I have not discussed it, because we don't know.  We

3    have tried to get his package -- his demonstration from him,

4    and he would not do so.  Now has he done so?  I don't think

5    he's done so, but prior to the litigation he wouldn't do

6    anything.

7    Q.    Since the litigation started, Mr. Kelley, you're aware

8    that Mr. Miller, Jason Miller, who works for you, has had a lot

9    of time operating Panorama.  Are you aware of that?

10   A.    No, I'm not aware of that.

11   Q.    Are you aware that your company and Mr. Miller in

12   particular were provided logins and access to Panorama?

13   A.    I'm not aware of that.

14   Q.    Nobody showed you?

15   A.    No one showed me.

16   Q.    Did you ask to see it?

17   A.    I did -- I asked to see it previously, and it was not

18   provided.  Has it been provided since litigation?  No.  Our

19   counsel has been adamantly strict and clear about not passing

20   information from one witness to another witness.  I don't know

21   what he testified about.  I have no idea.

22   Q.    You decided to file this lawsuit in 2018, correct?

23   A.    I decided to file the lawsuit.  I don't know when it was.

24   It was a long time ago.

25   Q.    It was a long time ago.

1       And since that time you haven't asked to see what it's all
2    about and looking at Panorama?
3    A.   Me, no.  Because I'm not going to look at it.  I don't
4    know if it's asked -- I presume if there's been any request
5    that it's been done.  It's not been requested by me.
6    Q.   Let's talk about VisualNode a little bit, because you did
7    say you've seen that, right?
8    A.   I've seen a high-level -- you know, a screenshot in
9    advance of a trading meeting or something like that, but I've
10   not seen the full operation of it; but, yes, I have.
11   Q.   When you were asked if you did anything to help create
12   VisualNode, you said you paid for it, right?
13   A.   Yes.
14   Q.   And at your deposition you didn't recall how much you paid
15   for VisualNode, correct?
16   A.   It's impossible to be specific because we had so many
17   people involved with getting suggestions over such a long
18   period of time that we did not log time.  We did not log
19   anything.  It was just a big effort over a long period of time.
20   Q.   Let's go back to when your brother hired Mr. Ross in 2013.
21       Did Saracen at that point in time make a payment to
22   Mr. Ross for his VisualNode 2013 code?
23   A.   When Sylvain was hired, a typical person we hire we give
24   them a salary offer and we give them a sign-on bonus or a
25   starting bonus.  The magnitude may vary greatly.  It may be

1    zero.  He negotiated.  He wanted more money, and he said in

2    exchange for that he would provide the code for what was

3    VisualNode at the time.  He would provide that to us for sale.

4         We asked him to confirm that the company he worked for,

5    Deutsche Bank, would not object to that; and he said, no, it's

6    not a problem.  I developed this after I left Deutsche Bank in

7    a three-month period of time.

8         So we were very concerned about confidential information

9    and property for us and we respect other people's.  We reach

10   out to everyone we hire and tell them don't take anything from

11   a previous company because we do not want to be involved in

12   lawsuits.  Lawsuits over this occur.

13   Q.   You're referring to the time period after Mr. Ross left

14   Deutsche Bank and before he started at Saracen.  That was the

15   time period when he developed VisualNode; is that correct?

16   A.   He said --

17   Q.   Do you have any reason to think that's not true?

18   A.   At this point in time I have no idea.

19   Q.   So you were comfortable with the fact Mr. Ross developed

20   VisualNode in 2013 after he left Deutsche Bank and before he

21   started at Saracen in March of 2013; is that right?

22   A.   Well -- am I aware?  What are you asking?  The question --

23   I lost the question.

24   Q.   Sure.  I'll repeat it for you, sir.

25        You were comfortable with the fact that Mr. Ross developed

1    VisualNode in 2013 after he left Deutsche Bank and before he

2    started working for Saracen in March of 2013?

3    A.    As part of his negotiation tactic for getting more money

4    when he was hired, he introduced VisualNode to the team, which

5    was a rudimentary start to the visualization of what we have

6    since expanded comprehensively.  I did not look at it at that

7    point in time.  I just told the people, my counsel and Jason

8    and Kevin, okay, well, if he wants to get a sign-on bonus X for

9    this, okay, we'll do that, but only if we get this affirmation

10   that it's clean from Deutsche Bank so if he --

11   Q.    Got you.

12   A.    However he did it...

13   Q.    So you said you discussed that with your counsel.  That's

14   Ms. Duensing?

15   A.    Yes.

16   Q.    And with Mr. Miller?

17   A.    Yes.

18   Q.    And with Mr. Kevin Kelley, your brother?

19   A.    Yes.  Yes, I did.

20   Q.    Okay.  Now, Mr. Kelley, that was March of 2013, all right?

21   A.    March what?

22   Q.    2013.

23   A.    I guess so.

24   Q.    That's when Mr. Ross came to work at Saracen, right?

25   A.    Yes.

1    Q.    And Mr. Miller came to Saracen later that year.  Do you

2    remember?

3    A.    I remember he came to work first.  I hired him.  I was

4    involved in his hiring, but I don't recall whether that was

5    before or after Sylvain.  It was about the same period of time.

6    Whatever the dates are, the dates are the dates.

7    Q.    So Mr. Miller came to work at Saracen about six months

8    after Mr. Ross.  Do you remember that?

9    A.    I don't remember that.

10   Q.    So, if you were talking to Mr. Miller and Ms. Duensing

11   about hiring Mr. Ross, Mr. Miller, he was still working --

12   A.    I'm only saying Mr. Miller because Mr. Miller was a

13   supervisor when he was there.  I don't know who came first, but

14   I definitely talked to Kevin.  I would have had some trading

15   input -- I'm not sure who it was -- and counsel.

16   Q.    Okay.  I think I understand.

17        So you had these discussions with at least Ms. Duensing

18   before you -- before Mr. Ross came with his software and you

19   were assuaged by the discussions that you had with Mr. Ross

20   about the software and Deutsche Bank.  Does that fairly sum it

21   up, sir?

22   A.    Yes.

23   Q.    Okay.  And going back to the payment, you testified that

24   there was a payment made to Mr. Ross -- this is at your

25   deposition -- that that would have been reflected, been

1    recited, in his offer letter and following certifications.  Do

2    you remember that, sir?

3    A.    Yes, I do.

4    Q.    Let's look at the offer letter and the annex.

5          MR. CONNOR:  First let's look at Defendants Exhibit 44.

6    BY MR. CONNOR:

7    Q.    Mr. Kelley, I'm going to put that up there if that's all

8    right.  I think it might be easier to read.

9          I can hold that for you.

10   A.    No, thank you.

11   Q.    So this is Exhibit 44.  Do you recognize that as the offer

12   letter to Mr. Ross?

13   A.    I don't recognize it.  I can't read it.

14   Q.    Why not, sir?

15   A.    Because I don't have my reading glasses on.

16   Q.    Do you have those in the courtroom here?

17   A.    I do not.  They're in the counsel room.

18         THE COURT:  Mr. Kelley, these might help.

19         THE WITNESS:  Thank you, Judge, Your Honor.

20         MR. CONNOR:  Thank you, Your Honor.

21             Try those.

22         THE COURT:  I also have a magnifying glass if that

23   would help.  Does that work?

24         THE WITNESS:  These are strong.

25         THE COURT:  They are.  Try that.

1          MR. CONNOR:  Would you like to try a magnifying glass,

2     sir?  I may have some that aren't so strong.

3          THE WITNESS:  No.  This works well.  Thank you.

4          THE COURT:  Okay.  Thank you.

5          MR. CONNOR:  It's heavy.

6          THE WITNESS:  Could someone get -- retrieve them?

7          MR. KITCHEN:  We've got some coming.

8          MR. WALKER:  They will be here momentarily.

9          THE COURT:  All right.  Thank you.

10          THE WITNESS:  I'm sorry.

11          THE COURT:  That's all right.

12          MR. CONNOR:  We can come back to that.  We'll keep

13     going, and we'll just come back to that.

14          THE COURT:  Keep your voice up, if you would, sir.

15          MR. CONNOR:  We can come back to that, okay?

16          THE WITNESS:  Certainly.  Thank you.

17          You brought the wrong pair.  I'm kidding.  Thank

18     you.  Yes.

19     BY MR. CONNOR:

20     Q.    So this is the offer letter that Saracen provided to

21     Mr. Ross when he -- you offered him employment at the company

22     in March of 2013, correct?

23     A.    Yes, it is.

24     Q.    And the offer letter doesn't state any amount of money

25     paid to Mr. Ross for his VisualNode 2013 code.  Do you agree

1    with that?

2    A.    It's not in this document, correct?  It's in a subsequent

3    document.  When he was hired I asked -- I had asked the same

4    question you're asking me.  Why isn't it in the offer letter?

5    It was too, I'll say, verbose.  They had a separate letter for

6    that.  It was provided.

7    Q.    Let's look at that separate letter.

8    A.    Okay.

9    Q.    That's DX 45, the document that's called the annex, the

10    certification you referred to in your deposition.  Do you

11    recognize that?

12    A.    Yes.

13    Q.    And this doesn't state any amount of money paid to

14    Mr. Ross for his source code, does it?

15    A.    This is an annex to the offer letter because he negotiated

16    a payment so we guaranteed him a minimum bonus for the first

17    year, $25,000, which was our method of agreeing to his numbers.

18    Q.    That's not --

19    A.    It was -- it was negotiated -- we negotiated salary.  We

20    negotiated bonus.  Well, bonuses are just completely

21    discretionary.  I said, we will do a minimum bonus as you

22    get -- if we get VisualNode as part of this process; so it's

23    $25,000.  I -- we guaranteed him.

24    Q.    That was not at the time -- that wasn't paid at the time

25    when he came to work at Saracen, was it?

1    A.    It was confirmed that it would be paid.  I told him he

2    would be paid in accordance with our payroll policy for

3    bonuses, which is done after every quarter ends, every quarter

4    ends.

5    Q.    Okay.  Let's talk a little bit about those years when

6    Mr. Kevin Kelley worked for you, okay?  You said he came to

7    work for you in 2008; and you let him go in January of 2015,

8    right?

9    A.    The dates are the dates.

10    Q.    Those dates are correct, sir?

11    A.    I presume so.  I don't have them off the top of my memory.

12    Q.    Okay.  Well, do you remember that Mr. Kevin Kelley's

13    compensation during that time wasn't memorialized in any

14    written agreement either?  In fact, you decided what you would

15    pay your brother each year.  Do you remember that?

16    A.    I decide what I pay everyone.

17    Q.    But you had no written agreement with Mr. Kelley?

18    A.    No written agreement with anyone.

19    Q.    And so let's talk a little bit about what this case really

20    is about.

21          In 2014 Saracen had a very good year, right?

22    A.    Yes, it was a good year.

23    Q.    The best year you had had in a very long time?

24    A.    Since, we've had better years; but, yes, we had a good

25    year that year, yes.

Q.   And Mr. Kevin Kelley over the years when he was running

the company, he had hired a good number of people, right?

A.   He hired some people, all were interviewed by me and

agreed by me, yes.

Q.   And let's talk numbers for a moment.

     So in the time that you let him go, there were 26

employees at Saracen, right?  Is that right?

A.   Correct.

Q.   Does that sound right?

     And eleven of those employees were people you had hired,

and 15 were people that your brother had hired?

A.   Can we -- I don't know that.  Can we talk about traders?

Q.   Well, we can; but I'm just trying to --

A.   I cannot comment on those numbers without looking at the

page and seeing the numbers.  I have -- I don't believe -- I

would question that process, 15 count; but the numbers are the

numbers.  I think you're wrong.

Q.   Okay.  Is it fair to say, Mr. Kelley, that your brother,

while he was running the company, grew it both in terms of

employees, traders and also in trading capital?

A.   I'm sorry.  What are you trying to get at?

Q.   I'm trying to get at, sir, the question that I think we

all want to understand, which is what happened between you and

your brother and how that precipitated this lawsuit and I want

to walk through the timeline with you and I want to ask you

1    some questions and then we're going to hear from your brother,

2    okay?

3    A.    Fine.

4    Q.    All right.

5    A.    Can I say something?

6    Q.    Of course.

7    A.    I know you want to talk about -- because you're mentioning

8    things and I can't agree to some things.  I don't recall them.

9         We'll go through the process of Kevin.  Kevin had nothing

10    to do with this lawsuit.  If you want to try to put up numbers

11    to say Kevin was valuable for the company or anything of that

12    sort, no.  Kevin was not involved in firing Sylvain.  He did

13    not contribute to us firing Sylvain.  It was a nonfactor with

14    regard to Sylvain and the code.  It was a hundred percent an

15    intellectual property concern.

16    Q.    Okay.

17    A.    That was it.  Now, with Kevin, there are so many issues of

18    how that went down --

19    Q.    Uh-huh.

20    A.    -- that you can bring up facts that I won't dispute or

21    agree to; but I had eight other things to do, other things that

22    you won't ask that contributed to it.  So I do not want to give

23    any unfair impression to the jury about the process.  You said

24    you wanted to --

25    Q.    Walk through the timeline.

1    A.    -- walk through the timelines.

2         Well, the timelines don't mean anything without us --

3    Kevin is not involved.  Kevin was paid.  He didn't think he was

4    paid enough money.  He thought he did a good job managing.  I

5    subsequently found out he did a terrible job with the people,

6    because our assets are our people and our information; and they

7    left.  And he didn't -- did not make me any money.  He -- the

8    company was successful, but a lot of things that he -- he never

9    made money himself.  He never traded -- I'm getting emotional,

10   because it is my brother.

11   Q.    Sure.

12   A.    And it's hard to hire and fire a brother, but it happened.

13   It happened too late.  I should have fired him three years

14   before, but I did not.

15   Q.    Okay.  I think it would be helpful to all of us if we just

16   step back a little bit and walk through what did happen; and if

17   I don't ask a question of you that you want to talk about, your

18   lawyers are going to have another opportunity to get back up

19   here and ask you more questions.  And so if we can just get

20   through this stuff, I think you will have an opportunity to

21   answer and explain other things.  But I would like to move

22   through this quickly because we are under a time --

23   A.    But the thing is you will not run through it quickly with

24   me because you're going to ask me about dates, and I don't

25   recall specific dates.

1    Q.    Sure.

2    A.    I'm not going to say yes or anything that I can't firmly

3    say yes to, so you're going to have to ask me the date and

4    we're going to spend a lot of time proving what the date was.

5    So show me what the dates mean and what the event was.

6    Q.    I think it will help us all, I think, if we do it by

7    looking back at some of your e-mails, okay?

8    A.    Okay.

9    Q.    Let's look at Defendants Exhibit 23.  And I'll help you

10   locate that here.  You're probably going to need your glasses

11   again because this is another small one.

12        Now, the jury has already seen this one, Mr. Kelley; but

13   since you wrote it, I think it's a good idea for us to talk

14   about it a little bit.

15        THE COURT:  Can you blow it up?

16        MR. CONNOR:  Yes.  Let's blow up the bottom.

17   A.    Yes.

18   BY MR. CONNOR:

19   Q.    So this was about the time Mr. Ross left Saracen in 2016,

20   correct?  And you said a moment ago that you fired him.  Is

21   that your recollection?

22   A.    My recollection is I fired Kevin.  I did not fire Sylvain.

23   Sylvain resigned.

24   Q.    Okay.  I wanted to make sure that that's clear for

25   everybody that Mr. Ross left on his own accord.

1    A.    Yes, he did.

2    Q.    And when he did, you wished him well, correct?

3    A.    Yes, I did.

4    Q.    And you asked him that day when you and Mr. Wilken and

5    Ms. Duensing and Mr. Miller sat down with Mr. Ross if he had

6    been talking with your brother.  Do you remember that meeting?

7    A.    I remember the meeting.  I don't recall asking that

8    question, but I'm sure I would have.

9    Q.    Do you remember this e-mail and Mr. Wilken coming to you

10   and expressing some question to you as to whether Mr. Ross was,

11   in fact, talking about doing business with your brother?

12   A.    We had a meeting prior to meeting Mr. Ross, as we do with

13   all employees who resign or are fired, to discuss whether to

14   noncompete and to discuss whether or not -- and to reaffirm

15   intellectual property concerns.

16   Q.    I'm talking about the discussions that you had after the

17   meeting with Mr. Ross when you asked him if he was going to do

18   business with your brother --

19   A.    He said he was looking to do business with my brother,

20   that was six or nine months, a year after he resigned from us.

21   Q.    Right.  And we're going to get to that in a moment.

22         But back at the time when he resigned, you asked Mr. Ross

23   in that meeting whether he had been talking with your brother.

24   Do you remember that?

25   A.    I do not remember that.

1    Q.    Okay.  Well, Mr. Wilken here poses a question to you about

2    whether -- in response to that question you asked Mr. Ross,

3    whether you had --

4    A.    Okay.  I see.  Okay.  I don't recall the meeting

5    specifically.  It was in the meeting, yes.  I asked him if he

6    was going to talk to Kevin.

7    Q.    And do you remember your response?  Let's look at Mr. --

8    A.    I do, yes.

9    Q.    You said that if he had been -- or if he had been talking

10   with Mr. Kelley, then he would be napalming a bridge.

11   A.    No, I said -- said it had nothing to do with Kevin; but I

12   don't think we noncompete him.  That was the discussion because

13   if he's going to join a competitor and he lied about it --

14   Q.    He didn't join a competitor, did he, Mr. Kelley?

15   A.    He did not.

16   Q.    But you did find out a few months later because Mr. Ross

17   told you, told Mr. Miller that he was, in fact, talking with

18   your brother and there was a potential that he would be doing

19   business with Mr. Kevin Kelley.  Do you remember learning that?

20   A.    As I said, I don't know the exact dates; but subsequent to

21   him resigning to create a software company, he came to us -- I

22   guess he talked to Jason first, but then Jason told me or I

23   requested to meet with Sylvain.  I don't recall the overture or

24   how it went down, but I said I have absolutely no problem with

25   him having Kevin as a customer as long as -- but he needs to

1    reaffirm he's not doing VisualNode or selling our confidential

2    information.

3    Q.    Right.

4    A.    But I wish him the best.

5    Q.    Let's look at that e-mail, because we do have that,

6    fortunately, here so we can look at exactly what was going on.

7    This was in January of 2017 and that's Exhibit 310?

8    A.    Can you kindly tell me the exhibit you're referring to?

9    Q.    Yes, sir.  It's going to be -- it's not in the book, so

10   I'm going to get it for you so you can look at it, okay?  I'm

11   going to set this down.

12        I think it's easier to look at it on paper; but if you

13   would rather look at it on the screen --

14   A.    The screen is fine.

15   Q.    Okay.

16        MR. CONNOR:  Then let's blow that up.

17   BY MR. CONNOR:

18   Q.    Here it is.  For your convenience, if you want to look at

19   it on paper, we have it here.

20        Let's first look at the very bottom, Mr. Ross's e-mail to

21   you.

22        MR. CONNOR:  Let's blow that up first.  So that's it

23   right there.

24   BY MR. CONNOR:

25   Q.    So, Mr. Kelley, can you see that okay on the screen?

1    A.    Yes, I can.

2    Q.    Okay.  Do you see the very -- that e-mail that Mr. Ross

3    sent to you in the middle of January?  He wanted to give you an

4    update on what he was doing, remind you that he left in March

5    of 2016.

6          And then he says:  Unfortunately there is a catch.  The

7    fund in question that Mr. Ross might be doing business with is

8    Kevin Kelley's.

9          Do you remember getting this e-mail?

10   A.    Yes, I discussed this previously with you.

11   Q.    Okay.  And this is when you responded -- and let's go up

12   to the top and let's just focus on the last sentence of the big

13   paragraph in that e-mail where you say:  I just offer this

14   reminder so that you don't find yourself in a situation that

15   puts you and your business at risk in the future.

16         That's what you said to Mr. Ross at that time, didn't you?

17   A.    Yes.  As you read the e-mail, I thanked him for advising

18   me and I said:  Don't hesitate to reach out to us as a

19   potential customer as you have new products.  I said:  If you

20   work for Kevin's fund, be assured it's not a problem.

21         But then I reminded him of our intellectual property

22   rights and the code rights and the confidentiality.  I reminded

23   him:  I'd be remiss, however, if I didn't remind you.

24         But I stated from the conversations at the departure that

25   you've take this seriously and you don't -- and that sentence,

1    I don't want you to put your business at risk, reflects that.

2    If you steal our property, we're going to enforce it.

3        So that puts his business at risk if he's selling our

4    property, which apparently he was.  We did not know that at the

5    time.

6    Q.    But what you did know and what you had just learned

7    straight from Mr. Ross was that he might be doing business with

8    your brother, right?

9    A.    Yes, I did.  I assured him that was no problem.

10        MR. CONNOR:  I pass the witness, Your Honor.

11            We would, with your permission, like to reserve

12    recalling Mr. Kelley should the testimony in our direct --

13        THE COURT:  We'll take that up outside the jury's

14    presence.

15            In the meantime, you may step down, sir.

16        MR. WALKER:  Just one follow-up question.

17        THE COURT:  Oh, you do?  Okay.  That's fine.  Sorry.

18            Stay where you are.

19        THE WITNESS:  I do as I'm told.

20                    **REDIRECT EXAMINATION**

21    BY MR. WALKER:

22    Q.    Mr. Kelley, what was happening in early 2016 that would

23    give you or Mr. Wilkens a heightened concern about Sylvain Ross

24    leaving and going to work for Kevin Kelley?

25    A.    I'm trying to locate specific dates.

1  Q.   Around the time that Sylvain Ross was resigning in early

2  2016, what concerns did the company have about Kevin Kelley?

3  A.   I was concerned.  I had let my brother go.  It was very

4  difficult.  He made a lot of money, he always wanted more, he

5  was unsatisfied.  I was concerned.  The reason I asked is it

6  okay to go to Kevin is that we were concerned that Kevin would

7  be taking information of ours to use in the FTR market.  Kevin

8  was starting an internet company, which was totally fine with

9  me.  I don't think he'd be satisfied; but he has been a little

10  successful, I gather.  But I didn't want him -- I was concerned

11  about our intellectual property.  That's what I was concerned

12  about.

13         MR. WALKER:  Thank you.  That's all the questions I

14  have.

15         MR. CONNOR:  Thank you, Your Honor.

16         THE COURT:  All right.  Can you both help Mr. Kelley

17  down.

18         MR. WALKER:  Yes.

19            We can also tell you we're going to be resting if

20  you want to take a break as well.

21         THE COURT:  All right.

22            Ladies and gentlemen, this is a good time as well

23  for our morning break.  We'll break for 15 minutes and then

24  we'll work until about 11:30, and then we'll break for lunch.

25  That's when the program begins next door and the lunch down on

1     the sixth floor for those who are interested.  And I'll figure

2     out when we will resume after that.

3               Go ahead, please.  You're excused.

4                    (The jury exited the courtroom.)

5          THE COURT:  Please be seated.

6               All right.  I will let you rest in front of the

7     jury, but I take it that the plaintiff rests.  Is that correct?

8          MR. WALKER:  Plaintiffs rest, Your Honor.

9          THE COURT:  All right.  You had a motion?

10         MR. CONNOR:  There is, Your Honor.

11              Mr. Davila.

12         MR. DAVILA:  Good morning, Your Honor.  We're moving

13    under Rule 50 for a direct verdict.  We're just going to orally

14    identify the grounds; and if there are any follow-up questions

15    or any briefing that you would like, we would like the Court

16    to --

17         THE COURT:  All right.  Thank you.

18         MR. DAVILA:  The first ground is that plaintiffs'

19    case-in-chief, there was no nexus identified between the

20    alleged secrecy of the asserted trade secrets and the

21    independent economic value that is required under the statute.

22              The second is that there's no legally sufficient

23    evidence of any damages sounded in restitution.

24              Third is that there's no legally sufficient

25    evidence of the originally asserted trade secrets Number 1, 3,

1    4, 5, 9, 13 and 14.  There was no testimony regarding the

2    requisite normalization, the requisite filtering, the requisite

3    linking of data retrievable as a single time series, the

4    requisite specific proprietary calculation method for power

5    flow, the requisite inversion of matrices of branch reactance,

6    the requisite systematic solving for power flow, the requisite

7    specific combinations of specific techniques regarding

8    particular amounts of actual historic transmission line outage,

9    causation of flows, and other such.  Those are under the

10   umbrella of asserted Trade Secret 15.

11         MR. CONNOR:  Mr. Kelley is still in the courtroom.  We

12   do --

13         THE COURT:  He's going to be re-called.  He needs to

14   step outside.

15         MR. WALKER:  Okay.

16         THE COURT:  Thank you.  Give him a minute.

17            (Brief pause in the proceedings.)

18         THE COURT:  All right.

19         MR. DAVILA:  So resuming the combinations, techniques,

20   particularized amounts, the actual historic transmission line

21   outages and as the cause flow and also the other amounts that

22   are recited in plaintiffs' asserted Trade Secret 15 with

23   respect to historic power generation data and historic power

24   demand data.

25            The next ground is that there's no legally

1   sufficient evidence of the secrecy of any asserted proprietary

2   interest and the secrecy of the look and feel of the software

3   because the overwhelming weight of the evidence demonstrates

4   that this was knowingly published on the big map network

5   website.  Those goes to the original trade secrets 2 and 10 and

6   any bucketization that was claimed as a proprietary interest in

7   the look and feel of the website.

8            The next ground is that there was no

9   apportionment in the damages evidence with respect to any of

10  the individual trade secrets, no proportion in evidence, no

11  legally sufficient evidence of damages because of the failure

12  to apportion with respect to individualized trade secrets,

13  individualized portions of the functionality of the Panorama

14  website and the apportionment analysis was not there.

15           The next ground is that there is no factual issue

16  that the MISO data and the alleged trade secrets that assert

17  any proprietary interest in derivation of MISO data, all of the

18  evidence in the case-in-chief confirm that any underlying

19  factual issues with respect to the MISO contract and Saracen's

20  obligations under it and the ownership of those derivations,

21  there are no factual issues and we're entitled to a directed

22  verdict with respect to any trade secrets that purport to

23  assert a proprietary interest in information derived from MISO

24  data.

25           The next grounds is sounds and due process.  The

1   asserted trade secrets that should have been tried by the

2   plaintiffs should have been limited to the 15 asserted in the

3   February 1st amended preliminary identification of the asserted

4   trade secret subject matter.  Because the contentions were

5   shifting, have continued to be shifting, we assert that

6   defendants did not have adequate notice and as a consequence of

7   that, they had suffered irreparable injury in connection with

8   their right to prepare a defense and marshall their evidence.

9   So we want to preserve that.

10           Insights and trade secrets.  To the extent that

11   they would be held to those, we assert that they did not put on

12   legally sufficient evidence, that the insights in and of

13   themselves have the requisite independent economic value.  We

14   also believe that the plaintiffs did not put on legally

15   sufficient evidence in their case-in-chief, that the insights

16   were in and of themselves secret as the statute requires.  And

17   we also contend that in plaintiffs' case-in-chief, any asserted

18   trade secret subject matter wherein the end user is the one who

19   actually performs the allegedly trade secret functionality, the

20   configuring the windows and anything like that, is not eligible

21   subject matter for trade secret and also lacks the requisite

22   secrecy under the statute.

23           To the extent plaintiffs would contend that

24   trading strategies in and of themselves are the proprietary

25   subject matter that are the subject of this case, they do not

1    adduce legally sufficient evidence that any trading strategies

2    were misappropriated by defendants or that any trading

3    strategies were disclosed by defendants.

4              We also contend that to the extent plaintiffs are

5    asserting proprietary rights in functional or ornamental

6    attributes of the VisualNode 2016 software, that functionality

7    and ornamental features are not information and are therefore

8    not eligible subject matter under the Defend Trade Secret Acts.

9              We also reassert the grounds that were raised in

10   our previous summary judgment motion that Trade Secrets 1, 2,

11   3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14 --

12             THE COURT:  Of the prior version?

13             MR. DAVILA:  Yes, that's correct.

14             -- that those are all generally known and are

15   readily ascertainable to those in the industry.  And now that

16   plaintiffs have rested their case-in-chief, they do not have

17   legally sufficient evidence with respect to those 14 subject

18   matters and whether they were generally known or readily

19   ascertainable.  It was their burden to establish that they were

20   not and they did not meet that.

21             We also reassert the vagueness grounds raised in

22   the motion for summary judgment with respect to all of the

23   asserted trade secrets.  We also reassert the one-year

24   limitation on the noncompete that was raised in the motion for

25   summary judgment.  Plaintiffs did not adduce legally sufficient

1    evidence to establish that Mr. Ross's contractual obligations

2    extended beyond that one year or that plaintiffs are permitted

3    to bootstrap a right that they expressly did not elect to

4    assert through a functional trade secret misappropriation

5    theory.

6              We also assert that now that plaintiffs'

7    case-in-chief has rested, there is no legally sufficient

8    evidence that the plaintiffs sustained any nonspeculative

9    injury and as a result, plaintiffs lack standing because they

10   have not sustained a cognizable injury.

11             MR. CONNOR:  And one last one, Your Honor.

12             THE COURT:  All right.

13             MR. CONNOR:  Mr. Schoettelkotte yesterday testified

14   that the basis for damages sounding in restitution for the

15   breach of contract claim were based upon the confidential

16   information being the trade secret information.  To the extent

17   the plaintiff seeks damages overlapping and a double recovery,

18   we believe that that is improper and that directed verdict is

19   appropriate as to the damages theory introduced by

20   Mr. Schoettelkotte and the plaintiffs.

21             THE COURT:  All right.

22             Okay.  Response?

23             MR. WALKER:  We stand opposed.  If you would like any

24   briefing on any point or any argument on any point, we're

25   willing to provide.

1          THE COURT:  Is there any specific point you want to

2     make on the record at this point?  I'm happy to hear it.

3          MR. WALKER:  Generally we put on sufficient evidence of

4     the trade secrets, the ownership of them, the fact that they're

5     not generally known or readily ascertainable by comparison to

6     what's known in the marketplace.  And we have established that

7     there was damages, both damages that we cannot quantify as well

8     as damages that we can quantify, that are available under the

9     statute for misappropriation of trade secrets.  We established

10    the existence of a contractual obligation related to

11    confidentiality and the breach of it and the resulting damages

12    from that under contractual law.

13         THE COURT:  All right.  I believe that there is

14    sufficient competent evidence in the record that raises a

15    triable issue as to the existence of the trade secret, the

16    misappropriation, the statutory and contractual and damages.

17              So I'm going to deny your motion.

18              I am concerned that in framing the damages

19    submission to the jury, that we not open the door to double

20    counting or double reward; and we will need to give particular

21    attention to whether we should even separate damages for

22    misappropriation under the statute from damages from breach of

23    the policy because they are the same damages.  And I am worried

24    about separating those, giving two bites of the damages apple

25    as opposed to defining what elements of damage the jury may

1    consider in reaching a number.

2              I need you guys to be thinking about that as we

3    work on the charge.  I'm inclined to think it's a one-damages

4    question.

5              Is there misappropriation?  Was it -- well,

6    first, are these secret?  Were they misappropriated?  Was it

7    willful as to any of them?  Was the policy breached?  Was that

8    waived?  Damages?

9              Basically how the flow would go, one damages

10   question.

11             So that's tentative thinking, obviously subject

12   to change.

13             So it is now 10:30.  In about five minutes, let's

14   resume with the jury.

15             And who is your first witness?

16             You will rest in front of the jury?

17        MR. CONNOR:  Mr. Kevin Kelley, Your Honor.

18        THE COURT:  All right.  And is he here?

19        MR. CONNOR:  Yes, he is.

20        MR. WALKER:  May we address the issue about

21   Mr. Neil Kelley and the ability to recall him?

22        THE COURT:  Does he live in Austin.

23        MR. WALKER:  He lives here in town.

24        THE COURT:  All right.  So I don't think we need to

25   decide that now.  I'm not going to release him from the Rule,

1    but I'm not making any ruling on whether he will or will not be

2    allowed to be recalled depending on where we are with other

3    witnesses.

4         MR. CONNOR:  If it's an accomodation issue, we will

5    make sure that we give you plenty of lead time if we intend to

6    call him back.

7         THE COURT:  All right.  Do you want to bring in

8    Mr. Kelley, take five minutes; and then we will get started?

9         MR. CONNOR:  Yes, Your Honor.

10        THE COURT:  And we will break right at 11:30.

11        MR. CONNOR:  At 11:30?

12        THE COURT:  Yes, sir.

13                      (Court is in recess.)

14        THE COURT:  All right.  Are we ready for the jury?

15              (Brief pause in the proceedings.)

16        THE COURT:  Is Mr. Kelley here?

17        MS. LEE:  Yes.

18        THE COURT:  All right.  Come forward, please, sir.

19             Can you get the jury lined up?

20             If you can, just pause right there, please.

21        MR. CONNOR:  Plaintiffs call Mr. Kevin Kelley.

22        THE COURT:  Do you want to wait for the jury to come in

23   and for Mr. Walker to rest in front of the jury on behalf of

24   Saracen?

25        THE LAW CLERK:  All rise for the jury.

1          (The jury entered the courtroom.)

2          THE COURT:  Please be seated, ladies and gentlemen.

3              Mr. Walker?

4          MR. WALKER:  The plaintiffs rest, Your Honor.

5          THE COURT:  All right.  Very good.

6              Ladies and gentlemen, it is now the opportunity

7    of Mr. Ross and Marginal Unit to present their evidence and

8    witnesses.  That does not mean that they have the burden of

9    proof on any issue except as instructed, and I will give you

10   those instructions in writing at the end of the case.

11             You may proceed with your first witness.

12         MR. CONNOR:  Thank you, Your Honor.  The defendants,

13   Mr. Ross and Marginal Unit, call Mr. Kevin Kelley.

14         THE COURT:  All right.  Mr. Kelley, please come

15   forward.  Raise your right hand to be sworn.

16                 (The oath was administered.)

17         THE COURT:  Take the witness stand, keep your voice up

18   and speak directly and closely into the mic.  It doesn't pick

19   up from a distance.

20         THE WITNESS:  Thank you.

21                     **KEVIN KELLEY**,

22   having been first duly sworn, testified as follows:

23                   **DIRECT EXAMINATION**

24   **BY MR. CONNOR:**

25   Q.   Good morning, Mr. Kelley.

1    A.    Good morning.

2    Q.    I think the jury has heard a lot about you, but just so

3    it's clear, would you identify yourself and tell us who you

4    are.

5    A.    Kevin Kelley.  I am CEO of Roscommon Analytics, which is a

6    power trading firm in Houston and we work in Australia.

7    Q.    Now, your brother, Mr. Neil Kelley, just finished

8    testifying.

9    A.    Correct.

10   Q.    And on the break I happened to see the two of you in the

11   hallway talking.

12   A.    Yes.

13   Q.    Until that moment, when was the last time you and your

14   brother spoke?

15   A.    It would have been spring of 2015.

16   Q.    That was five years ago?

17   A.    Yes.

18   Q.    And when you -- that was when you left Saracen?

19   A.    I left Saracen early January 2015.

20   Q.    And what was your position at Saracen when you left?

21   A.    I'm sorry?

22   Q.    What was your position?

23   A.    I was president at Saracen.

24   Q.    Okay.  And you started at Saracen in 2008?

25   A.    Correct.

1    Q.    Tell us what you did during that time.  If you could, just

2    step through the timeline briefly.

3    A.    Sure.  Christmas of 2007 I was on a ski strip with Neil

4    and our families, which we did every year.  At that point

5    Saracen was a 1.7-billion-dollar hedge fund trading all North

6    American energy commodities.

7            THE COURT:  Louder and slower.

8    A.     It was 1.7-billion-dollar hedge fund trading all North

9    American energy commodities.  Power, natural gas, coal, crude

10   oil, gasoline, et cetera; and Neil wanted to start a private

11   equity strategy, which was my background, i.e., let's buy

12   businesses and assets that are in the energy space that they

13   could improve by their trading capabilities or alternatively

14   buying assets that would make them better traders; so I agreed

15   to join.

16         By the time I got there, it was maybe early March of 2008,

17   Saracen lost $540 million on a natural gas trade that went

18   wrong and the private equity strategy went by the wayside.  In

19   2008 I really was there helping with crisis management.  You

20   know, how do we keep investors around?  How do we keep the

21   employees that we want?  How do we downsize?  What do we do

22   about our strategy?  And really the business got back to making

23   money later that year and then the financial crisis happened

24   and they had a lot of redemption requests as a result of the

25   financial crisis, not necessarily as a result of Saracen's

1   performance.

2       So entering 2009 -- and really my role had just been

3   whatever was needed in terms of analytics and thoughts and

4   strategies, et cetera, on how to keep the company best moving

5   forward.  So in 2009 we were looking at being a 5- or

6   600-million-dollar fund, if I recall correctly.  There was a

7   decision to carve out the FTR business and fund that

8   separately.  Neil made that decision.  He went to John Arnold

9   at Centaurus, a big natural gas and power trader; and that

10  business was separated from the hedge fund starting April 1,

11  2009.

12      Additionally through that time period in early 2009,

13  Mike Kutsch, who was a cofounder of Saracen with Neil, was CFO,

14  decided to retire; and on Mike's retirement I was promoted to

15  CFO.

16  Q.   Then what happened?

17  A.   Then in June of 2009 Neil was in a car accident and

18  suffered a traumatic brain injury and he was in a coma for a

19  while and he was in the hospital for months and then a long

20  time doing rehab.

21      Immediately post the car accident when he was in a coma, I

22  basically came back and stepped in to keep the company going

23  and managed the company to the best of my abilities.

24  Q.   What happened --

25  A.   When Neil was --

1    Q.    Go ahead, yes.  Talk about what you were just going to

2    say.  Talk about Mr. Neil Kelley post-accident and your role at

3    Saracen.

4    A.    Sure.  So post-accident, Neil was really focused on his

5    recovery, as he should have been; and really his rehab was a

6    full-time job for him.

7         Relative to his prospects at the time of the accident,

8    according to what the doctors told us, he's had a remarkable

9    recovery.

10        When Neil was able, I would keep him regularly informed on

11   what was going on in the business, which was probably several

12   months after the accident.  And sometime in that time frame he

13   gave me the title of president, and we developed a working

14   relationship where I ran the business day-to-day.  I tried to

15   keep him informed and involved on major decisions while he was

16   busy, focused on his recovery.

17        We kept the hedge fund going until I think about the fall

18   of 2009.  Maybe another year later, when it was clear that Neil

19   was not going to recover back to where he was before the

20   accident and still needed to focus on his recovery, so we

21   closed the hedge fund down and continued to manage the FTR

22   business.

23   Q.    So you were running the Saracen energy trading business at

24   this point and you were president?

25   A.    Correct, yes.

1  Q.    And between this time and 2013, how did you grow the

2  company?

3  A.    Well, 2009 through 2012 we were funded by Centaurus and

4  the marching orders I had from Centaurus was don't change a

5  thing, just keep making money, just keep turning the crank.

6  And it was about a hundred million dollars in capital, and I

7  think we were averaging $40 million a year in profits.  We

8  had --

9  Q.    How many traders?

10  A.    I think we had three traders and two analysts.  It might

11  have been four traders and two analysts at the end of it.

12  Q.    So how many total employees at that time?

13  A.    I think there were about ten people in support positions,

14  i.e., back office, finance, accounting, HR, legal, et cetera.

15  So it was 16, 18 people.

16      Summer of 2012 Centaurus decided to shut their hedge fund

17  down and we needed a new -- and decided not to continue funding

18  the Saracen trading business.  So we needed a new source of

19  capital.  I got the Mackenzie Investment office to step in to

20  Centaurus' shoes at that point.

21  Q.    That's Mr. Arthur White?

22  A.    Correct.

23  Q.    So you had a relationship with Mr. Arthur White; and MIO,

24  Mackenzie Investment Office, invests the trading capital for

25  Saracen to continue its business?

1    A.    Correct.

2    Q.    And how much was that?

3    A.    Well, they stepped into Centaurus' shoes; and about a

4    hundred million dollars on average.  We could flex it up to

5    200, but we really hadn't done that.

6    Q.    Were they pleased with the results that Saracen was

7    yielding?

8    A.    Yeah, very pleased.  I mean, it's a great, great business.

9          And then post-2012, as Mackenzie -- post-summer of 2012,

10   really fall of 2012, I was challenged by Mackenzie.  You guys

11   are real good at this business.  How do you grow it?

12         So I went back to them with a growth strategy that we then

13   executed on it.  It really involved diversifying

14   geographically, getting a little deeper into some of the key

15   markets and also trading other products and FTRs that really

16   are valued based upon congestion on the grid.

17         So from 2012 to 2014, end of 2014, the capital outstanding

18   grew from about a hundred million on average to 300 million on

19   average and --

20   Q.    What about your office?

21   A.    2014, I think profits were about 120 million.  It was a

22   great year for business.

23   Q.    Best year ever?

24   A.    Best year ever because of the polar vortex.

25   Q.    So that was 2014?

1    A.    Correct.

2         And also grew front office, meaning traders and analysts,

3    from 6 people to 18 people so we really hired 12 new people for

4    front office.

5    Q.    And at the time -- let's go to January 2015.  26 people

6    working at Saracen?

7    A.    I think maybe a little more than that.  28 maybe.

8    Q.    And how many of those had been there when you started and

9    how many had you hired?

10   A.    I think 14 or 15 had been there when I got there; and the

11   balance, 12 people, I hired.

12   Q.    Okay.  And you grew -- so you grew the company

13   substantially --

14   A.    Correct.

15   Q.    -- during that time?

16        Your brother let you go?

17   A.    He did.

18   Q.    Tell us about that.

19   A.    In -- you know, we certainly through 2014 had had

20   discussions about what my value added was worth, because I

21   didn't own any of the company and my compensation was entirely

22   at his discretion.

23   Q.    Let me stop you there for a second.

24        What do you mean your compensation was entirely at his

25   discretion?

1    A.   Meaning there was no formula, there was no percentage of

2    profits, there was no ownership.  It was what Neil wanted to

3    pay me.

4    Q.   So all of those years you had been working at Saracen you

5    didn't know how much money you would make?

6    A.   That's correct.

7    Q.   So what happens in 2014 when you had that discussion?

8    A.   You know, we certainly -- through 2014 we had an ongoing

9    discussion and hadn't reached resolution as of the end of 2014.

10    In 2015 I -- in early 2015 I come back from Christmas

11    vacation and meet with Neil on I think my first day back when

12    he tells me I'm no longer going to work for Saracen.

13    Q.   Did he tell you why?

14    A.   He did.  You know, Mark Wilken, who was our best FTR

15    trader, had resigned in September of 2014, which I think was a

16    surprise to everybody, including me.

17    And what Neil told me was after Mark's resignation he went

18    around and he spoke with every person that Neil hired -- I

19    think about 12 of the people at Saracen, 14 of the people, and

20    just to aussage them of Mark's departure.

21    Q.   So he told you that he spoke with the people that he had

22    hired?

23    A.   Correct.

24    Q.   He didn't tell you that he spoke with everybody?

25    A.   He did not, no.

1    Q.    Okay.

2    A.    And he told me that in these conversations with everybody

3    that Neil hired, every conversation led to my role in the

4    company and that not a single person that Neil hired supported

5    me being at Saracen and that, hence, Neil had no choice but to

6    let me go.  He didn't make the decision.  Everybody that Neil

7    hired made the decision.

8    Q.    What did you think was the real reason?

9    A.    Well, you know, I believe in every situation there's my

10   reality and the other person's reality.  I don't know what

11   Neil's reality is.  My reality was I was let go because we

12   couldn't agree on compensation.

13   Q.    I want to ask you a question just to get a sense of what

14   this was like.

15        Could you tell us about that night after your brother let

16   you go what you did?

17   A.    Well, it certainly was a shock to me and a disappointment.

18   At that point I was 58 years old.  I had spent the last eight

19   years commuting from Columbus, Ohio, to Houston, Texas,

20   Columbus, where my family lived, a great sacrifice with kids in

21   high school, missing their sports games and seeing them at

22   night and really I just, you know, kind of did the right thing

23   stepping in after Neil's car accident to do everything I could

24   for my brother.

25        So I was there at 58 years old, unemployed, needing a job.

1    I still had to work and it was a pretty daunting task because

2    at that point I had spent 25 years working in private equity

3    and eight years working in a hedge fund environment and my main

4    skill set of being a private equity person was now eight years

5    dated and I only had eight years' experience in hedge funds.

6    So finding a job was -- the task was a daunting consideration.

7    Q.    And this termination when your brother fired you, that was

8    abrupt, would you say?

9    A.    Yes.

10    Q.    What did they do in the meeting?  What did they take from

11    you in the meeting room?  What did they take from you in that

12    meeting when you were let go?

13    A.    You know, I don't recall if anything was taken in the

14    meeting.  I know that, you know, they obviously kept my laptop

15    and shut off my access to e-mail, et cetera.

16        That evening I went back to the office to clean out my

17    desk in private and get all my personal belongings out.

18    Q.    What happened?

19    A.    I had -- there's an alarm system at Saracen that I had

20    forgotten the code to that I needed to arm the system and I

21    called Jason Miller to get the code and Neil lives very close

22    to the office and five minutes later Neil was in the office

23    wondering what I was doing.

24        And I just said, hey, I'm cleaning my desk.

25    Q.    Let's talk about Mr. Ross.

1    A.    Sure.

2    Q.    You hired Mr. Ross in 2013, right?

3    A.    I did, yes.

4    Q.    Tell us why.

5    A.    I think, you know, generally in managing the Saracen power

6    trading business, it really was status quo in terms of people

7    and tools and software really up through 2012 and, you know,

8    heading into 2013.  Everybody did the same thing the same way

9    over and over and over again.  And we were shown the

10   opportunity to buy what we euphemistically called the Sergio

11   tool from Deutsche Bank.  Sergio and Frederico were a trading

12   team at Deutsche Bank trading in the FTRs that were very

13   successful and they were renowned for having developed a

14   software tool that made them efficient in trading as many

15   markets as they could and were good at it.

16        When they went to Vitol, Deutsche Bank was getting out of

17   the FTR trading business and tried to sell the Sergio tool.

18        So we had looked at it.  I think we were concerned about

19   what it was going to take to keep it running and maintained and

20   how to plug it into our database.  So we ultimately decided not

21   to buy it.

22        Having said that, we had just hired a trader from Deutsche

23   Bank, Puneet Agrawal; and Puneet had been using the Sergio

24   tool, was a big fan of it in terms of helping him be efficient

25   and he knew of Sylvain and he knew Sylvain's knowledge of the

1    Sergio tool, so he introduced us to Sylvain.

2    Q.    And did you know that Sylvain had developed VisualNode

3    2013 at that time?

4    A.    When I met with Sylvain he had an interest in being a

5    trader.  He had been busy developing VisualNode.  He really

6    didn't have a product ready for sale, but he was busy trying to

7    develop a commercial product called -- that he was calling

8    VisualNode.

9    Q.    Did he come and demo the VisualNode tool to you before you

10   hired him?

11   A.    He demoed it to Saracen.  I don't remember if I sat in on

12   the demo.

13   Q.    So you knew that Mr. Ross had worked at Deutsche Bank?

14   A.    Yes.

15   Q.    And you knew that Mr. Ross had or Mr. Agrawal -- you knew

16   that Mr. Ross had experience working with software in this

17   business?

18   A.    Correct.

19   Q.    And that he specifically had knowledge and experience

20   working on the Sergio tool at Deutsche Bank?

21   A.    Correct.

22   Q.    And that was something that as president of Saracen you

23   were thinking would be a good resource to have onboard at that

24   time?

25   A.    Yeah, correct.  I think that given the mandate from

1    Mackenzie to grow the business, it wasn't just about adding

2    people, it was also about getting our software and tools up to

3    speed with what is going on in the market.

4    Q.    Were you aware of other traders other than Deutsche Bank

5    who had developed their own in-house tools?

6    A.    Not specifically.  I'll also note that Yes Energy was

7    making great strides in offering better tools for FTR traders

8    and power traders, but not specific of other firms developing

9    their own.

10   Q.    You were the one at Saracen who negotiated the employment

11   agreement with Mr. Ross, right?

12   A.    That's correct.

13   Q.    And you were also the one who received -- who figured out

14   whether to pay Mr. Ross for his software, right?

15   A.    Yes.

16   Q.    And tell us about that.  Did you pay Mr. Ross for the

17   source code?

18   A.    We did not.

19   Q.    And did you at that time have an opinion about VisualNode

20   2013 and its capabilities?

21   A.    I don't recall specifically what I thought.  But we wanted

22   VisualNode at Saracen.  I think some of the traders,

23   particularly Puneet, was excited about it.  I think other

24   traders were more migrating towards Yes Energy.  I don't know

25   what the ultimate usage of VisualNode was in the next 18 months

1    while I was still at Saracen.

2    Q.    You're obviously not involved in this case, but you

3    understand this case is about trade secrets that Saracen claims

4    to own that are in the VisualNode software?

5    A.    Correct.

6    Q.    Okay.  Let's -- from your perspective when you were

7    president of Saracen and your experience in the business, let's

8    talk about the difference between software and trading

9    strategies.  Can you give us an overview of how traders use

10   software and what the secret sauce in this business really is?

11   A.    Sure.  I think that as a trader, there are two things that

12   traders spend in terms of analytics, two things that they spend

13   a lot of time on, understanding what has happened on the power

14   grid and using that to predict what's going to happen on the

15   power grid.  And there are many tools out there to understand

16   what has happened on the power grid, which VisualNode was very

17   good at analyzing history.

18        The way traders really make money, though, is to know

19   that, for instance, a transformer outside of Pittsburgh is

20   going to be taken out of service in the month of July and it's

21   never been taken out of service before, understanding how power

22   flows around Pittsburgh currently and then modeling how it's

23   going to flow around Pittsburgh when that transformer is taken

24   out of service, where is congestion going to occur and

25   basically figuring out how to make money on things that either

1    haven't happened before or happened a long time ago that are

2    going to happen again.  That's really --

3    Q.    Where is the valuable information in that?

4    A.    The valuable information is predicting what's going to

5    happen.

6    Q.    And is that something that the trader does in the trader's

7    mind or is that something the software tells you?

8    A.    The trader will know what they consider to be kind of key

9    constraints and outages and then there are power flow modeling

10   tools that will assist that trader in understanding the effect

11   of those outages or concerns on the power grid.

12   Q.    So the trader makes certain assumptions about what's going

13   to happen or how long a transformer, for example, is going to

14   be out of service?

15   A.    Correct.

16   Q.    And -- what do they do with those assumptions?  They feed

17   those into the software?

18   A.    They will feed it into a power flow model software.

19   Q.    And there are many of those on the market?

20   A.    There's three or four that people use.

21   Q.    Okay.  And so that feeding those assumptions, that

22   information, into the computer creates a model.

23   A.    Correct.

24   Q.    And does the model tell the traders what to do?

25   A.    I think the model will tell -- will tell the trader where

1   power prices -- will predict power prices at points on the

2   grid.  And then the trader will figure out the best way to

3   construct a portfolio of FTRs to profit from it.

4        And, you know, the easy way to understand this is if you

5   think of congestion on the power grid like congestion on the

6   streets.  And here in Houston there's three ways to get from

7   downtown to the airport.  You take 59, you take the Hardy Toll

8   Road, you can take 45.  What happens if the Hardy Toll Road

9   gets shut down?  Where does the traffic go?  Where does the

10  congestion occur?  How bad is it going to be?  How bad has it

11  been in the past?  Am I better off betting on congestion on 45

12  or 59?  Am I better off betting on congestion on the access

13  road on 45 or the access road on 59?

14       Those are the decisions that a trader makes once they know

15  that the Hardy Toll Road is going to be shut down.

16  Q.   So the traders have to take that information, synthesize

17  it, use their experience or intuition; and then they can decide

18  what to bid on at an auction?

19  A.   Correct.

20  Q.   In your view, does VisualNode contain trade secret

21  information?

22  A.   Well, I'm not terribly familiar with the VisualNode

23  product.  I know that my company, we evaluated becoming a

24  customer of VisualNode.

25  Q.   The company where you work --

1    A.    A customer -- I'm sorry -- VisualNode.  I'm sorry.  We're

2    talking VisualNode.  I don't know.

3    Q.    I think you were saying your company now --

4    A.    My understanding at the time was VisualNode was about

5    evaluating history and not about projecting.  It didn't solve

6    power flow cases going forward.  It just was a tool to evaluate

7    what had happened in the past.

8    Q.    Historical information?

9    A.    Historical information.

10   Q.    So it was a tool for analyzing the information that the

11   traders synthesized?

12   A.    Correct.

13   Q.    Now, let's do skip ahead and talk about your company now.

14   So you've got a company, a fund that trades energy.

15   A.    Correct.

16   Q.    Okay.  And you developed some tools in-house?

17   A.    We have, yes.

18   Q.    Visualization tools like the one behind you?

19   A.    Correct.

20   Q.    And do you think that -- you've also looked at

21   Marginal Unit's Panorama tool.

22   A.    We've looked at Panorama and Reflow.

23   Q.    And what did you think?

24   A.    We didn't become a customer of either.

25   Q.    And why?  Any concern?

1    A.    Reflow, we -- at the time that we were looking at it, it
2    just wasn't a product that was ready for us.  The main thing
3    that we got started in late 2016 was getting all the historical
4    data that exists so that we can then be ready to start
5    investing in FTRs in 2017.  And Reflow just didn't have the
6    data that we needed.  We talked to Sylvain about getting the
7    data, having him write some tools for us to get the data; but
8    he wasn't interested in writing specific tools for us and we
9    weren't comfortable with where the data was in Reflow.  So we
10   went a different direction.
11         Then I think later in 2017, maybe even 2018 -- I don't
12   recall -- we demoed Panorama and we had been developing our own
13   internal mapping software that I think was -- we didn't see any
14   real advantage to becoming a Panorama customer relative to the
15   in-house capabilities that we had.
16   Q.    So your employees built software that essentially does
17   what Panorama does?
18   A.    Correct.  My understanding is, yes, we have our own
19   mapping software.
20   Q.    And how many employees do you have doing that work?
21   A.    Two.
22   Q.    How long did it take them?
23   A.    On and off, 18 months.
24   Q.    And now, you have a functioning software platform at your
25   company to analyze congestion?

1    A.    Well, yeah; and that's just a piece of the tools that we

2    have.

3    Q.    You've developed other tools?

4    A.    Yeah, we've got hundreds of thousands of lines of code of

5    tools in our software repository of which mapping software is a

6    small fraction.

7    Q.    In trading, do you think that the software is the secret

8    sauce?

9    A.    Oh, no.

10    Q.    What's the secret sauce?

11    A.    The secret sauce is the traders.  I know that you have

12    heard from Mark Wilken earlier in this trial.

13    Q.    He worked for you?

14    A.    He worked for me.  Absolutely the best FTR trader ever,

15    and it's in his brain.  He knows how to make money and he

16    knows -- he has just an innate sense of where congestion is

17    going to be and how to buy it and how to profit from it.

18        It's very much a business of key traders understanding the

19    market and how to make money.

20    Q.    Mr. Kelley, you came here today to testify on your own?

21    A.    Correct.

22    Q.    You're not under a subpoena or anything like that?

23    A.    Correct.

24    Q.    Tell us why would you do that?  Why did you come here on

25    your own?  You paid your own way?

1    A.    Yes.

2    Q.    You came down from New York?

3    A.    Yes.

4    Q.    Why?  Why did you come here to testify?

5    A.    I've always had a very good relationship with Sylvain.  He

6    was a difficult employee at Saracen, but a very talented

7    person.  And I think a lot of his difficulties had to do with

8    figuring out how to work for Jason Miller, who is, I think, an

9    extremely difficult person.

10        And Sylvain and I just maintained a good relationship ever

11   since.  When I started my company, I reached out to him and

12   said, hey, what are you doing?  We have money.  You need money.

13   What can we buy from you?  It ultimately didn't result in

14   anything that he had that we wanted to buy.

15        And I also felt a -- some sense of responsibility here

16   because my understanding from Sylvain was when we were looking

17   at buying Panorama from him or becoming a customer of Panorama,

18   he reached out to Saracen and said that was it okay that he

19   brought me on as a customer.  And it was after that that

20   Saracen filed the lawsuit against him.

21        So I felt -- and I don't know what the reasons were, but I

22   just felt that I may have been partially responsible for this

23   trial occurring.  And Sylvain called and asked if I would

24   testify and I said, well, I'm not sure if I can be helpful;

25   but, of course, I'm happy to come and spend the morning

1    testifying for you.

2              MR. CONNOR:  Thank you, Mr. Kelley.

3                    I pass the witness.

4              THE COURT:  Cross?

5                         **CROSS-EXAMINATION**

6    **BY MR. WALKER:**

7    Q.    Mr. Kelley, I'm Charles Walker.  We haven't had the

8    opportunity to meet other than seeing each other in the

9    hallway?

10   A.    Sure.

11   Q.    While you were at Saracen, you helped manage the traders

12   in your position as president, correct?

13   A.    Correct.

14   Q.    Did you actually make trades on FTRs?

15   A.    Not a one.

16   Q.    Were you a user of VisualNode?

17   A.    I was not.

18   Q.    In your current company, do you actually trade FTRs?

19   A.    I do not.

20   Q.    Do you use the internal tools that your company has

21   developed?

22   A.    I do not.

23   Q.    Those tools that have been developed by your company, do

24   you use them internally?

25   A.    Yes.

1   Q.   Do you allow people outside the company to use those

2   tools?

3   A.   We do not.

4   Q.   Do you consider those tools to be proprietary to your

5   company?

6   A.   Yes.

7   Q.   Do you consider them to be part of your confidential

8   information?

9   A.   Yes.

10          MR. WALKER:  Thank you.  That's all the questions I

11   have.

12          MR. CONNOR:  No further questions, Your Honor.

13          THE COURT:  All right.  And may this Mr. Kelley be

14   excused?  Any objection?

15          MR. WALKER:  Yes.

16          MR. CONNOR:  Yes.

17          THE COURT:  You're free to leave, sir.  Thank you.

18              Your next witness?

19          MR. CONNOR:  The plaintiffs call Dr. Sham Siddiqi.

20          THE COURT:  All right.

21          MR. CONNOR:  Just one moment.  We're going to set up a

22   laptop.

23          THE COURT:  That's fine.

24              While this is being set up, ladies and gentlemen,

25   if you want to stand up and stretch, that's just fine.

1           (Brief pause in the proceedings.)

2    BY MS. LEE:

3    Q.   Good morning, Dr. Siddiqi.  Did I get that right?

4    A.   Yes.

5           THE COURT:  I need to swear the witness.

6           MS. LEE:  Sorry, Your Honor.

7           THE COURT:  Please stand and raise your right hand.

8              (The oath was administered.)

9           THE COURT:  Please be seated, speak directly and

10   closely into the mic.  It doesn't pick up from a distance.

11          THE WITNESS:  Okay.  Thank you.

12                        SHAMS SIDDIQI,

13   having been first duly sworn, testified as follows:

14                      DIRECT EXAMINATION

15   BY MS. LEE:

16   Q.   Can you tell the jury a little bit about yourself?

17   A.   Yeah.  My name is Shams Siddiqi.  I'm the president of

18   Crescent Bar, Inc.  It's a consulting firm in Austin, Texas.

19          THE COURT:  Slower, please, sir, and more directly into

20   the mic.

21          THE WITNESS:  Okay.

22   A.   So I'm the president of Crescent Bar, Inc., an energy

23   consulting firm in Austin, Texas.

24         We specialize in the ERCOT market, which is the Texas

25   market.  Actually we helped design the ERCOT market, which is

1    the rules by which the market operates, so specifically the

2    day-ahead market, the congestion and other mitigation and

3    provisions of the market.

4         So we actually helped design the market, so we're very

5    familiar with how these markets work.

6         We also help clients with, you know, doing congestion

7    analysis; and that requires tools like PowerWorld, which I will

8    show in a bit.  And we do also serve consulting services for

9    clients.

10   BY MS. LEE:

11   Q.    So I think you said your company is Crescent Power.

12   A.    Yes, Crescent Power.

13   Q.    And what market do you focus on?

14   A.    On the Texas market, which is called Texas Reliability

15   Council of Texas.

16   Q.    We've heard that called ERCOT, more accurately?

17   A.    Yes.

18   Q.    Can you tell us a little bit about your educational

19   background?

20   A.    Yes.  I have a bachelor's of engineering -- electrical

21   engineering.

22         THE COURT:  Excuse me.  Slower.

23   A.    And I did my master's and Ph.D. from The University of

24   Texas at Austin.  And both of those are in electrical

25   engineering as well.

1   Q.    And where was your undergrad degree from?  I don't think

2   we have it here on the record.

3   A.    Bangladesh University of Engineering & Technology.

4   Q.    You talked when you first started about the rules of the

5   market.  Can you tell the jury a little bit about the rules of

6   the ERCOT market?

7   A.    Yes.  So the ERCOT market is a deregulated market in the

8   sense that it's more like a market that you're familiar with

9   where people buy and sell electricity.

10        Before deregulation in 1999, it was a regulated market in

11   the sense that you really didn't have a choice of who you would

12   buy your power from.  It's your local provider that would

13   provide you the power, and essentially the government would

14   regulate how much they could charge you for power.  With

15   deregulation, as you probably know if you're from Houston, you

16   have a choice of who you can you buy your energy from.  You

17   have all these ads and stuff.  You have the Reliant, you have,

18   you know, all different energy, all these different energy

19   companies that are trying to provide you energy.

20        So those are all the load serving entities or retail

21   electric providers.  And in the market, you have a generation

22   segment and a transmission segment.  The transmission is still

23   regulated.  The generation produces the power and these retail

24   electric providers provide the power on the generators and sell

25   them to you.

1   Q.   And what have you been asked to do in this case?

2   A.   I was asked to analyze and sort of compare the output of

3   PowerWorld and Panorama for six different features of those

4   tools.  So I looked into -- I created those analyses and

5   provided that feedback.

6   Q.   Are you being paid for your time?

7   A.   Yes, I am.

8   Q.   Okay.  So let's talk a little bit about PowerWorld and

9   Panorama.

10       So we've heard a little bit about PowerWorld throughout

11  this trial, but can you just real quickly tell us what it is?

12  A.   PowerWorld is a load flow analysis tool.  It's a very

13  powerful tool actually.  I hope to be able to demo it.  You can

14  see that it has all the functionality, pretty much similar

15  functionality as Panorama.  And I think it has even more

16  flexibility in doing things when you're doing load flow

17  analysis.  And load flow was what was previously referred to

18  when you're looking at congestion and when you're looking at

19  where bottlenecks are going to be on the system.  You do this

20  load flow analysis.

21  Q.   And do you trade power?

22  A.   No, I don't.

23  Q.   So let's take a look at PowerWorld.  Do you have it

24  available on your computer?

25  A.   Yes, I do.

1    Q.    So let's open it up.

2    A.    So this is the first thing you get when you open up

3    PowerWorld.  And that's very simple.  Like in this case, we

4    were talking about the MISO state estimator cases.  So what you

5    do is you open that file.  You go to -- that's directly what

6    you would get.  This file is directly what you would get from

7    MISO.  So I just open that up and it opens up in PowerWorld and

8    will display all the information that's available in that file

9    the same way that Panorama does.

10   Q.    Can you give us the -- what information now are you

11   looking on the screen?

12   A.    So this is the information regarding buses.  So you will

13   see, like, on this side, buses is the first one by default

14   that's selected.  So a bus is a substation, a substation where

15   there's either load connected or generation connected to that

16   substation.  So this will give you the number, the bus number,

17   the name of the bus, the area that it's in, the voltage level

18   and so on and the load on the bus and generation and stuff like

19   that.  So this gives you all the information related to the

20   bus.

21        Similarly, you have branch information, which is all the

22   transmission information so that you know how the transmission

23   line is connected from which bus to which about bus and from

24   which bus number to which bus number and what is the

25   characteristics of that line and its load-carrying capability

1    and how many megawatts can flow over the line.

2    Q.    So under network, that's a series of tabs with folders.

3    Is that what you're referring to with the branches and the

4    buses --

5    A.    Yes.

6    Q.    -- and the generators?

7    A.    So this doesn't have the generation information.  It just

8    has the buses, the from bus, the to bus.  Each transmission

9    line or transformer connects two buses or two substations.  So

10   this gives you the information of the transmission line that

11   connects those two substations.

12   Q.    Where does this data come from?

13   A.    This is coming from MISO.

14   Q.    And MISO -- we've heard that is called the Midwest or

15   Midcontinent grid.  Is that your understanding as well?

16   A.    Yes.

17   Q.    And do -- is the MISO data shared by MISO with industry

18   participants?

19   A.    Yes.

20   Q.    How does that work?

21   A.    So you have to sign an agreement with MISO to keep this

22   information restricted.  And then once you sign that agreement,

23   they provide you this.  And when you're approved, you're

24   provided this information.

25   Q.    Okay.  So let's continue in PowerWorld.  What would be the

1    next thing that you would do?

2    A.    So, you know, if -- so if you want to see all the

3    information the same way that Panorama is displaying it, you

4    can look at all the different loads, load levels.  You can see

5    the loads are displayed.  This display -- you know, I didn't

6    have to do anything to the software.  These are the default

7    displays, and typically it has all the information that you

8    would need in order to understand what's going on.

9         And then it has really cool, you know, graphical features

10   as well.  So if you want to draw a map of what the system looks

11   like and what the flows look like, you would just go into the

12   file and you would open a new oneline.  Since this is a raw

13   file from a very basic -- something that I've just incorporated

14   for MISO, it doesn't come with the oneline to create it.  So in

15   order to create the oneline, you basically have to sort of

16   first of all import a map, which has all the borders.  So I'll

17   give it -- like, select all and I will give it the county

18   boundaries instead of just states and I can just import in the

19   map of the U.S.

20        So this has the map without all the buses and transmission

21   lines in it yet.  In order to add the transmission lines, you

22   have to say, okay, let me import all the buses.

23        So for the buses you have to give it the geographic

24   location of the buses, so there's a file that has longitude and

25   latitude of each bus on the system.  So I will just import that

1    into this case and this is -- when I select this, you

2    automatically draw the transmission lines.  I'm just giving it

3    the information about the substations; and by checking this I'm

4    saying that, okay, draw the lines in between.  Draw the

5    transmission lines in between those substations based on

6    information in the model.

7          So with that it will take just a couple of seconds, and it

8    will pull up the whole map.

9          So now that was -- at the bottom -- it's a big system so

10    you're seeing a lot of lines in there; but I can zoom in, too,

11    and say, okay, find an object in this line.

12          Let's say we want to find a particular bus.  So we find

13    that bus and it will zoom in on that bus, on that particular

14    bus so you can look at what's happening around that bus.  And

15    if you want to see which way the powers are flowing, you just

16    put it on run mode and it will show you the direction of the

17    flows, of the load flows.  So this shows you which way the

18    power is flowing, and these circles show you how congested it

19    is.  So if it's fully filled up.  That means it's fully

20    congested and binding.  That means there is price of moving

21    power on that line.  That's what FTR traders are looking for,

22    how close is it to binding or is it binding.

23    Q.    And so the arrows show what?

24    A.    The direction of the flow of power.

25    Q.    So PowerWorld is able to show the direction of the flow of

1    power?

2    A.    That's correct.

3    Q.    Are you able to zoom in and zoom out?

4    A.    Yes, it's very easy to zoom in and zoom out in this tool.

5    See, you can look at the whole system or parts of the system;

6    and it has all the information in there.

7    Q.    And what do the lines represent on the map?

8    A.    Those are the transmission lines.

9    Q.    And are those mapped to where they actually are in the

10   United States?

11   A.    Roughly, yes.

12   Q.    Is this a way to visualize power flow?

13   A.    Yes.

14   Q.    How long has PowerWorld been around?

15   A.    I know that people have been using it -- it's one of the

16   more popular load flow tools.  I don't know the exact date it

17   was started.

18   Q.    What's the next step in looking at power on PowerWorld?

19   A.    So apart from this, I mean, you can look into -- it has

20   really nice features where you can look into each transmission

21   line or generation system just by clicking on it and saying,

22   okay, what is the line information?

23        Like, it will tell you what the flows are, you know, and

24   what the ratings of the lines are, the same thing you can do

25   with the generation.  It will tell you how much each one is

1    generating in that case.  And so it has a lot of details in

2    here, but this is the -- there are also, you know -- you can

3    have a lot of tools to do the same sort of analysis that

4    Panorama does.  I don't know if you want me to go through those

5    analyses, but this can get you what's called the PTDFs, the

6    power transfer distribution factors, the generation shift

7    factors and so on.

8    Q.    All right, Mr. Siddiqi.  Let's take that one-by-one and

9    slow down a little bit, because it's a lot of acronyms.

10         So you said, PTDF.  What is that?

11   A.    So that is a good tool that we look at.  So what that

12   tells you is if I move power from one location to another, how

13   much of that power will flow through each line.

14         Let me give you a simple example, if I have time.

15   Q.    Yes.

16   A.    So if you have -- let's say it's a very simple system.

17   You just have two buses, two substations, one has a generator

18   the other has load and you have two parallel lines that connect

19   these two substations and they're identical lines.  So what

20   happens?  When you put in power, 1 megawatt of power by the

21   generator, and you take out 1 megawatt at the load, that power

22   flows through those lines and the physics dictate how they flow

23   through the lines.

24         So if it's identical lines, equal amounts of power flow

25   through both lines.  So that means half of the power will go to

1    one line and half to another.

2         So what these PTDFs or shift factors will tell you how

3    much -- what percentage flows through each line.  So in this

4    case or this simple example it's 0.5 and 0.5, because half of

5    the power goes to one line and the other half to the other

6    line.  So the shift factor basically would just be shift factor

7    of 0.5, which means half of the power is flowing through that

8    line.

9              THE COURT:  Slower.

10             COURT REPORTER:  Would you please repeat.

11   A.   Oh, yeah.  So each line would have a shift factor of 0.5

12   because it flows 50 percent, or 0.5 of each megawatt that's

13   injected at the injection bus.

14   BY MS. LEE:

15   Q.   We've heard a lot about shift factors, but can you very

16   briefly define what a shift factor is?

17   A.   So the shift factor is -- essentially there's just two

18   concepts -- the concepts are very similar -- of power

19   transmission and distribution factors and shift factors.

20        Shift factors just say, okay, if I inject 1 megawatt, how

21   much goes to each line?

22        And typically the withdrawal point is the load buses, but

23   you can specify -- in PowerWorld actually it's very powerful.

24   You can specify any point on the system where you want to

25   withdraw that power and inject it, so the power distribution

1    factor -- the PTDF and the shift factors are similar things.

2    It's just two different terminologies of how you look at it.

3    One looks at on one constraint what is the impact of all the

4    buses on that constraint and the other is, you know, if I have

5    a path that I'm going on, like a transmission line, then what's

6    the impact on all other transmission lines, on my flow on this

7    line?

8    Q.    Are shift factors well-known?

9    A.    Yes.

10    Q.    Does it involve math?

11    A.    Yeah.  To determine it involves math, yes.

12    Q.    Is the math well-known?

13    A.    Yes, it is.

14    Q.    And can you calculate shift factors in PowerWorld?

15    A.    Yes.  Yes, you can.  Would you like me to demonstrate?

16    Q.    Yes.  That would be lovely.

17    A.    So basically you go into sensitivities.  These are called

18    sensitivity shift factors and the PTDFs.  So you go into

19    generation shift factors, and then you select -- let's see.  We

20    select a point like a bus and then -- you have this option of

21    selecting whatever area or, you know, particular bus you want

22    to sync where the power goes.  So here I selected one and then

23    you say, okay, calculate the sensitivities and that's it and

24    basically it's calculated and you can look at the shift factor

25    of the difference.  So this gives you, like, this node, this

1    7Newton substation, if you inject 1 megawatt of power in there,

2    that means 0.65, 615, 61 percent of that will flow through this

3    line, the 7Newton, to 7Casey line.

4    Q.    So did you compare PowerWorld and Panorama with respect to

5    this factor?

6    A.    Yes, I did; and they give very similar answers.

7    Q.    Let's talk about LCDF.  Who is that?

8    A.    That's the line closure distribution factors.

9         So you have the line outage distribution factor, which is

10   the LODF; and you have LCDF.

11        So same thing.  In tools you go into sensitivity and you

12   look at, you know, the line outage distribution factors.  So

13   this does both the outage sensitivities and the closure

14   sensitivity.  So for outage you have to pick a line that's

15   currently not in outage, so I will select one that's -- let's

16   see if the same one is not in outage:

17        So what this will do is it will actually -- you know, that

18   line that I've just selected is in -- if it's in service, I'm

19   going to take it out of service and look at what the impact is

20   going to be on the rest of the system.

21        Okay.  So this gives you the LODFs.  Since that line was

22   taken out, of course it has a hundred percent LODF because that

23   line is the one that's taken out.  But this shows all the rest

24   of the lines, how is it being impacted by opening this line.

25   So that's what LODFs do.  And the same thing with LCD.  You

1    just have to select the closure sensitivity and run it again

2    and it's as quick as that to run this and to get the answers.

3    Q.    And did you compare PowerWorld with Panorama with respect

4    to the features?

5    A.    Yes, I did.

6    Q.    What did you find?

7    A.    I found that the results were strikingly similar.

8    Q.    So with respect to the trade secrets that have been

9    alleged in this case of the -- one of the iterations that we've

10   heard is that gathering power grid data and putting it into the

11   system -- gathering it before it disappears and putting it into

12   the system is one of the things that has been articulated as a

13   trade secret over time.  Can PowerWorld do that?

14   A.    PowerWorld doesn't gather the information; so you would

15   have to yourself, you know, download information from MISO in

16   this case; and we do that from ERCOT.  ERCOT has a small server

17   where they publish information and the information is there for

18   a month or two.  So if you want to store the information, you

19   download it and keep it locally.

20   Q.    And is PowerWorld set up to accept data from ERCOT or

21   MISO?

22   A.    Typically you would download the data and then once you

23   have the file on your server or on your laptop, then you can

24   open it up just like I did.

25   Q.    And Dr. Siddiqi, in your experience in the energy field

1  and with PowerWorld and other products, is Saracen the only

2  company that knows to download the data before it disappears?

3  A.    No.  I mean, we do it ourselves; so I think there are a

4  lot of companies -- if you look at Yes Energy, all these people

5  that provide this kind of service, they all download the data.

6  They have to store it in their own servers because of the fact

7  that the ISOs don't.  ISOs will provide it to you upon request.

8  At least ERCOT will.  If it's not on the website anymore, you

9  can request it.  But typically you don't want to go in every

10  day and request information, so we just download the

11  information on our servers and store it so we can retrieve it

12  later to do analysis.

13  Q.    Okay.  And is creating a tool that will take that

14  information off the internet and download it to a database --

15  in your experience is Saracen the only one that's ever done

16  that?

17  A.    No.  I think there are many companies that do that.

18  Q.    Okay.  So let's talk about calculating power flow.  There

19  has been an articulation of a trade secret over time that's

20  shifted and changed, but the Saracen method of calculating

21  power flow on an electric power grid using phase angle -- can

22  you explain what phase angle is?

23  A.    Yes, phase angles are the -- at each bus you have a --

24  it's a little difficult to, you know, explain in nonelectrical

25  engineering terms; but it's basically the voltage angle at each

1    bus is what's referred to as the phase angle.

2    Q.    Okay.  And phase -- is calculating power flow using phase

3    angle a secret?

4    A.    Not at all.  There's very standard equations that's used

5    for all load flow analysis so you can get it in any textbook

6    and, you know, even without doing a load flow, if you have a

7    solid load flow case that gives you voltage levels and the

8    phase angles, you can calculate the flow of each line.

9    Q.    So let's go back on PowerWorld to the map with the arrows

10    for power flow.  And you had several windows open there, it

11    looked like.

12    A.    Yes.

13    Q.    Is that how it works?

14    A.    Yeah.

15    Q.    Okay.  So can you turn on the power flow feature in

16    PowerWorld for us to see?

17    A.    Yes.  So basically, you know, this is -- when I load the

18    data, like the MISO data, in, it automatically does some

19    calculation to figure out the power flow using the equations

20    you just talked about, the power flow equation; but you can

21    also do a load flow analysis, you know.  Within PowerWorld we

22    could just -- pressing this button that says Solve, so once you

23    ask it to solve, it just solves the case very quickly; and then

24    you can see the results on the chart and the tables.

25          So it won't look much different in this case because, you

1    know, the case was already a solved case; so basically the

2    answers are pretty similar.

3    Q.    You can see the arrows on the branch lines?

4    A.    Yes.  So now the arrows actually move, because this is --

5    I just solved the load flow, so it's actually showing that it's

6    a solved load flow case and the arrows on the diagram will show

7    the direction of the flow in this case.

8    Q.    And right now in PowerWorld we're only looking at one

9    piece, right?

10    A.    Yes.

11    Q.    That's one set of data, right?

12    A.    Yes, that's correct.

13    Q.    So you're not looking at multiple sets of data every time?

14    A.    No, you're not.

15    Q.    Okay.  So with respect to PowerWorld, would you agree that

16    you can't at one time do time series?

17    A.    That's correct.

18    Q.    Okay.  But is PowerWorld showing us the direction of the

19    power flow?

20    A.    Yes, it is.

21    Q.    So let's talk about another one of the many articulations

22    of trade secrets.  We talked a little bit about shift factors

23    and how they're computed.  Can you talk about how PowerWorld

24    calculates shift factors?

25    A.    You know, in order to calculate this quickly there's a

1    sort of brute force with calculating shift factors, which is

2    you convert what's called the admittance matrix.  It's a huge

3    matrix that the dimension is, like, the number of transmission

4    lines and buses.  It's very large and to invert that, if you

5    wanted to do it by brute force, if you just want to do, like,

6    matrix inversion, it will take quite a bit of time to solve

7    that.  But there are a lot of papers and a lot of techniques

8    and I'm not exactly sure what PowerWorld uses, but I'm sure

9    they're using one of these techniques so that they can give you

10   the result so quickly.

11        When I ran the sensitivity analysis, when I ran the shift

12   factor analysis, it just took, like, less than a minute, a few

13   seconds to run.

14   Q.    So let's break that down just a little bit.

15        So you said invert a matrix.  What is that?

16   A.    That's sort of a mathematical term that says, you know, if

17   you have a matrix -- like, in this case it would be, like, tens

18   of thousands of -- tens of thousands of rows and tens of

19   thousands of columns and you just invert that matrix and that

20   inversion process means -- it's quite involved.  I mean, you

21   have to do some calculations to figure out the inverted matrix.

22        But doing that brute force takes a long time if you just

23   use a standard matrix inversion tool.  But if you take

24   advantage of some of the techniques that people have used over

25   the years, you know, to do this analysis, it's much quicker

1  than that would be.

2  Q.    Okay.  And when you say brute force, you're not saying,

3  like, longhand on a piece of paper --

4  A.    No.

5  Q.    -- you're doing the calculations, right?

6  A.    It's still software.  It's still software that's doing it

7  for you, but it's using a matrix, the standard matrix, as if

8  you were inverting -- for small matrixes it's no issue, you

9  know.  I can even do it on paper, you know, inverting matrix;

10  but when it gets really large, then we have the software to do

11  that calculation for you.

12  Q.    And what kind of time -- I mean, we all watched you do it

13  and it doesn't happen instantaneously; but what kind of time

14  are we talking about to generally invert the matrix, the large

15  one?

16  A.    The size of this, like the MISO system -- I mean, I

17  haven't done that that way, but my guess would be it would be

18  several minutes to maybe half an hour to just invert that

19  matrix.

20  Q.    Okay.  And when you used Panorama, in your opinion was

21  Panorama using this method of inverting the matrix to compute

22  shift factors?

23  A.    I don't believe it was using matrix inversion, you know,

24  what I'm calling brute force.  I believe it's using something

25  similar to what PowerWorld is using in doing that analysis,

1  because it also does it in a few seconds.

2  Q.    Okay.  So let's talk a little a little bit about

3  PowerWorld and maps and tables and other stuff.  We talked

4  quite a bit about all of those things.  So you showed us a map

5  on PowerWorld.  Is that a way to show power grid elements to

6  look at congestion?

7  A.    Yes.  So basically this is showing you congestion.

8  Whenever you see, like, the circle fully filled up, it means

9  it's very congested; and I'm sure if we look around, you might

10  be able to find a line that's fully congested.

11      So that's what it's, again, showing, this element, like,

12  with the X on it.  It's showing that that's open, so that's not

13  in service currently.  So it has a lot of information that's

14  being shown graphically in this map.

15      MS. LEE:  Okay.  So could you zoom in on the green X.

16  BY MS. LEE:

17  Q.    So what does the green X with the circle represent?

18  A.    It's showing that in this case that line is actually open,

19  so it's not closed.  It's not actually active.  There's no

20  power flowing through it.

21  Q.    And what about the blue circle with the pie chart?  What

22  does that represent?

23  A.    So that is the percentage flow on the lines.  So basically

24  it's showing, you know, if -- let's say a line is rated a

25  hundred megawatts.  It can carry a hundred megawatts.  So this

1    is a -- I think this is, like, let's say roughly 20 percent.

2    That's saying that the flow on the line is only 20 megawatts

3    out of that hundred megawatt possibility so it's not fully

4    loaded.  When it's closer to a hundred megawatts, that's when

5    you say congestion on the system and that's where you see price

6    separation.  So that's what FTR traders take advantage of is

7    the price spread.

8    Q.    And Dr. Siddiqi, would you call PowerWorld a visualization

9    tool?

10   A.    It's a load flow and this is the visualization part of it,

11   yes.

12   Q.    Okay.  And Panorama, would you also call that a

13   visualization tool?

14   A.    I would say that's in the same way, yes.

15   Q.    Okay.  And you showed us some charts and some maps, but

16   are they linked together in PowerWorld?

17   A.    Linked across time?

18   Q.    Yes.

19   A.    No, they are not.

20   Q.    Okay.

21   A.    These are all snapshots of analysis.

22   Q.    Okay.  And did you take a look at VisualNode 2013 in this

23   case?

24   A.    I haven't seen VisualNode.

25   Q.    Okay.  So you haven't seen 2013 or 2016?

1    A.    No.

2    Q.    Okay.  So you're not going to tell the jury about that?

3    A.    No.

4    Q.    So if VisualNode 2013 had dynamically-linked maps, charts

5    and tables, you're not going to talk about that?

6    A.    That's correct.

7    Q.    Okay.  Fair enough.

8          I did want to talk to you about other tools in the

9    industry.  You focused on PowerWorld, but are you aware of

10   other tools?

11   A.    Yes.  We've used those extensively in our, you know,

12   consulting business.  UPLAN, which is used quite extensively in

13   ERCOT and that's to actually forecast congestion going forward.

14   So you put in all the assumptions of what the transmission

15   system looks like, what the load is going to be like, what the

16   generation is, what the outages are going to be and then you

17   forecast congestion looking forward.  So that's a very valuable

18   tool especially if you think about it.  If you're going to

19   build a power plant, you want to know that the location that

20   you're building it in -- is it going to face congestion in the

21   future or not.  So we use that tool to forecast that and so FTR

22   traders would also find that valuable to see, okay, given the

23   output of the system and load is evolving, the generation

24   outages and stuff, what does the system look like in the

25   future.  What do prices look like in the future?  So there's

1    UPLAN, there's Dayzer and there's ProMod.  We've used all three

2    of those tools.

3    Q.    Okay.  I want to get out my board to make sure we have it

4    all in here.

5          THE COURT:  We'll break in about five minutes.

6               Did you hear we'll break in about five minutes?

7          MS. LEE:  Yes, Your Honor.

8    **BY MS. LEE:**

9    Q.    So Dr. Siddiqi, you mentioned a tool.  Was it UPLAN?

10   A.    UPLAN, yes.

11         MR. KITCHEN:  Objection, Your Honor.  403.  Beyond the

12   scope.  There's no testimony in his report about any of these

13   other programs.

14         MS. LEE:  I'm just asking about other tools in the

15   industry, Your Honor.

16         THE COURT:  All right.  I'll allow this as general

17   background and context, but limited.

18         MS. LEE:  Yes, Your Honor, very limited.

19   **BY MS. LEE:**

20   Q.    Is it U and then PLAN?

21   A.    Yes.

22   Q.    You also mentioned Dayzer?

23   A.    Yes, and ProMod.

24   Q.    And ProMod-AT?

25   A.    Yes.

1    Q.    So those are just other tools in the industry you're

2    familiar with?

3    A.    Yes.

4    Q.    But you weren't asked to analyze those tools in this case?

5    A.    No, I wasn't.

6    Q.    Okay.  But you're aware of them?

7          MS. LEE:  I pass the witness.

8          THE COURT:  All right.  Ladies and gentlemen, let's

9    break now so that those who want to attend the program in

10   Judge Hoyt's courtroom next door can and then have lunch on the

11   sixth floor.  The lawyers and I are going to have some work

12   that we need to do outside your presence and we're going to

13   take a slightly extended lunch hour to permit to us do that.

14   It will save us time on the other end.

15          So let's -- it's now almost a quarter to noon.

16   Let's resume at -- 1:30.  I'm going to give that you long.  If

17   you don't want to go to the program, it's really pretty outside

18   and it's going to get cold.  So there's that opportunity as

19   well.  We will resume at 1:30, and we will work through the

20   afternoon.

21          So far, we are on pretty good target to perhaps

22   allow you to begin deliberating tomorrow; but stay tuned for

23   more a precise time estimate.  I'll do my best to be as

24   detailed and specific as possible so you can have some

25   assistance in your own scheduling decisions, but we have to do

1    it right.  We don't want to have to do it again and I know

2    you-all understand that.

3               Continue to follow all the instructions, enjoy

4    the lunch hour and we'll see you at 1:30.

5                    (The jury exited the courtroom.)

6          THE COURT:  You may step down, sir.  Please step

7    outside.  Actually you can stay here.  You're excepted.

8               So let's take up the 403 issue quickly since we

9    barely started that.

10         MR. KITCHEN:  In his report the only thing he talks

11   about is PowerWorld and one small paragraph on a company called

12   Energy Stream, but nothing about UPLAN or Dayzer.

13         THE COURT:  Nothing about what?

14         MR. KITCHEN:  Nothing about UPLAN or Dayzer or any of

15   those third-party products.

16         MS. LEE:  Your Honor, I'm just mentioning them as other

17   products.  I didn't have him -- I elicited testimony that he

18   didn't analyze them.  I'm not offering them as --

19         THE COURT:  That's fine.  I'll allow it.

20              So we're working on the charge.  I'm going to try

21   to get you a draft of it in about an hour, and then we will

22   meet at about 1:00 o'clock and just start going through it.  It

23   pretty much tracks what we talked about and I'm experimenting

24   with one damages submission, but obviously subject to change.

25              Are attorneys' fees for the jury or you're going

```
 1   to --
 2          MR. WALKER:  We've agreed on that.
 3          THE COURT:  You're okay to submit them to me by
 4   affidavit after --
 5          MR. CONNOR:  We've agreed on that.
 6          MR. WALKER:  Yes.
 7          THE COURT:  All right.  That sounds good.  That's
 8   helpful.
 9              Okay.  Anything else that we need to do between
10   now and then?
11          MR. WALKER:  I just wanted to clarify that this is not
12   the official charge conference where we're making --
13          THE COURT:  No, no, no, no, no.  This is an informal
14   charge conference.  We're going to go through this
15   line-by-line.
16              Okay.  How much longer do you have with this
17   witness?
18          MR. CONNOR:  We just passed him.
19          THE COURT:  Oh.
20          MR. CONNOR:  We've passed Dr. Siddiqi.
21          THE COURT:  Yeah, I know.
22              But cross?
23          MR. KITCHEN:  It will be pretty quick.
24          THE COURT:  Okay.
25          MR. CONNOR:  We've got Professor Kliakhandler, who's
```

1    coming right after lunch and then we've got a couple of the

2    Marginal Unit employees who are going to be brief and then that

3    will probably get us through the day.  I think -- is there

4    anyone else?

5           MR. KITCHEN:  Then we have a 14-minute clip from

6    Mr. Maurizi.  That will probably round out the day, Your Honor.

7    If we have time, then, you know, Mr. Legate can start his

8    testimony today; but we don't expect that that will conclude

9    today.

10          THE COURT:  How long will your evidence take tomorrow?

11          MR. CONNOR:  It's just going to be Mr. Legate and

12   Mr. Ferchill, both experts.

13          MS. LEE:  And Mr. Childress.

14          MR. CONNOR:  And Mr. Childress, which will be brief.

15          THE COURT:  10:30 or noon?

16          MR. CONNOR:  I'm thinking noon.

17          THE COURT:  Okay.  What I may have you do is come in

18   really early tomorrow morning and we'll do more work on the

19   charge if we need to, all right?

20              Okay.  So where will you be so that you can --

21   well, we'll just e-mail you drafts of the charge, all right?

22              We'll see you at 1:00 o'clock.

23          MR. CONNOR:  1:00.

24          MR. WALKER:  May we address the issue of

25   Mr. Neil Kelley about whether he's needing to be recalled at

1    this point?

2            MR. CONNOR:  We don't know yet.  We don't know yet.

3    There's more testimony that we need to --

4            THE COURT:  Still open.

5                  Very good.  Thank you.

6                        (Court is in recess.)

7            THE COURT:  Okay.  This is an informal charge

8    conference, so the robe is optional.

9                I've got copies for each of you of the proposed

10   questions and instructions.  If you've not had time to look at

11   these, I'm going to give you time to do this and then we'll

12   start going through them.  They're pretty straightforward, I

13   hope.  Do you have enough copies on each side?

14           MR. CONNOR:  We do.  We started looking through it.

15   You want to just jump right in?

16           THE COURT:  Ready?

17           MR. WALKER:  Yes.

18           THE COURT:  Okay.  Let's go to Page 2 of the proposed

19   charge.

20           MR. WALKER:  These are the jury instructions?

21           THE COURT:  Yes.

22           MR. WALKER:  I'm sorry.  Jury questions?

23           THE COURT:  No.

24           MR. WALKER:  Okay.

25           THE COURT:  We'll then go through the associated

1    questions as they come up.  Okay.  Any suggestions for revision

2    on Page 2 from the plaintiff?

3            And I will tell you I'm a lousy proofreader, so

4    I'm going to really rely on you guys.

5            MR. CONNOR:  We don't see anything, Your Honor.

6            MR. WALKER:  We do not on Page 2.

7            THE COURT:  Okay.  Page 3.  Look at the second

8    paragraph on Page 3.  Did I give any limited instructions so

9    far?  I don't think so.  We talked about one vaguely-limiting

10   instruction, but it really wasn't -- I can leave it in.  I

11   don't have any objection to it.  I'll leave it to you guys.

12           MR. CONNOR:  We don't have an objection.  There was an

13   instruction.

14           THE COURT:  All right.  Then let's leave it.  Okay.

15           Okay.  Anything else on Page 3?

16           MS. LEE:  No.

17           MR. WALKER:  No.

18           THE COURT:  Page 4?  I do not use the word expert in

19   describing 702 witnesses.  Please do not.

20           MR. WALKER:  Are you referring to in closing not to

21   refer to them as experts in closing?

22           THE COURT:  Correct.  But it doesn't mean anything to

23   the jury to call them 702 witnesses.

24           MS. LEE:  Okay.  The last part, Your Honor, about

25   deciding whether to accept the opinions?

1        THE COURT:  That's standard pattern jury.

2        MS. LEE:  Pattern jury?

3        THE COURT:  Yes.

4        MS. LEE:  All right.

5        THE COURT:  You're welcome to check.

6        MR. CONNOR:  Other than that, Page 4.

7        THE COURT:  Okay.

8        MS. LEE:  Yes.

9        THE COURT:  Page 5?

10            And I'm going to insert the words the defendants

11   to match the plaintiff.  So it would be after the number and

12   the words and seven in the second paragraph:  You are asked to

13   determine whether the defendants, comma, Mr. Ross and

14   Marginal Unit, comma, have proven yada, yada, yada.

15        MS. LEE:  Your Honor, I think the form of it is fine.

16   I think we did assert in our original draft that there was a

17   higher standard of proof for willful and malicious --

18        THE COURT:  Get me authority.  If you get me authority,

19   I'll look at it.

20        MS. LEE:  Okay.

21        MR. CONNOR:  Okay.

22        THE COURT:  Okay.  Specific instructions, anything on

23   the ending of Page 5, last paragraph?

24            I take it you guys missed the Frenchy's fried

25   chicken, too.

1          MR. WALKER:  Yes.

2          THE COURT:  I did, too.

3              Is the last paragraph on Page 5 acceptable to

4     both sides?

5          MR. WALKER:  It is.  I have one comment on the top of

6     6, though, the continuation.

7          THE COURT:  Hang on.

8          MR. CONNOR:  I want to flag the issue --

9          THE COURT:  On Page 5?

10         MR. CONNOR:  Yes, ma'am.

11         THE COURT:  Which is?

12         MR. CONNOR:  So we've got the allegation that the

13    defendants misappropriated certain information.  That

14    information, it is the trade secret information.

15         THE COURT:  I think that's fair not to use trade

16    secrets, Saracen's trade secrets, to disadvantage Saracen.

17              Is that okay, Mr. Walker.

18         MR. WALKER:  That's fine.

19         THE COURT:  Okay.  Top of Page 6.  And it should be to

20    third parties to use in trading, a missing word on top of

21    Page 6.

22         MR. CONNOR:  I want to go back to this paragraph.  I

23    think for clarity, that sentence we were just looking at, what

24    if we said --

25         THE COURT:  Uh-huh.

1       MR. CONNOR:  What if we said Saracen alleges that its

2   former employee and the company he formed in 2016

3   misappropriated certain trade secrets Saracen alleges it owns

4   that are incorporated in VisualNode 2016 as of March --

5       THE COURT:  That's fine.

6       MR. CONNOR:  Then the last sentence that says --

7       THE COURT:  Hang on.  It owns incorporated in

8   VisualNode --

9       MR. CONNOR:  2016 software.

10      THE COURT:  -- in the VisualNode 2016 software program.

11          So we're just essentially moving some stuff up --

12      MR. CONNOR:  Exactly.

13      THE COURT:  -- as of March 2016?

14      MR. CONNOR:  Yes.

15      THE COURT:  And breached a contract not to use

16  Saracen -- okay.  So then we would --

17      MR. CONNOR:  Then we can say -- and I think you can

18  start that with and not to use the claimed trade secrets.

19      THE COURT:  Well, it's two separate questions on

20  misappropriation and contract breach.  I want to identify that,

21  okay?

22          That it owns -- and then Saracen alleges that it

23  owns certain trade secrets as of -- okay.  Saracen -- I think

24  the rest is actually okay.

25      MR. CONNOR:  I think so, too.

1          THE COURT:  It's a little repetitious, but not in a way

2     that hurts.

3          MR. WALKER:  Correct.  My only comment -- and I may

4     have a better suggestion later -- breach of confidentiality is

5     related to the confidential information.  Yes, there is no

6     overlap in the type of information; but calling it a trade

7     secret suggests it has to rise to the level of trade secret.

8          THE COURT:  But there's no other identification of

9     confidential information alleged here.  This is a trade secret

10    case.

11         MR. WALKER:  Okay.  That's all right.

12         THE COURT:  If can you point out to me what else I

13    should reference and then not define --

14         MR. WALKER:  I think we can make sure that we just take

15    advantage in the instruction on the breach of contract.  I

16    think it will be okay.

17         THE COURT:  All right.  Note to self.  Okay.

18         MR. WALKER:  On the top of Page 6, we would recommend

19    that software programs as of March 2016 in developing and

20    selling Marginal Unit software.

21         THE COURT:  That's fair.  Well, I think it had in

22    developing Marginal Unit software programs that it sold to

23    third parties to use in trade.

24         MR. CONNOR:  We're good with that.

25         THE COURT:  Okay.

1           Definitions applicable to all jury questions.  Is

2    that okay?

3           MR. CONNOR:  We propose a -- with respect to

4    VisualNode 2013, a short statement that references that

5    VisualNode 2013 is admittedly not a trade secret.  We can

6    formulate that in the way the RFA was just somehow -- just make

7    it clear that VisualNode 2013 does not embody any of the

8    claimed trade secrets.

9           THE COURT:  Okay.  Saracen does not allege that it owns

10   trade secrets in VisualNode 2013.

11          MR. WALKER:  Not that we own, but that we assert.

12          THE COURT:  Does not assert trade secrets.  Fine.

13          MR. CONNOR:  We can clean that up to make it easier to

14   understand, but I think the notion --

15          THE COURT:  I don't think it's bad.  Okay.

16           How about instructions for Jury Question

17   Number 1?

18          MR. CONNOR:  So first comment, I think we can take out

19   the that sum on all because it's repeated with the alone or in

20   combination language.

21          THE COURT:  That's fine.  In fact, that certain methods

22   and processes.

23          MR. CONNOR:  Uh-huh.  I think the rest of it on Page 6

24   is okay.

25          THE COURT:  Okay.

1            Any issues, Mr. Walker?

2            MR. WALKER:  Yes.  So this --

3            THE COURT:  So it should be Mr. Ross and Marginal Unit

4    contend that these methods and processes were not trade secrets

5    and deny --

6            MR. WALKER:  My concern with the paragraph at the

7    bottom of Page 6 and then the one starting on Page 7, we agree

8    and understand that these are following process and method

9    alone or in combination for doing this?

10            THE COURT:  Correct.

11            MR. WALKER:  But then we have the next paragraph --

12            THE COURT:  I can take out the top line on Page 7.  I

13    don't think we need it.

14            MR. WALKER:  Yes.

15            THE COURT:  Does that help, Mr. Walker?

16            MR. WALKER:  It does.

17            THE COURT:  All right.  Let's try that.

18            MS. LEE:  But the denial is getting deleted then, too.

19    Is there a way to incorporate the denial in the previous --

20            THE COURT:  Look at the bottom of Page 7.  It's there.

21            MS. LEE:  Okay.

22            THE COURT:  Okay.  And keep going to the bottom of

23    Page 7.

24            MR. CONNOR:  So on 7 on the top, I can wait.  I have a

25    comment on the bottom.  So I think we should change does not

1   have protected trade secrets and take out that they

2   misappropriated.

3          THE COURT:  Okay.  Because that's the next question.

4   Okay.  That's fine.

5          MR. WALKER:  Where was that change?

6          MS. LEE:  Right here.

7          MR. CONNOR:  Bottom of 7, three lines up, that they

8   misappropriated.

9          THE COURT:  So then the question is do I need to remove

10  the last sentence in Page 7 and the first full -- and the rest

11  of the paragraph at the top of Page 8?  I think I do because

12  that's covered in the next items.

13         MR. WALKER:  I agree.

14         THE COURT:  Okay.  It's getting shorter.  I like that

15  better.  Okay.

16         MR. CONNOR:  Yes.

17         THE COURT:  How about Page 8?  And I'm going to take

18  the words "thereof" after "owner" out because I hate the word

19  "thereof."

20         MR. CONNOR:  This is just -- perhaps it will be easier

21  to read and understand.  I think if we just reconfigure that

22  sentence so it says:  "With respect to Saracen's breach of

23  contract claim against Mr. Ross."

24         THE COURT:  We're going to take that out because it's

25  covered later.

1          Okay.  So we start Page 8 with in answering Jury

2     Question Number 1.

3          And you'll notice that each question is on a

4     separate page.  Predication is, I hope, clear so that the jury

5     can turn to the questions with specific instructions for that

6     question.

7          MS. LEE:  Your Honor, we had proposed over on Page 8 on

8     the what is not a trade secret or what is, items that are not

9     generally known in the trade or business.

10          And I know you have competitors, but the case law

11     actually is broader than that.

12          THE COURT:  Well, wait.  Okay.

13          The extent to which the information was known

14     outside of Saracen to others was known or readily ascertainable

15     outside of Saracen to others in the business.

16          Okay.

17          MS. LEE:  In the energy business or -- because it makes

18     it sound like in Saracen's business.

19          THE COURT:  You can call it trader business.

20          MS. LEE:  Okay.  That works.

21          THE COURT:  Or we can say to the extent to which the

22     information is known by Saracen -- I don't know that that

23     factor applies, the second bullet point.  I don't think it

24     does.  It's not alleged to be a secret from Saracen employees.

25     It's not like the Coke formula, which Coke employees don't

1    know.

2         MS. LEE:  Right.  But does that go to the secrecy and

3    identification internally?  Is that what it's directed towards?

4         THE COURT:  It protects it against external

5    dissemination, but that doesn't apply to --

6         MR. WALKER:  Your Honor, may I ask where the bullet

7    points you have for --

8         THE COURT:  Second bullet point, Page 8.

9         MR. WALKER:  Yes.  Where did those come from?

10        THE COURT:  Just different charges that I and others

11   have given over time.  They're standard misappropriation

12   factors.  If they don't track the statute and you have better

13   language, I'm happy to consider it; but I didn't find any.

14        MR. WALKER:  Okay.  So the statute does have a

15   definition for trade secret.

16        THE COURT:  Okay.

17        MR. WALKER:  So it -- I believe we have, in proposed

18   jury charges that both sides agreed to, agreed that the term

19   trade secret means all forms of business and technical

20   information.

21        THE COURT:  It's up there.  It's up there.

22        MR. WALKER:  That's up there.  And then it says:  If,

23   A, the owner has taken reasonable measures to keep such

24   information secret --

25        THE COURT:  It's up there.

1          MR. WALKER:  Okay.  And then --

2          MS. LEE:  I tracked it.

3          MR. WALKER:  Okay.

4          THE COURT:  And then we just --

5          MR. WALKER:  So it's the same.

6          THE COURT:  -- unpack it.

7          MS. LEE:  Yes.

8          MR. WALKER:  Okay.

9          THE COURT:  As in undefeated.  I know it sounds

10    heretical.  It's trying to be helpful to the jury.

11         MR. WALKER:  Okay.

12         MS. LEE:  Your Honor, we also had suggested language

13    about knowledge of a solution is not the same as the solution

14    itself.

15         THE COURT:  That's nonsense.  That's jargon.

16         MS. LEE:  Well, there's been a lot of allegations that

17    just because you know you can do something --

18         THE COURT:  That's argument.  You can argue it based on

19    the charge; but that sound sounds like argument to me, not --

20    unless I'm misunderstanding what you're trying to say.

21         MS. LEE:  What I'm trying to say is that they said,

22    well, you know that we came up with a solution so, therefore,

23    that's the trade secret, where we do it differently in Panorama

24    now.  So just because you know that there is a solution doesn't

25    rise to the level of a trade secret and that's from the *Trilogy*

1    case.

2         THE COURT:  You can argue that.  It's common in any

3    business that uses -- comes up with solutions to problems.  Is

4    that solution a secret?  Well, here are the factors that you

5    look at in determining the answer to that question.

6              The mere fact of a problem and a particular

7    solution doesn't mean that that's the only solution or a secret

8    solution, and you can argue that.

9         MR. CONNOR:  This is going to come up with respect to

10   power flow orientation.

11        THE COURT:  All right.

12        MR. CONNOR:  So there's a lot of testimony about the

13   discovery that was made and then they implemented what is a

14   trade secret, but the knowledge that there is a problem and

15   that there could be a solution is not a trade secret.

16        THE COURT:  And it sounds like the jury would love to

17   hear you talk about that during your closing.

18        MR. CONNOR:  I think they would rather hear it from

19   you.

20        THE COURT:  I don't think so.  I couldn't say it better

21   and I wouldn't tie to it the facts in the way that you should

22   in argument, because that's what argument is, tying it to the

23   particular evidence in the case.

24        MS. LEE:  We also propose an instruction on novelty.

25        THE COURT:  Well, how is that different from not being

1   generally known to or readily ascertainable by?

2        MR. CONNOR:  Because novelty is first to do it, whereas

3   you can have a trade secret without novelty.  And that's the

4   point.  The argument here is we don't want the jury to be

5   confused with, oh, we were the first to do it, because that

6   doesn't qualify as a trade secret.  It has to also be -- it has

7   to be --

8        THE COURT:  Well, how about just adding the word in

9   Paragraph 2 in the statute or how about the first bullet point,

10  the extent to which the information was novel as opposed to

11  known or readily ascertainable outside of Saracen to others in

12  the trade or business?

13       MR. WALKER:  But as counsel stated, there isn't a

14  requirement of novelty for trade secrets.  You don't have to be

15  the first person to come up with it.  If there's another entity

16  out there that has come up with it first and they keep it

17  secret, that's not generally known or that's --

18       THE COURT:  But that goes to acquired by improper

19  means, so I think he's right about that.

20            Now, if you are -- if it's something that

21  everybody's doing, there's nothing unusual about it --

22       MR. CONNOR:  It's not a secret.

23       THE COURT:  -- it's not a secret in the first place; so

24  I think we've got it covered.

25            All right.  Anything else through the top of

```
1    Page 9 -- actually through instructions on jury Question

2    Number 2?

3         MR. WALKER:  At this time we don't have any additional

4    suggestions.  Some of this language is new.  We'll go back and

5    if we have any additional thoughts --

6         THE COURT:  I'm going to have Mr. Mooney make these

7    changes.  You'll get a fresh copy.  I think we're making some

8    pretty good progress and we're on track that if the evidence

9    finishes tomorrow, we can charge the jury tomorrow afternoon

10   and you would have to be prepared to argue.

11             How long did I give you for argument?  Remind me.

12        MR. CONNOR:  You originally said 35 minutes, Your

13   Honor, just like openings.

14        THE COURT:  Do you want 45 each?

15        MR. CONNOR:  Yes.

16        THE COURT:  Okay.  That's fine with me.

17             All right.  Mr. Mooney, I'm going to go get my

18   robe; and we can bring in the jury.

19        THE LAW CLERK:  All right.  Sounds good.

20                       (Court is in recess.)

21        THE COURT:  Your next witness?

22        MR. WALKER:  Judge, we do have one evidentiary issue

23   that's coming up with the next witness.  We can address it now.

24        THE COURT:  Let's get as far as we can now.

25        MR. WALKER:  The next witness is Igor Kliakhandler.  He
```

1    produced about an hour's worth of videos where he shows his

2    product and he also narrates throughout it.

3              We understand that the videos are in, but we

4    believe that it was just for the visuals and not for the

5    hearsay commentary overall, that it was created at the request

6    and for defense counsel.  It is -- essentially it was ruled by

7    this Court that those videos were essentially his expert report

8    so we would be allowing in his expert report, which is

9    generally hearsay.

10             THE COURT:  Can you do it without the audio?

11             MR. CONNOR:  It will go much faster and be more

12   complete with the audio.  He's going to explain it on the

13   stand.  He's going to say what we're about to watch, the

14   circumstances of its making and he's going to -- you know, it's

15   two at the most two short clips and he's going to be -- you

16   know, he's going to explain everything about it and what he's

17   talking about --

18             THE COURT:  My inclination is to allow it and you can

19   cross-examine him on the audio as well as on his testimony.  It

20   gives you double -- in essence two bites at his apple and

21   that's my current inclination.

22             Okay.  Thank you.

23             Bring them in, please, Lisa.

24             THE COURTROOM MANAGER:  All rise for the jury.

25                  (The jury entered the courtroom.)

1          THE COURT:  Please be seated.  Thank you for your

2     patience, ladies and gentlemen.  So here is the good news.  The

3     reward for your patience is that we were able to get a lot of

4     good work done on stuff that has to be right before you guys

5     can get the case to decide.  So it was a long lunch that we

6     hope will end up speeding the case up and we are moving with

7     efficiency, so if we go longer than you hoped, you can blame

8     me; but you can't blame the lawyers.  They're doing just fine.

9          Go ahead.

10          MR. KITCHEN:  Thank you.

11                     **CROSS-EXAMINATION**

12     **BY MR. KITCHEN:**

13     Q.    Mr. Siddiqi, we haven't met before, have we?

14     A.    No, we haven't.

15     Q.    You've been retained by defendants in this case?

16     A.    That's correct.

17     Q.    They're paying you, correct?

18     A.    Yes.

19     Q.    And I believe they're paying you $500 an hour for your

20     time.

21     A.    That's right.

22     Q.    And you have experience analyzing congestion, correct?

23     A.    That's correct.

24     Q.    But that's only in the ERCOT, or the Texas operator?

25     A.    Yes.

1    Q.    And so you haven't worked in the MISO or the Midcontinent?

2    A.    Not to analyze congestion.

3    Q.    Okay.  And those are separate interconnects, right?

4    A.    Yes.

5    Q.    So they're not electrically connected between MISO and

6    ERCOT?

7    A.    There are DC ties.

8    Q.    Okay.  But congestion in MISO wouldn't have impacts on

9    congestion in ERCOT?

10    A.    Correct.

11    Q.    Okay.  I wanted to start with the big picture, which is

12    comparing analysis you've been asked to do comparing Panorama

13    and comparing PowerWorld.  At the end of that you have

14    tabulations in PowerWorld, correct?

15    A.    Yes.

16    Q.    And tabulations in Panorama?

17    A.    That's correct.

18    Q.    But this is for a single case?

19    A.    Yes, for the MISO.

20    Q.    It's not across cases?

21    A.    I think if you took each case and loaded it up in each of

22    the tools, the results were editable.

23    Q.    Sure.  But PowerWorld doesn't have the capability of

24    looking at multiple cases across time, correct?

25    A.    That's right.

1    Q.   So it can't look at historical flows across time across

2    multiple cases?

3    A.   Right, not across multiple cases.

4    Q.   Or historical demand across multiple cases?

5    A.   That's correct.

6    Q.   Or historical generation across multiple cases?

7    A.   That is correct.

8    Q.   Correct.  But that is something that Panorama can do?

9    A.   I believe so.

10   Q.   Okay.  And you compared the two; but you didn't show the

11   jury Panorama today, right?  You just showed them just

12   PowerWorld?

13   A.   That's correct.

14   Q.   So they weren't able to really see the comparison that you

15   did, correct?

16   A.   I showed the capabilities of PowerWorld.

17   Q.   Sure.

18   A.   But --

19   Q.   But you didn't display Panorama?

20   A.   No, I did not.

21   Q.   I want to get just a little bit into your actual opinion

22   and comparisons that you were asked to do.

23        So the first one was the create a map, correct?  In

24   Panorama when you created that map, you just opened it in the

25   program, right?  And it just opened, correct?

1    A.    You have to select the case.

2    Q.    Sure.  Select the case and then the map opens?

3    A.    That's correct.

4    Q.    But in PowerWorld you had to actually draw the map, right?

5    You had to create your oneline map, correct?

6    A.    You have to -- yes, you have to draw a oneline.

7    Q.    Got it.

8    A.    Because the raw files, they don't come --

9    Q.    It doesn't come with --

10         COURT REPORTER:  You had to draw a oneline because the?

11   A.    The draw plan isn't -- doesn't include a map.

12   Q.    Right.  And then you also had to include the GIS, the bus

13   coordinates, right, for all the bus elements on that map?

14   A.    That's correct.

15   Q.    And you didn't need to do that in Panorama, right?

16   A.    That's correct.

17   Q.    And that file was actually provided to you by defendants,

18   the file you loaded in for that topology correct?

19   A.    That's right.

20   Q.    And then you also had to add buses and branches and

21   generators to that map, correct?

22   A.    No.  Basically if you looked at the demo, you know, I was

23   just able to check that box that added the lines.

24   Q.    Correct.  But those were additional steps you had to take?

25   You had to make those additional clicks to put those on the

1  map?

2  A.    You have to select that in the software, yes.

3  Q.    Sure.  But you wouldn't have had to do that in Panorama.

4  It's all in there when you load the case?

5  A.    Yes.

6  Q.    And so only after adding -- you know, drawing the map,

7  adding these bus coordinates that was from a file provided to

8  you by defendants and then clicking these additional elements

9  to add to create really the whole map topology did you get

10 something that looked like what was in Panorama?

11 A.    That's correct.

12 Q.    And you said it showed flow direction; but again that was

13 for only one case, right?

14 A.    That's right.

15 Q.    So if in the next case the flow direction had changed on

16 any of those branches, PowerWorld is not going to help you to

17 determine that, correct?

18 A.    If you load in the next case?

19 Q.    And I guess that case would show that change, but

20 you're --

21 A.    Yes.

22 Q.    -- not going to be able to deal with that across cases,

23 because PowerWorld doesn't deal across cases, right?

24 A.    That is correct.

25 Q.    Okay.  The next thing you were asked to do was create

1    tables between the two; and I believe you had to modify some

2    columns, correct, in PowerWorld just to he get it to look like

3    what was in Panorama?

4    A.    That's correct.

5    Q.    Okay.  And then the next thing you were asked to do was

6    create some -- to do some shift factor analysis, right?  PTDF,

7    you said, and LODF, LCDF is shift factor outage analysis.

8         So for the shift factor calculations, specifically the

9    PTDF, you needed to create a super -- a simple super area with

10   loads, correct?  That was an initial step you had to take --

11   A.    That's correct.

12   Q.    -- in PowerWorld?

13   A.    That's correct.

14   Q.    And you didn't need to do that in Panorama, right?

15   A.    Panorama only provides that one option by default.

16   Q.    Okay.

17   A.    But PowerWorld you actually can choose where you want to

18   sink.

19   Q.    Understood.  So you had to, like -- you had to take

20   another click --

21   A.    That's correct.

22   Q.    -- is that correct?

23        And then, for example, also with the -- but you did that

24   to be consistent with Panorama, because that's what Panorama

25   did?

1    A.    Right.

2    Q.    Right.

3    A.    The results are the same.

4    Q.    Right.  And then for the LODF and the LCDF, you had to add

5    another column?  You called it a lengthy MBA column?

6    A.    For the display to look the same.

7    Q.    For the display to like that.  You did that for comparison

8    purposes?

9    A.    Exactly.

10    Q.    Okay.  So because you had Panorama already and you had

11    seen what it looked like and you were asked to do this

12    analysis, you made all these changes to PowerWorld to try to

13    get you something that looked like what was in Panorama, right?

14    A.    That's correct.

15    Q.    And if you hadn't seen Panorama before, you had never seen

16    that, you wouldn't have had a reason to make all of these

17    changes, correct?  It was just for comparison purposes?

18    A.    That's correct.

19    Q.    So making all of those changes that you made, that took

20    time; is that right?  It added additional time to get to the

21    same point you were at in Panorama?

22    A.    I think it displayed, you know -- it was pretty easy to

23    do.

24    Q.    Sure.  Pretty quick, but --

25    A.    Yes.

1    Q.    -- still additional time?

2    A.    You could say, yes, a few additional steps.

3    Q.    Sure.  Maybe a few extra minutes?

4    A.    That's fair.

5    Q.    Okay.  And you're not a trader?

6    A.    I'm not.

7    Q.    You don't trade for a living and speculate contracts?

8    A.    No.

9    Q.    Are you aware that Mr. Gontkovic in this case, who is a

10   very experienced trader, has said that sometimes for his

11   auctions he actually makes thousands of trades, maybe 10,000

12   trades, in a single auction case?

13   A.    I'm not aware of that.

14   Q.    But for Mr. Gontkovic, having those couple of extra

15   minutes for each one of those steps of analysis would add up.

16   Would you agree with that?  A couple of minutes over 10,000

17   trades?

18   A.    I don't think you have to do the same analysis a thousand

19   times to do a thousand trades.

20   Q.    But you're looking and trying to compare elements; and

21   each time you want to do a load flow analysis and you want to

22   compare it to a different case, you've got to bring up a new

23   case and you've got the run the analysis again?

24   A.    I agree with that description.

25   Q.    Okay.  So each time you do that, it adds more and more

1    time?

2    A.    Right.  If -- but I'm not saying that to make that trade,

3    he needs to do all those cases.

4    Q.    Right.

5    A.    But if he does want to find those cases, yes, it will take

6    time to run the cases.

7    Q.    That's right.  But you're not a trader?

8    A.    I'm not a trader.

9    Q.    So you don't have experience.

10          And you've also said that you didn't look at the Panorama

11   source code?

12   A.    No, I did not.

13   Q.    Okay.  So you don't actually know how it functions, how it

14   calculates power flows or shift flows?

15   A.    No, I do not.

16          MR. KITCHEN:  I think that's all I have.  I'll pass the

17   witness?

18          THE COURT:  Questions?

19          MR. CONNOR:  No further questions.

20          THE COURT:  All right.  Your next witness, please.

21              And may this witness be excused?

22          MR. CONNOR:  No objection, Your Honor, from the

23   defendant.

24          THE COURT:  You're free to leave, sir.  Thank you, sir.

25          MR. CONNOR:  Defense calls Professor Kliakhandler, and

1    Professor Kliakhandler is going to have a computer.  We're

2    going to plug it in.

3            THE COURT:  Come on up, sir.

4                One of my personal triumphs in this case, ladies

5    and gentlemen, is I figured out how to pronounce his name.

6                All right.  Professor Kliakhandler, raise your

7    right hand to be sworn.

8                    (The oath was administered.)

9            THE COURT:  Take the witness stand.  You need to lean

10   forward, pull the mic towards you and speak directly and

11   clearly into the mic.  It does not pick up from a distance.

12               Thank you, sir.

13           MR. KITCHEN:  I have a few additional materials to

14   present.

15           MR. WALKER:  Your Honor, we have an objection to these

16   exhibits that apparently are going to be used.  This is outside

17   the report.

18           THE COURT:  Which part?

19           MR. WALKER:  The analysis of any of the trade secrets.

20           THE COURT:  Why don't you take those boards down for

21   the moment.  Let's get the background established --

22           MS. LEE:  Yes, Your Honor.

23           THE COURT:  -- and predicates laid, and then we'll deal

24   with it.  And if you have a copy of any document you want me to

25   look at in connection with what you just said, I'm happy to do

1   that.

2        Go ahead, please.

3        MR. CONNOR:  Thank you, Your Honor.

4                    **DIRECT EXAMINATION**

5   BY MR. CONNOR:

6   Q.   Go ahead, Professor Kliakhandler.  Please introduce

7   yourself to the jury.

8   A.   Professor Kliakhandler.

9        THE COURT:  Okay, Mr. Kliakhandler.  Nobody is hearing

10   a word you're saying.

11        THE WITNESS:  Okay.  Okay.

12        THE COURT:  Thank you.

13   A.   My name is Igor Kliakhandler.  I'm 53 years old, married,

14   three kids.  I was former --

15        THE COURT:  Okay.  Mr. Kliakhandler, slower, much.

16        THE WITNESS:  Okay.

17        MR. CONNOR:  She's taking down every word manually.

18        THE COURT:  And the jury is really trying to

19   understand --

20        THE WITNESS:  Okay.

21        THE COURT:  -- your answers.

22        THE WITNESS:  Okay.  One more time.

23   A.   I'm Igor Kliakhandler, 53 years old, three kids, live in

24   Houston.  I'm in myself marriage, in love.  I was previously

25   professor of mathematics at Michigan Technological University

1   and then eventually started to trade power.  And now we live in

2   Montrose area, 15 minutes from here.

3        Is that good enough?

4   BY MR. CONNOR:

5   Q.   Yes.  You said you were a professor at Michigan Tech?

6   A.   Yes.

7   Q.   And what were you a professor of?

8   A.   Professor of mathematics.

9   Q.   And how many years did you teach?

10  A.   I was teaching seven years, maybe six, yes, actually.

11  Q.   And what got you interested in energy trading?

12  A.   What got me interested in energy trading?  I wanted to

13  explore this area.  First of all, it seems to be that I am --

14  forgive me -- too -- academic world is a little slow, you know.

15  You write papers, you teach students, which is great.  I love

16  it.  My wife -- by the way, my wife is a teacher; so we love

17  this profession.  But it seems to be that I'm a little bit more

18  active than requires to be a professor.

19       So I took a one-year leave of absence, went to work for

20  a power trading company here in Houston and then took second

21  year leave of absence, was granted, and then eventually wrote a

22  letter of resignation --

23       THE COURT:  Okay, professor.  Yeah, it's not working.

24  Lean closer to it.

25       THE WITNESS:  Okay.

1          THE COURT:  Much better.  Slower.

2          THE WITNESS:  Okay.  Is it better?

3          THE COURT:  That part I heard, yes.

4          THE WITNESS:  Okay.  I will try to do my best.

5    A.   And then started -- then wrote letter of resignation, so I

6    still continue to support my department and is in contact with

7    them and support them financially.  That's it.

8    BY MR. CONNOR:

9    Q.   Let's talk a little bit about how we met.  So do you

10   remember the first time that we ever spoke?

11   A.   Yes.

12   Q.   Was it a phone call?

13   A.   Yes, it was phone call.  I -- probably it was you on the

14   phone.  I got a phone call sitting working at my desk.  I got a

15   phone call from guy who I didn't know.  Usually I would get

16   such phone calls from the company who would try to sell me

17   health insurance or, you know, electricity provider.  So

18   usually I'm very cautious about talking.  But this time it was

19   something different.  I started to listen, we started to talk,

20   and I understand it's about power trading.  It took some time

21   for me to even agree to discuss the issue because, you know, I

22   didn't know anything; and it involves Saracen, a well-known

23   company.  So the moment we finished talking, I typed "Saracen,"

24   and I don't know a single person from Saracen.  I just know

25   they're in Greenway Plaza, called Saracen, asked about, you

1    know, I got phone call from some guys who are supposedly in

2    litigation.  Seemingly I spoke with Allison Duensing, who is

3    present here.

4    Q.    Allison Duensing?

5    A.    Yes.  And was basically ongoing litigation and you do what

6    is right and, you know, basically was pushed back and I said

7    okay.  It seems to be reasonable.  Let me try, then, to talk to

8    the party who is requesting the help and then I arrived to my

9    house, we spoke a couple of times and from this, it started.

10   Q.    And why did you call Ms. Duensing after we spoke?

11   A.    Just because, you know, imagine me sitting at my desk.

12   I'm suddenly getting a phone call from some attorney whom I

13   don't know.  I think it's just, to me, normal prudence, yes, if

14   one side is saying that something has happened, I think it's

15   reasonable to call to other side and ask what's going on.  Is

16   it really something that I should be involved in?  You know, is

17   there some beef between the parties?  Who knows?

18   Q.    And Ms. Duensing told you what?

19   A.    She told me it's ongoing litigation.  I cannot comment on

20   this.  Just do what you think is right.

21         And so I did.

22   Q.    So, we've met?

23   A.    Yes.

24   Q.    Tell the jury if you've been compensated by Mr. Ross and

25   Marginal Unit for any of your time in this --

1    A.    I was compensated on relatively -- a relatively, I would

2    say, graceful rate.  So I basically lose money sitting here and

3    right now being here and running back and forth I'm not

4    compensated.  I just think, you know, it's -- he's a single guy

5    standing against a large powerful company, and I think it's

6    fair for me to help.

7    Q.    You have a company -- several companies that you trade

8    under, correct?

9    A.    Yes.

10   Q.    And the name of the company is Intergrid?

11   A.    It's Intergrid Group, LLC; Transgrid Midwest; Intergrid

12   Power.  I forgot, frankly.  I forget a LLC.  And Intergrid

13   Power Management.

14   Q.    And you trade in FTRs in the same markets that Saracen

15   participates in?

16   A.    Yes.

17   Q.    Midwest?

18   A.    Yes.  MISO, Southwest Power Pool, California, ERCOT,

19   New York, New England, everything.

20   Q.    And just so we're all clear, have you ever seen the

21   VisualNode software?

22   A.    No.

23   Q.    Have you ever seen the Panorama software?

24   A.    No.

25   Q.    Okay.  But you developed your own software?

1    A.    Yes.  I have to.

2    Q.    Okay.  And explain to the jury why we started talking

3    about that in the first instance?  Do you remember?

4    A.    Yes.  In our first conversation, attorneys for

5    Marginal Unit say that there is ongoing litigation between the

6    parties and the main issue between the parties is a way of

7    interpreting the data, which is embedded in so-called raw

8    files.

9         Probably I should take just literally half a minute to

10   explain what those raw files are and what those things are,

11   those names.

12        A raw file, especially those that we are talking about

13   here, are basically photographs of the system.  Snapshots.

14   It's instantaneous state of the -- state of the system.  So it

15   shows in some specialized format names of the lines, basically

16   power flow, angles, everything about the system, a physical --

17   not physical.  A mathematical photograph of the system.

18        My emphasis for those photographs, which -- was this -- on

19   its website.  You have to be a member of MISO to download it;

20   but except for that, there is nothing else that -- and

21   critically important was at least the way I was explained by

22   the attorneys of Marginal Unit the matter of -- conversation

23   matter of -- discussion was the way lines and -- the lines and

24   transformers are denoted in this -- in this -- in those files

25   to which I replied, you know, it's common knowledge.  There is

1    nothing -- there is very little to know about this.  You just

2    open the file, the text file, you look at this and it's very

3    obvious.  In our companies, everybody knows it.  Physical

4    everybody knows it, so I don't see any -- not only issue.  I

5    don't see any reasoning to discuss it.

6        But both attorneys at Saracen -- at Marginal Unit assured

7    me that this was a issue in this litigation.

8        I said, okay.

9        So did I describe it correctly?

10   Q.    I think so.  I --

11   A.    Okay.

12   Q.    Is that your understanding of the code -- well, let's talk

13   about what we've been referring to as the Svetlana code.  Do

14   you remember that?

15   A.    Yes.  We can talk about Svetlana.

16   Q.    Okay.  Let's just very briefly describe what that was and

17   where it was when you found it.

18   A.    Okay.  Let's talk about Svetlana.  Frankly I don't really

19   know why we're talking about Svetlana.  She is not here.  I'm

20   here, but let's talk about Svetlana.  Svetlana is one of the

21   employees in one of my companies.

22   Q.    She's a programmer?

23   A.    Yeah, she's software engineer.  As you may know, when you

24   write code, there are some -- you write code today, you write

25   code tomorrow and there's some versions.  The transitional

1    version is annoying and painful task basically.  And there is

2    GitHub, which allows it to synchronize this process.

3         And Svetlana not knowingly posted -- not knowingly.  Let's

4    fix -- we'll do the -- she posted the codes there, and it's how

5    it came basically to the attention of attorneys of

6    Marginal Unit.

7    Q.    You understand Mr. Ross found the code on GitHub?

8    A.    Yes.

9    Q.    Okay.  And he recognized and came to -- that's why we

10   contacted you?

11   A.    Yes.

12   Q.    And that code was used to automatically download the

13   Midwest grid data?

14   A.    Well, downloading is such a small thing.  I don't know why

15   we're talking about this.  It does much more than downloading.

16   Q.    Well, let's say gathering historical grid data.

17   A.    Yes.

18   Q.    Is that also something that's commonly known?

19   A.    It's elementary thing.  I don't see why --

20        COURT REPORTER:  Did you say, it's interesting, or --

21   A.    It's elementary thing.  It's very simple.

22   Q.    Elementary?

23   A.    Elementary, yes.

24        If I could allow myself the liberty of comparison, yes.

25   Let's say, you know, everybody is eating and talking, the vast

1    majority of the people.  Bringing in data is like bringing food

2    from supermarkets.  Today downloading of data is done by high

3    school student.  You don't have to even go to university to

4    know that.  It's a simple thing.

5    Q.    So even writing -- so writing software --

6    A.    Yes.

7    Q.    -- to go out and gather historical power grid data --

8    A.    Yes.

9    Q.    -- and congestion information that's relevant to

10   calculating power flow --

11   A.    Yes.

12   Q.    -- is that something that is generally known in the

13   business?

14   A.    Absolutely.  It's open information about congestion.  It's

15   publicly known.  Congestion -- so-called shadow prices are

16   publicly known.  Probably I have to open MISO website to show

17   congestion happening right now in real-time.  There is nothing

18   significant about this.  Information about prices, lines,

19   it's -- everything is open.

20   Q.    In fact, you wrote code or somebody that works for you

21   wrote code to do that very thing so that that information could

22   be used by software that you've written?

23   A.    Yes.  I prefer to talk about things which I own because,

24   you know, other people, they're not here.  Why should I talk

25   about them?

1    Q.    Let's talk about the software that you wrote --

2    A.    Yes.

3    Q.    -- okay?

4        Tell us -- at a high level explain what it is that your

5    software does.

6    A.    Basically it does the following thing.  Let me explain a

7    couple of things about the way business is organized.

8        So in power trading it's financial transmission rights.

9    Critically important is bidding for the future.  It's vastly

10   important.  We can beat our heads about talking about the past,

11   but it's about the future.  So while understanding the past is

12   important, critically important, understanding of the future is

13   still even more important.

14       So my code consists of two pieces -- first to last line.

15   I have software for -- it's mapping software and pricing

16   software and specific to organize in the middle of the

17   congestion.  Those are the main pieces of what I personally

18   created.  From first to last line is the code.

19       For what I understand, subject of contention is mapping

20   software, basically get mapping.

21       Shall I begin?

22       Basically the way I started to create it was very simple.

23   Basically I wanted to use Google map.  Google map, everybody

24   knows it's simple, easy; but Google map got very small and

25   underlying feature that I could not overcome.  It could not

1    show me the direction.  Just arrow.  Google map at that time

2    could not do it, and I was beating my head doing this and this.

3    Could not do it.

4    BY MR. CONNOR:

5    Q.    Can I stop you there for a second, Professor?

6          When you're talking about direction, direction of what?

7    A.    Direction of the flow.

8    Q.    Of power?

9    A.    Of power flow, yes.

10    Q.    And why is that important to show?

11    A.    Well, think of water, yes?  Power is very similar to

12    water.  When you open the -- open the water line at your home,

13    you expect water to come to you, yes?  Not outside.  So the

14    same as power.  It comes from generator to your house, not vice

15    versa.  So direction of power flow is important.  You know,

16    it's nature.  Think about water flow.  It's very, very similar.

17    Equations describing power flow and water flow are very similar

18    actually.

19    Q.    All right.  So please continue.

20    A.    Okay.  So originally I wanted to do things on Google map

21    and, again, they could not show me direction of the flow and I

22    tried to do this and that, could not do it.  And then I wrote a

23    very simple piece on mathematical software, Word form; and it

24    was fine.

25          Then I say, okay, can I slightly improve it?  I improved

1    it a little bit.  I did colors.  I did this, I did that.  I did

2    51 features and suddenly it became a suddenly new thing.

3    Suddenly it became the backbone of what we do.  So it's how we

4    started again, from the first line to last line of code it is

5    written by me so I can realize any question about this.

6    Q.    When you get the data into your database --

7    A.    Not necessarily a database.  Into a collection of the

8    data.

9    Q.    You gather it?

10   A.    Yes.

11   Q.    Do you use that data to create time series

12   representations?

13   A.    Yes.  Again, can I take a small liberty to explain what is

14   time series?

15   Q.    I think it will be helpful.

16   A.    Okay.  Time series.  My wife is a middle school

17   mathematics teacher.  Now she does not teach, but I found this

18   in her teaching material.  It's not even a book.  It's not --

19   books for middle school contain examples of time series.  And

20   what is time series?  Time series is very simple thing.  It's

21   two-column spreadsheet.  That's it.  One column contains data.

22   That's it.  Very simple.  One column is data and second thing

23   may be whatever.  It may be price of your stock.  It may be

24   amount of calories that you consume.  It may be your blood

25   pressure.  It may be temperature in Houston.  Whatever you

1    want.  But all in all time series is two-column spreadsheet.

2    That's it.  And this concept is, as can you guess, very, very

3    common.  The moment you call on your phone is very simple time

4    series.  The moment you use voice recognition is time series.

5    The moment TV is played is time series.  Everything is

6    effectively connected to technology because going in time vast

7    majority of it is time series.  Not only that.  My daughter is

8    first-year freshman.  I found this in her room.  Right there.

9    Good book.  I physically ran out of stickers literally.  I just

10   went through first 20 percent of the book.  Do you see how many

11   times time -- time series is mentioned here?  All the books are

12   here.  Please feel free to look through that.  And, again, I

13   just ran out of stickers.  If I would go through it, then it

14   would be completely in those stickers.  Time series is

15   ubiquitous.  Its everywhere.

16       So as a result there are special databases for time

17   series; so as a result, yes, we do things in time series.

18   Power flow is, you know, in time.

19   Q.    Can you walk us through the process that you -- that your

20   software employs to create a time series of historical power

21   flow, particularly -- let's use an example -- the Midwest grid

22   or a MISO case?

23   A.    Okay.  The process effectively -- it may be slightly

24   annoying, but there is nothing mysterious about this.  If

25   there's a secret in this business, it's a much deeper level and

1    there are small secrets in this business; but they're much,

2    much deeper technical level.

3        So I download those files.  Maybe I may show that's on my

4    computer if it's of any value.  I have those files from 7/12,

5    so four files a day.  So right now we don't look at anything

6    older than 2016 so we have about -- through 1500 files, yes.

7    So my software, similar to probably the software of other

8    vendors.  I just open it, find power flow and dump this into

9    the files.  There is nothing mysterious about it.  So

10   effectively, physically, because I prefer to do things in a

11   simple manner, I literally create 70,000 files so you open this

12   file, the CSV file.  You open it and you see date, time --

13   flow -- date/time of flows.  That's it.  It's very simple.

14   Q.   What about generation?  Do you create time series of

15   generation?

16   A.   Absolutely, of course.

17   Q.   What about load?

18   A.   Load, a little bit less interesting because load is very

19   distributed.  Load doesn't change that much.  For large load,

20   yes, large load; but not -- not -- not small load.

21   Q.   Is load the same thing as demand?

22   A.   Yes.

23   Q.   Okay.  You brought your computer today?

24   A.   Yes.

25   Q.   Do you have the ability to show the jury what your system

1    looks like when you operate it?

2    A.    Sure.

3    Q.    Okay.  The map that you've been talking about --

4    A.    Yes.

5    Q.    -- the power flow time series?

6    A.    Yes.

7    Q.    Okay.  Let's get back to that.  I want to keep going on to

8    some other basic things --

9    A.    Okay.

10   Q.    -- okay?

11        You do power flow, but do you -- how do you calculate it?

12   How does your software calculate power flow on each branch?

13   A.    I don't -- you know, there are Kirchoff's laws, which

14   is -- which are very simple.

15   Q.    You said Kirchoff's laws?

16   A.    Kirchoff's laws.  They are very simple.  First Kirchoff

17   law says -- is very simple thing.  But the amount of power

18   coming to an intersection is equal to amount of power leaving

19   the intersection, yes?  So the result of generation of power at

20   any point.  Very simple.

21        Second Kirchoff law is very similar to law of flow of

22   water.  Basically difference of voltage is proportional to the

23   current and inversely proportional to the resistance.  The same

24   as for water.  Difference of pressure is proportional to --

25   excuse me.  Flow on pipeline is proportional to pressure

1    difference and inversely proportional to the dam.  The smaller

2    dam, the water flows.  For power it's absolutely the same.  But

3    it just matters -- in power flow you have, say, 70,000 lines

4    and in water line you probably not have that many, but

5    mathematically it's absolutely the same.  They are similar

6    equations without any difficulty.

7    Q.    Is there any difficulty or special trick to calculate

8    power flow using phase angle?

9    A.    I wouldn't say difficulty.  There are small, small, I

10   would say, exotic cases; and, for instance, sometimes there are

11   transformers with negative reactance.  You have --

12            COURT REPORTER:  There are transformers with?

13   A.    With negative reactance.

14   Q.    Reactance?

15   A.    Negative reactance.  In Southwest Power Pool, there are

16   fake lines.  There are so-called zero lines.  There are small

17   things that you have to be careful about; but other than that,

18   it's straightforward.

19   Q.    How do you know about that?

20   A.    What does mean?

21   Q.    How do you know that there are exotic cases where

22   calculating flow with phase angle needs to be done?

23   A.    I am a mathematician.  I write everything -- everything

24   from scratch myself.  I don't take anything for granted.  I

25   write everything myself so -- and I have 25 years of prior -- I

1    have mathematical experience and 12 years in power, so I do

2    everything from scratch myself.

3    Q.    Does it take a 25 years of experience and a doctorate and

4    your level of experience to be able to know that phase angle

5    can be used to calculate power flow?

6    A.    No.  This is a small difference.  Those are becoming -- if

7    you're going into very technical details where there are -- I

8    wouldn't say secret, but there are some tricks of the trade.

9    Then having more experience is helpful, but doing basic stuff,

10   no.

11   Q.    Just calculating power flow with phase angle, is that

12   basic?

13   A.    Again, any student or, I guess, good student finishing

14   electrical engineering can do it.

15   Q.    We talked about how you put arrows on your map --

16   A.    Yes.

17   Q.    -- to indicate power flow direction and orientation?

18   A.    Yes.

19   Q.    How did you find out that the flow would change, the

20   direction?

21   A.    In very simple cases, for instance, when I may be in a

22   rush, you will just see by the absolute variance of the angle.

23   Angle on the generator is always bigger than angle on the load;

24   so as a result this, immediately will show which direction

25   power flows.  If you actually have to compute something, then

1    it's -- I don't think you understand.  It's a limitation.

2    Q.    So is it somebody with some basic level of understanding

3    and experience in the field would come to know by looking at

4    the files and working with them that power flow changes

5    direction over time?

6    A.    Well, yes.  Look at examples of every ISO is posting on

7    the website.  You will see, for instance, if transmission line

8    is down, then power flow may change.  Is generator is down,

9    power can change.  And those examples are in very basic

10   training materials and all ISO are posting.

11   Q.    So this is information the ISOs publish?

12   A.    Yes.  It's common knowledge.

13   Q.    Public information?

14   A.    Published information.  Not only public.  Again, training

15   material.  It's not public.  Training material.

16   Q.    Are you aware of any of those materials published by the

17   Midwest grid?

18   A.    Sure.  We can go to the website and find some.

19   Q.    Okay.  Let's do that.  I think we're going to look at one

20   in particular when we talk about the comment fields.

21   A.    Comment field.

22   Q.    Yes.  In fact, let's do that in just a second.

23         Let's talk about two more things and let's look at your

24   software and then we'll look at MISO.

25   A.    Sure.

1    Q.    Shift factors?

2    A.    Shift factors.

3    Q.    Do you work with shift factors, Professor?

4    A.    I work -- frankly in our group, we don't like this term,

5    but yes.

6    Q.    You don't like the term shift factor because it's

7    imprecise?

8    A.    Because we think about it in more -- in a more -- I don't

9    know which word to use.  Shift factors are great when you look

10   at the static flow; but when things start changing, shift

11   factors are -- I wouldn't say not good, but we just prefer to

12   run -- to do simulations from scratch.

13   Q.    Is it fair to say that shift factors are the common way of

14   doing it?

15   A.    Yes.  We just -- we just -- I -- I want to believe that we

16   just moved slightly beyond that.

17   Q.    Your software is more sophisticated than simply using

18   shift factors?

19   A.    I want to believe so.

20   Q.    Can you explain in a couple of sentences to the jury your

21   understanding of how shift factors are -- relate to congestion

22   for the calculation of flow and congestion on the network?

23   A.    I have a proposition.  One picture worth seven words.  Why

24   don't we go to website of MISO and look real-time what is

25   happening right now.  This will explain everything.  We don't

1    have to say, you know, many, many, many sentences.

2    Q.    Let's do that.  Okay.

3    A.    Is okay?

4         MR. CONNOR:  Yes, if it's all right with Your Honor.

5    BY MR. CONNOR:

6    Q.    So can you tell us where you're going as you take us

7    there, Professor?

8    A.    Okay.  We are going to Midwest MISO website.

9         THE COURT:  Mic.  Keep your --

10   A.    We are going to Midwest ISO website.  Not only that.  I

11   don't even want to go to website.  I will take MISO in Google,

12   yes?  MISO real-time map.

13        Yes.  Real-time displays.  Do you see?  It's what's

14   happening right now, and what we can do to see what is

15   happening in Houston actually.

16   BY MR. CONNOR:

17   Q.    So what are we looking at right now?

18   A.    Yes, just -- just a second.  Let it load.

19        So this is -- right now we will see here a map of Midwest

20   MISO or ISOs.  MISO.  Here is information about actual load,

21   supposed load, plant load.  Huge amount of information, which

22   by the way, everything is in time series, yes.  You see

23   congestion is happening right now.  Power shank transformer.

24   Q.    Second line.

25   A.    Second line from the top, yes.  Power shank transformer.

1    Q.    And, Professor, you said that we're seeing congestion

2    there?

3    A.    Yes.

4    Q.    How do you know that?

5    A.    Yes.  Let's look at that.  You see some points are having

6    negative price?  You see?  Deep blue.  Deep blue here.  And

7    this is positive price.  Between those two points -- well, not

8    points.  Online in this direction there's a congestion; so

9    power going from southwest to northeast is congested.  So this

10   is an example of congestion.

11   Q.    So this is a public website, Professor --

12   A.    Yes.  Of course.

13   Q.    Did it have your credentials saved?

14   A.    No, no, no.  Again remember --

15   Q.    You didn't have to log in?

16   A.    -- I went to Google.  I typed Google, and that's it.

17         Now, if you want to have any information about condition,

18   about the load generation, everything is here, pulls up.  Price

19   of the points, everything is here.  You don't have to have any

20   credentials or anything.  It is publicly-available for anybody

21   to see.

22   Q.    So relate this to shift factors for us.

23   A.    Okay.  Now, if we -- I will try to be as simple as

24   possible; and if I will be annoyingly, annoyingly technical,

25   excuse me.

1        Let me explain how the condition happen first.  Think

2    about large city, for instance Houston.  During summer people

3    are coming to the power jack and just turn on the light and

4    they expect the light happen, yes?  We think about this as

5    everyday thing, but actually it's mystery because behind the

6    scene should be real-time match between generation and

7    consumption.

8        Now, what happens in the hot days when Houston has a huge

9    amount of AC power and transmission line cannot physically

10   transmit it?  Because transmission line is physical equipment

11   designed for a certain transmission capacity and it cannot

12   transmit more than it was designed for, because if it would

13   transmit more, it will physically heat, sag, touch the ground

14   and unpleasant things may happen after that.  So as a result

15   people in the city turning on the light, but the system cannot

16   literally provide it, how do you resolve it?  There's very

17   simple way to resolve it, and the way is to offer local

18   generators higher price.  Local generators, those that are

19   inside Houston.  If you offer a higher price, those generators

20   are extensive because it's very...

21   Q.   Can you repeat what you just said, because I think that

22   was very fast.

23   A.   Okay.  My apology.  I will again.

24       People are turning on the light; but however, transmission

25   line cannot run -- cannot physically deliver the light, deliver

1    the power.

2         And how do you resolve this contradiction?  And there is a

3    way to resolve this contradiction.  It is to offer local

4    generation higher price, local generation, which is inside of

5    Houston local basically.  You offer it at a higher price, then

6    it will turn on.  It's expensive generator running on basically

7    maybe natural gas; but for special design, it's designed to

8    be -- it's designed to be run unfrequently.

9         I will explain to you in a nutshell.  So this is why

10   prices in different systems, prices in different points of the

11   system may be different, because if the transmission line is

12   not overloaded, price everywhere will be the same.  It will be

13   transmitted over power -- power line.  But if power at some

14   point is in deficit, it is necessary to turn on local power

15   generator, hit send, prices will be different in different

16   parts of the system.  So now coming back to shift factors.

17   It's effectively, in a nutshell, effect of -- I try to be not

18   technical.  It's effect of offering generator a higher price

19   and see how this price will be distributed through the system.

20   Q.   Let me try to summarize.  Tell me if you agree with this.

21   A.   Okay.

22   Q.   Does the shift factor quantify the degree to which a

23   specific element or a change in the power grid contributes to

24   congestion?

25   A.   Yes, because again this thing is very quantitative because

1    it raises the price.  The amount of money involved and exchange

2    of money between different factors involved, everything

3    becoming very precise quantity, yes.

4        I just don't want to bore people with mathematics.  I know

5    how annoying it might become.

6    Q.    Is there a conventional way of calculating shift factors

7    when you have a linear system, a big matrix?

8    A.    Yes.

9    Q.    Mathematically what's that called?

10   A.    I believe -- I don't want to go into that because we have

11   our secret way of doing it.

12   Q.    Forget your secret way of doing it.

13       Let's talk about the conventional way, just the common

14   way.

15   A.    Conventional way?

16   Q.    The textbook way, if you will.

17   A.    The textbook way.

18       As far as I remember, shift factor would mean change of --

19   it would be activity of the inversion to change of one element,

20   if I'm not mistaken.

21   Q.    So in other words, basically speaking, you have to invert

22   a matrix?

23   A.    Yes.

24   Q.    That's the commonly-known way of calculating shift

25   factors?

1    A.    We do it differently, but yes.

2    Q.    Okay.  Would you say you do it, like you described earlier

3    about calculating power flow, that you do it in a more advanced

4    way?

5    A.    Yeah, I hope.  I want to think so, yes.

6    Q.    And does everybody in the business understand that the

7    conventional way of calculating power -- shift factors involves

8    inverting the matrix?

9    A.    Don't trust me.  Let's go to the web and try a shift

10   factor.

11   Q.    Well, would you find discussion about inverting a matrix?

12   A.    You will not get discussion.  You will have many tons of

13   paper discussing it.

14   Q.    Let's do it if we have time.

15   A.    Okay.

16   Q.    If we have time.  There's one more piece I want to cover

17   about this, and then I want to make sure we have time so the

18   jury can see your software in operation.

19   A.    Yes.

20   Q.    You have a map, and we're going to see it?

21   A.    Yes.

22   Q.    I think you described some software you wrote to show the

23   map.

24   A.    Yes.

25   Q.    Okay.  What are some of the things that we see and are

1   going to see on your map?

2   A.   We will see simple things like graphs of condition, just

3   general topological structure of the grid, different lines,

4   different colors of the line.  We can move in and out.  It

5   resembles Google map in a way.  It's not precisely the same,

6   but -- what else?

7   Q.   Can you zoom?

8   A.   Of course.

9   Q.   Pan?

10  A.   Without a doubt.

11  Q.   Is the map connected to any other visual displays of data,

12  your software?

13  A.   We can do it, yes.  If we load additional files, yes, it

14  will -- it can import data and show this on the map, yes.

15         MR. CONNOR:  At this time, Your Honor, I would like to

16  show the jury the boards and summarize this segment of

17  Professor Kliakhandler's testimony.

18         MR. WALKER:  It wasn't part of his report --

19         THE COURT:  Approach.

20              (Conference at the bench, as follows:)

21         MR. CONNOR:  He provided the videos.

22         THE COURT:  I understand.

23         MR. CONNOR:  He didn't submit a video report and he did

24  not analyze the transcripts, but what he just testified about

25  was each one of them organically.  I did not provide them to

1    him.  I asked him how his stuff worked.  He described it in

2    terms that are in the transcripts, and I would like to show

3    them and check them off.

4              THE COURT:  All right, sir.

5              MR. WALKER:  He was not even designated in a protective

6    order to be able to see the trade secrets.

7              THE COURT:  As being able to see the trade secrets?

8              MR. WALKER:  Our trade secrets were designated as

9    confidential, and so he didn't even have access to them to do

10   this analysis that they're about to do.

11             THE COURT:  Well, he could do the analysis.  You can

12   cross-examine him on the limits of what information he was

13   provided and relied on in arriving at these conclusions and

14   opinions, but I'm going to allow it.  That's cross-examination.

15             (Conference at the bench concluded.)

16             THE COURT:  All right.  You may proceed.

17             MR. CONNOR:  Thank you, Your Honor.

18             THE COURT:  And, Professor Kliakhandler, your attention

19   is going to be drawn away from the mic.  Talk into the mic.

20             THE WITNESS:  I will do my best.  Thank you.

21             THE COURT:  Thank you.

22   A.    Okay.  Right now let me go to my home computer.  I am

23   using so-called Team Viewer.  It's commonly known, I think; so

24   I will connect to my home machine.

25   BY MR. CONNOR:

1   Q.   So let's get that queued up and then I want to summarize

2   what you've talked about so far and then we'll do the

3   demonstration.

4        So you're remoting in to your computer in your office?

5   A.   Yes.

6   Q.   Okay.  Now, just a little bit of background so that it's

7   clear and the jury understands, Professor.

8   A.   Yes.

9        Just a second.  Right now -- right now, for instance, my

10  code is compiling, already compiling -- I specifically want to

11  do this to show -- it compiles database of power flow just as

12  we speak.

13  Q.   How do you know that?

14  A.   Because I see this code is running.  You see this?  You

15  see?  You see this thing?  My code is running.

16       Next file, closing.

17       Next file, closing.

18       I do this specifically for this purpose.

19       THE COURT:  Slower.

20       THE WITNESS:  Thank you.

21  A.   You see this window is appearing.  My tool takes those

22  so-called SE files, 1500 of them, one by one, processes those

23  files, throws the thing into CSV file of power flow.

24       Takes the next one, processes, throws the data in CSV file

25  of the data and just goes through the entire stack of those

1    1500 files.

2         And my software, because it computes incredibly much more

3    than just power flow, it takes about two minutes.  I have the

4    numbers from Sunday, and it will run for two more days.

5    BY MR. CONNOR:

6    Q.   Calculating power flow on every branch --

7    A.   Every branch.

8    Q.   On how many cases?

9    A.   1500 cases.

10   Q.   And when you're finished, you'll have all the data you'll

11   need to create a time series of power flow for 1500 cases?

12   A.   I will not have data.  Those will be time series.  Those

13   will be time series.  And, again, time series is just -- it is

14   just spreadsheet, two-column spreadsheet.

15        Date and something else.

16        Date, power flow.

17        Date, stock price.

18        Date --

19             THE COURT:  Slower.

20   A.   Date, stock price.

21        Date, blood pressure.

22        Date, temperature in Houston.

23        Whatever.

24   Q.   So with respect to power flow --

25             THE COURT:  You are mic-free.

1      MR. CONNOR:  Thank you, Your Honor.

2  BY MR. CONNOR:

3  Q.   Linking the data from the Midcontinent grid into a time

4  series of cases is something your software does?

5  A.   Yes.

6  Q.   Okay.  Let's stop for a second because I want to ask you a

7  couple of questions.  So you don't know what the trade secrets

8  are that are asserted in this case, do you?

9  A.   I know my trade secrets.  I don't know other trade

10  secrets.

11  Q.   You don't know the trade secrets that Saracen claims in

12  this case.

13  A.   I don't have slightest -- well, I was told by -- by --

14  first of all, you've got Saracen original motion, those trade

15  secrets which pertain to loading and processing the data, as

16  far as I remember.

17  Q.   Loading and processing data?

18  A.   Yeah.

19  Q.   Okay.  What kind of data?

20  A.   We're talking about those SE files and extraction of data

21  on -- extraction of power flow data on every line and then

22  maybe manipulation of the data.

23  Q.   So generally speaking we're talking about gathering the

24  power grid data and congestion information that you use to

25  calculate power flow?

1    A.    Yes.

2    Q.    Okay.  And that's something your software does?

3    A.    Yes.

4    Q.    And it's something you described earlier as something that

5    a lot of people do?

6    A.    You have to be a little bit more careful.  I wouldn't say

7    a lot of people are doing it because let's say -- let me take

8    the liberty to explain.

9          Let's say you want to have a server, yes.  Nowadays you,

10   of course, may go to the store, buy server and do everything by

11   yourself.  You can do it, but many people find it more

12   economical and more interesting and more basically reliable and

13   just convenient to go to Amazon and rent server from them.  So

14   is there anything mysterious about making your own server?  No.

15   Is it convenient?  Not necessarily.  The same is true here.

16   I'm not saying that every person is actually doing it.  I'm

17   saying, look, not every person, but maybe people can do it, not

18   to say they are doing it.

19   Q.    So there's nothing mysterious about gathering that

20   historical data from MISO or any of the other grids?

21   A.    No.

22   Q.    You also talked about your software and how it calculates

23   power flow.

24   A.    Yes.

25   Q.    And you described it as using some of your own proprietary

1    methods that are a bit more advanced?

2    A.    I want to hope so.

3    Q.    Of course.  I'm sure they are.  But you described

4    calculating power flow using phase angle as the common way of

5    doing it.

6    A.    It's the definition.  It's a definition of how power flow

7    is defined through angles.

8    Q.    Okay.  And then we talked about the direction of power

9    flow.  You are going to show us on your map the arrows?

10   A.    Yes.

11   Q.    Is that something else that everybody in the business

12   knows?

13   A.    It's -- you know, let me explain again.  Let's look at

14   the -- at this -- at this flow of mine, yes?  Generally

15   speaking, you want to go from here, from low price to higher

16   price, yes?  From low price to higher price.  Making mistake of

17   inverting -- inverting the direction of the flow is most

18   horrible mistake that you physically can make in this business

19   and I know people who have done it and consequences have been

20   astronomical.  I know people who have been losing 2 million an

21   hour because they missed the direction.  So I don't want to be

22   in this place.  I'm not sitting on minutes of someone else's

23   money; so I -- yes, direction is extra super-important.  It's

24   one thing to go from, say, from Chicago to New York.  Totally

25   different thing to going from New York to Chicago.  Completely

1    different thing.

2    BY MR. CONNOR:

3    Q.    Is it fair to say that the direction of power flow is

4    something everybody in the business pays attention to?

5    A.    It's the very most important thing.

6    Q.    Now, what is a bus name?

7    A.    A bus name is a typical way to call a physical bus.

8    Q.    Is that secret information?

9    A.    No.

10   Q.    Is it published in the case?

11   A.    Absolutely, of course.

12   Q.    And does MISO publish the names of the buses?

13   A.    In those raw files without a doubt.

14   Q.    Does everybody in the business know what those can be used

15   for?

16   A.    Absolutely.

17   Q.    What can they be used for?

18   A.    Whatever you want.  You can -- when you do trading

19   decisions, first of all, you have to trade points.  If it's

20   about direction, it's from one bus to another bus.  If you

21   think about -- I don't know.  Literally everything is connected

22   to the bus name.

23   Q.    Now let's move on to shift factors.

24   A.    Just a second.

25   Q.    Uh-huh.

A.    Just a second.  Bus name is one thing.  Name of a bus line
slightly different thing.  I want to emphasize this very, very,
very strongly.  It is necessary to understand that transmission
equipment is very expensive.  Power line between two large
cities, a high-voltage power line may cost literally half a
billion dollars, literally $500 million.  So would you think
that line or piece of equipment, which is worth a few hundred
million dollars, or a simple line that could cost a few million
dollars -- would you think that the equipment, which is worth a
few million dollars have very specific name?  Of course, yes.
Every car has different license plate, yes?  It's much less
expensive.  So every line has its unique name, which is, of
course, mentioned in those raw files.  Again, it's very
expensive equipment.

Q.    And very common to name it?

A.    What?

Q.    And is it common to name them?

A.    Of course.  Again, it's expensive equipment.  It will not
happen without, you know, calling line ABC.  It's usually very
specifically connected to geographical names.

Q.    Professor, when you link your time series cases --

A.    Yes.

Q.    -- do you use the name of the equipment?

A.    Yes, sir.

Q.    Is that --

1    A.    Do you want me to show you?

2    Q.    -- the easiest way to do it?

3    A.    Yes.  Do you want me to show you?

4    Q.    Can you show us?

5    A.    Yes.  Okay.

6         I'm on my home machine.  Here I have folder, which is

7    called specific MISO power flow data by place.  Let's go here.

8    You see the way this is organized?

9    Q.    Is there any way can you make it larger?

10    A.    I will do my best.  Just a second.  Wait, wait, wait.  No.

11    Q.    Tell us what you're looking --

12    A.    Because it's updating, as we speak.  It will update.

13    That's what I'm telling.

14    Q.    So let's make it a little bigger if we can.  It's a little

15    hard to see.

16         But meanwhile tell us what you're looking at.

17    A.    Okay.  Let's look at -- for instance -- I don't know.  Let

18    me look at -- okay.  There is one.

19         First few letters, those which will finish with LN would

20    be name of the line.  You see it's not just 123.  It's a long

21    name; because again, it's an expensive equipment.  Then you see

22    name of one substation and name of another substation, because

23    lines are between one substation and another substation.  It is

24    the way they -- it is organized on the ground and all of them

25    are organized this way.  Name of the equipment, name of the

1    equipment, name of the equipment.  It's here.  One substation

2    and another substation.  All those files are organized this

3    way, and let us see how many files we have here.  We have here

4    172 -- 73,000 lines.

5    Q.    73,000 lines?

6    A.    No, no, no.  173.  I would have to deal with direction

7    again because those -- why is it a doubling?  Because direction

8    may switch and that's why there is a doubling of the lines --

9    the number of lines.

10   Q.    Got you.

11   A.    Let me deal with this later.

12   Q.    So you link time series --

13   A.    Yes.

14   Q.    -- using the bus name?

15   A.    You want me to open it?

16   Q.    What are we going to see?  A picture of the map?

17   A.    It's okay.  Let's take a look.  Okay.  Let's see.

18   Q.    So we're going to see your software in action?

19   A.    Yes.  You may say so.

20         Okay.  Here is MISO grid.  Here is MISO grid.

21   Q.    This is the Midcontinent grid?

22   A.    Yes, Midwest MISO grid.  Here is Lake Michigan, Chicago,

23   Lake Superior.

24   Q.    And the purple lines?  Those are --

25   A.    Purple lines, those 500KV lines or here 765KV lines, here

1    blue lines, 345; and some green lines, is 230KV lines.  So here

2    we see the entire U.S. grid as if it would be from the

3    satellite.  The lines which are within MISO proper are bold

4    lines.  Lines which are further down from MISO, they are --

5    what is the right way to call them -- subdued lines.

6    Q.    You created this software yourself?  You wrote this --

7    A.    Yes.  From the first to the last line, yes.

8    Q.    -- for your own use --

9    A.    Yes.

10   Q.    -- inside your company for trading?

11   A.    Yes.

12   Q.    Did you look at anybody else's software to --

13   A.    Well, I have seen couple -- well, maybe five times how

14   PowerWorld operates.

15   Q.    You said PowerWorld?

16   A.    PowerWorld, yes.

17         But for me best example is basically Google map.  You

18   don't have to go further.  Google map is very functional,

19   simple.  To me I have good benchmark against my eyes every day.

20   Q.    Stepping back here to what you described earlier as

21   inverting the matrix --

22   A.    Yes.

23   Q.    -- that's, I think you said, a common way to -- or a more

24   conventional way, maybe not the way you do it, but --

25   A.    Okay.

1    Q.    -- a conventional way to calculate shift factors?

2    A.    Oh, you see?  You see it's exactly what I said.  Okay.

3    Q.    The way it's set right there in Number 5 --

4    A.    Okay.

5    Q.    -- do you agree -- is that common?

6    A.    I think it's definition.

7    Q.    Okay.  Now, the last one, Number 6, we're looking at your

8    map.

9    A.    Yes.

10   Q.    Do you have maps, charts and --

11   A.    Okay.

12   Q.    -- tables in your software?

13   A.    No.  Let's look at some points.  Let's look at what's

14   happening here.  Here.  I click.  Okay.  I jump to this place

15   in the map.  Now on this -- on this -- another tab -- again the

16   vast majority of my things I inherit from Google.  You don't

17   have to go any further.  Here you see large map, and you see

18   where we are looking.  This red rectangle shows where we are

19   looking.  It's very -- it's here.  You see we're near city of

20   Fort Wayne.  There are three -- three high-voltage lines, 765KV

21   lines, go down this point.  There is transformer here.  If you

22   want to see -- can you -- you see those lines?  Green

23   transformer, very well-known thing.  Here you will see green

24   transformer, one of them.

25   Q.    So that's a particular transformer --

1    A.    Yes.

2    Q.    -- that --

3    A.    Yes, it is.  So you see, because multiple information is

4    literally staggering, beyond comprehension, so it's necessary

5    to think about the way to compress information.  So it would --

6    the way I think about this or the way I perceive it, I have

7    those -- those small, small elements, you have to just put --

8    not even click.  You put mouse over it and you see condition,

9    condition which has happened on this specific transmission

10   element.

11   Q.    And is that -- and are we looking at the transmission

12   element in that chart that corresponds to what we were looking

13   at on the map?

14   A.    Again?

15   Q.    Yes.  Did you pull up this chart because you had clicked

16   on the map?

17   A.    Yes, yes.

18   Q.    So they're linked?

19   A.    I didn't click.  I just push, push my house over.  I

20   didn't do a click.  I just push my mouse over.

21   Q.    And this is something you developed yourself?

22   A.    Yes.

23   Q.    Was it -- and for your internal use?

24   A.    Yes.  Visually presenting charts, tables, the

25   information -- historical power -- first time series, shift

1  factors, yes, resulting constraints, yes, that's what we've

2  seen.

3  Q.   That's the first time you've seen this, isn't it?

4  Number 6, Number 5, all of these.  Have you ever seen these

5  before just now?

6  A.   I don't get it.

7  Q.   Have you ever seen this list of six things?

8  A.   The list of six things?  No.  This is a list?

9  Q.   Well --

10  A.   I don't get question.

11  Q.   Have you ever seen this statement or description before?

12  A.   Well, the definition, yes.

13  Q.   Differentially --

14  A.   Differentially -- definition of shift factors, yes, I have

15  seen.

16  Q.   What about 6?  Have you ever seen those?

17  A.   Method of visually presenting -- so it's -- in a nutshell

18  my computer is doing -- I don't get question.

19          MR. CONNOR:  I think you've answered it, Professor.

20  Thank you.

21              I pass the witness.

22          THE COURT:  Cross?

23                    **CROSS-EXAMINATION**

24  BY MR. WALKER:

25  Q.   Good afternoon.

1    A.    Good afternoon.

2    Q.    You were retained by Marginal Unit as a consultant in this

3    case, correct?

4    A.    Consultant?  I don't think so.

5    Q.    You have an agreement with Marginal Unit's counsel?

6    A.    I don't recall, but maybe, okay.

7          MR. WALKER:  Let's go to Plaintiffs' Exhibit 91.

8          THE WITNESS:  Okay.

9          MR. WALKER:  Zoom in on the top.

10   BY MR. WALKER:

11   Q.    This is the agreement between you and Marginal Unit to be

12   an expert witness in this case?

13   A.    Yes, not consultant, but expert witness, yes.

14   Q.    And this happened in April of last year, of 2019?

15   A.    Yes.

16   Q.    That was around the time that counsel for Marginal Unit

17   approached you?

18   A.    Yes.

19   Q.    That was Marginal Unit that sought you out, correct?

20   A.    It's not how it happened.  I have spoken with the

21   attorneys for Marginal Unit.  I have seen Sylvain Ross only in

22   probably month and a half, maybe even two months.  I don't

23   remember, but it was not Marginal Unit -- attorneys for

24   Marginal Unit.

25   Q.    It was the attorneys for Marginal Unit that contacted you

1    first?

2    A.    Yes.

3    Q.    You don't normally do expert witness consulting for

4    litigation, correct?

5    A.    Again, the word consulting has a couple of different

6    meanings in my business.  I have not been expert witness

7    before, yes.

8    Q.    If we go down to the bottom of this page, you're being

9    compensated at $325 an hour for your time?

10   A.    Not today.

11   Q.    But you have for the time that you've spent on this case?

12   A.    Not today, not yesterday, not our second deposition, no.

13   I only given single pay.

14   Q.    You have billed time for some of your work on the case,

15   correct?

16   A.    For some of the work; but, again, at the very beginning,

17   the second deposition, time counted yesterday, time counted

18   today, not a single penny.

19   Q.    You are the majority owner of the Intergrid group of

20   companies, correct?

21   A.    Yes.

22   Q.    Their business is generally trading in electric power?

23   A.    Yes.

24   Q.    That includes trading in FTRs?

25   A.    Yes.

1    Q.    Your companies still have about 15 employees?

2    A.    You may so say.

3    Q.    Most of them are based in Russia?

4    A.    Yes.

5    Q.    And they're managed day to day by your brother?

6    A.    Yes.

7    Q.    Each of those employees signed confidentiality agreements.

8    A.    Absolutely.

9    Q.    You have them sign those confidentiality agreements before

10   they start with the company?

11   A.    Before they sign agreement with the company, first thing.

12   Q.    And one of the things you seek to protect with your

13   confidentiality agreements is your software?

14   A.    Repeat again.

15   Q.    One of the things you seek to protect with that

16   confidentiality agreement is your software?

17   A.    To some extent, yes.

18   Q.    You developed some software internally?

19   A.    Yes.

20   Q.    You consider that confidential to the company?

21   A.    Yes.

22   Q.    You also use the confidentiality agreements to protect

23   your internal procedures?

24   A.    It's much more human-based.  You cannot, you know -- you

25   cannot protect it.  If person is smart, you cannot protect --

1    you cannot protect him being smart by confidentiality, you

2    know.

3    Q.    You use the confidentiality provisions to protect your

4    data, software and procedures?

5    A.    Data, yes.  Software and what else?

6    Q.    Procedures.

7    A.    You may say so.  In a little sense, yes.

8    Q.    Do you recall your deposition in this case?

9    A.    Maybe.  I don't necessarily recall every detail, but yes.

10    Q.    You have each of those employees sign a confidentiality

11    agreement?

12    A.    Yes.

13    Q.    It's for the time period while they're employed at the

14    company?

15    A.    Yes.

16    Q.    And they're expected to keep it confidential even after

17    they leave the company?

18    A.    Not necessarily so.  Again, if person is smart, you cannot

19    keep him being confidential.  You expect him not to immediately

20    run and post your software up on a website somewhere.

21    Q.    You expect the confidentiality agreements to run

22    indefinitely?

23    A.    No.  I'm not -- they're not my slaves.  They have their

24    own lives.  Why they -- effectively we're having conversation

25    about this.  No, no, I force them to go to vacation and just

1    have their time.  They're not my slaves.

2    Q.    Do you remember being asked a question how long does that

3    confidentiality obligation last during your deposition?

4    A.    I don't remember.  Maybe.  I don't expect a reasonable --

5    we don't think about it this way.  At least I don't think this

6    way.  I do expect confidentiality, so I don't expect person

7    next day to -- to do something, you know, to physically harm

8    the business, yes.  I don't expect this.  But at the same time,

9    they're human beings.  You know, world is large.  I cannot tie

10   them to myself indefinitely.

11          MR. WALKER:  May I approach the witness, Your Honor?

12          THE WITNESS:  Sure.

13   **BY MR. WALKER:**

14   Q.    The question is:  How long does that confidentiality

15   obligation last?

16          Your answer:  Indefinitely.

17   A.    Maybe.  Okay.  Okay.

18   Q.    We talked -- you talked a little bit about some code that

19   was written by Svetlana, correct, the Svetlana code?

20   A.    Yes.

21   Q.    This was the piece of code that counsel for Marginal Unit

22   found on GitHub, correct?

23   A.    Yes.

24   Q.    All right.  So now this code is something that you

25   consider to be confidential to the company?

1    A.    Yes, I would think so.

2    Q.    The code itself is about five years old?

3    A.    Can I say something?

4    Q.    When your counsel is asking questions, yes.

5    A.    Okay.

6    Q.    The code itself was about five years old?

7    A.    Since you're asking me questions about what precisely I

8    say half a year ago, okay.  I perceived the same fear.  I don't

9    remember frankly, okay?  But let's assume five years ago.

10   Q.    There's a current version of the software code within the

11   company?

12   A.    Say it again.

13   Q.    There's a newer version --

14   A.    Yes.

15   Q.    -- of the code?

16   A.    Yes.

17   Q.    And that is kept as confidential within the company?

18   A.    Within the company, yes.

19   Q.    After you learned about this older code that was on the

20   GitHub --

21   A.    Yes.

22   Q.    -- you had a conversation with your brother about it?

23   A.    Yes.

24   Q.    And your brother was surprised that the code was available

25   on GitHub?

1    A.    In a way, yes.

2    Q.    He wasn't happy about it.

3    A.    He wasn't thrilled about it, yes.

4    Q.    He had a meeting with the employees afterwards?

5    A.    I didn't have the meeting, but he may have had the

6    meeting.

7    Q.    You understood that there was a meeting?

8    A.    Okay.

9    Q.    You understood that they were tidying up procedures?

10   A.    In a way, likely.

11   Q.    You personally preferred not to have internal code

12   available to the public?

13   A.    In a way, yes, we invest huge amounts of time.  I invest

14   my personal time, yes.

15   Q.    During your deposition you were asked to try to find the

16   code on GitHub on the internet, correct?  Do you recall that?

17   A.    Are you asking me about things which have been half a year

18   ago?  I sincerely do not remember.  If you say so, I say all

19   right; but I sincerely don't remember.

20   Q.    Do you remember not being able to find the code on the

21   internet?

22   A.    Yes, I do remember.  Just a second.  The fact that I was

23   unable to find it does not mean it was not there.  It's just

24   the rush of the deposition, the rush of those things, typing

25   things.  I was not able to do it.  It doesn't mean it's not

1    there.  It might not be there.

2    Q.    Are you aware of it still being available?

3    A.    I don't know.  I would presume it's not available, no.

4    Q.    Do you know how long the code was available on GitHub?

5    A.    No clue.  It likely was available before the issue emerged

6    and after this probably was available for maybe a couple of

7    months.

8    Q.    Do you know who had accessed the code while it was on

9    GitHub?

10    A.    I don't have the slightest clue.

11    Q.    Do you know how many times it was looked at?

12    A.    I don't have the slightest clue.

13    Q.    Do you know whether there was anyone outside of your

14    company and Marginal Unit's counsel that ever saw this code

15    that was on GitHub?

16    A.    I'm nobody's shepherd, you know.  If people find it, they

17    find it.  What shall I do?

18    Q.    Now, the code itself that was presented to you by

19    Marginal Unit's counsel, it wasn't enough to run by itself,

20    correct?

21    A.    It was not enough.

22    Q.    It needed some additional information within your company

23    to work, correct?

24    A.    That's correct, yes.

25    Q.    So with that code, it wouldn't operate by itself without

1    the additional information kept at your company?

2    A.    Most likely and especially taking into account its -- you

3    know, it's live organism and things are changing.  It's fair to

4    assume it's not necessarily going to be able to run, yes.

5    Q.    That code, the Svetlana code, that's not code relating to

6    the mapping tool that you have on your computer right now,

7    correct?

8    A.    No, it's the same as which Moscow office is doing.  We

9    have -- company has four software suites, one of them is mine.

10   One of them -- three of them are not mine.  So I prefer to talk

11   about my things because other things, you know, I may not

12   presume correctly.

13   Q.    So let's talk about your tool.  You refer to it as a

14   mapping tool?

15   A.    One of the tools, yes, is mapping.

16   Q.    And it was developed by you?

17   A.    Yes.

18   Q.    And you, again, have a Ph.D. in math, right?

19   A.    Correct, yes.

20   Q.    You were a professor in math for about six or seven years?

21   A.    Yes.

22   Q.    You've been a trader for the last 13 years now?

23   A.    About that.

24   Q.    Now, when you showed your tool to Marginal Unit's counsel,

25   you were the one actually driving the program, correct?  You

1    were the one at the keyboard?

2    A.    Of course, they have seen it first time, yes.

3    Q.    You later in this case a few weeks ago gave another

4    demonstration for myself and Mr. Craig Gontkovic?

5    A.    Yes.

6    Q.    He's the expert for Saracen in this case?

7    A.    Okay.

8    Q.    In that case, you were again driving the software,

9    correct?

10   A.    My piece of software, yes.

11   Q.    Now, you showed us pieces of your software --

12   A.    Yes.

13   Q.    -- correct?

14   A.    Yes.

15   Q.    There were other pieces of it that you didn't show to us

16   because it was more sensitive, correct?

17   A.    Not necessarily so.  Again, this mapping tool already

18   contains substantial amount of information which is

19   proprietary, you would just not guess looking at is what is

20   this.  It's like trying to find the needle in the haystack.

21   This already has a substantial amount of proprietary

22   information.

23         Because this business is actually very dangerous, you just

24   have to literally switch direction of the so-called source and

25   sink.

1        So I intentionally structured.  Me.  It was my design and

2    I insist on this design and intentionally structured business

3    in such a way so human being can always intervene and fix

4    something because they have seen examples when software

5    basically doesn't sink from the very beginning until the very

6    end and the result may be disastrous.  And I don't want this,

7    so I intentionally split my software into pieces.

8        And as far as I understand, in this litigation, this

9    issue, at least mapping pieces, mapping tools have been a

10   discussion.  So, yes, I have shown you mapping tool, yes.

11   Q.    Okay.  Let me focus on this.  So you originally prepared

12   some video demonstrations of your tool for Marginal Unit's

13   counsel?

14   A.    Yes.

15   Q.    And in those videos you were reluctant to show certain

16   features of your mapping tool, correct?

17   A.    Features, not necessarily.  I just say that there are

18   some -- again, James, I don't appreciate you talking about me

19   what has happened half a year ago.  Precise -- how precisely

20   they say -- I don't want to be quoted on that.

21       But I think that there are some small -- some technical

22   secrets which probably I don't want to talk about, but not

23   necessarily -- again, mapping tool is the way you see it.  It

24   already contains substantial amount of proprietary knowledge

25   the way we perceive the data.  But you'll never be able to

1    guess just looking at the map.

2         So, again, if you want to ask me something, I am not here

3    to show you anything.

4    Q.    In the videos --

5    A.    Yes.

6    Q.    -- you indicated that you were reluctant to show certain

7    features of the mapping tool, correct?

8    A.    Again, it happened half a year ago.  If you say so, let it

9    be so; but I sincerely do not remember.

10   Q.    May I approach --

11   A.    Yes.

12   Q.    -- to refresh your memory?

13        The question in the video:  You indicated that you were

14   reluctant to show certain features of the mapping tool?

15   A.    Yes.

16   Q.    And your answer was?

17   A.    Okay.

18   Q.    Yes?

19   A.    Okay.  If you say so, okay.

20   Q.    And you were even reluctant to describe those features --

21   A.    Yes.

22   Q.    -- because the features could be highly indicative of the

23   way you conduct --

24   A.    Yes.  And I'm reluctant now.  You will never be able to

25   guess what is this; but I'm reluctant now as well, yes.

1    Q.    Because you consider that to be highly proprietary?

2    A.    Reasonably proprietary, yes.  Yes.  Highly reasonable,

3    yes.

4    Q.    Now, as we heard testimony today, you have not seen

5    VisualNode Saracen software in this case, correct?

6    A.    No.

7    Q.    And you have not seen Panorama or Marginal Unit software

8    in this case?

9    A.    No.

10   Q.    So you have not done a comparison of your software to

11   either of the software being discussed in this case?

12   A.    No.

13   Q.    Were you here for the comparison of your software to

14   VisualNode and Panorama done by Mr. Gontkovic the other day?

15   A.    No.

16   Q.    Okay.  Your software works with MISO data, correct?

17   A.    No.  It's universal.  In this code -- in this code, if you

18   will look here at the very beginning, it's called MISO.  If I

19   looked here --

20         THE COURT:  There's something wrong with the screen.

21   Can you fix that?

22         THE WITNESS:  My apologies.

23   A.    Forget all this.  No.  It's universal.  It's around for

24   every market.

25   BY MR. WALKER:

1    Q.    You're a member of the MISO market?

2    A.    Yes.

3    Q.    You get data from MISO?

4    A.    Yes.

5    Q.    You get some of the confidential data from MISO?

6    A.    As well as everybody else, yes.

7    Q.    And as part of that, you signed a nondisclosure agreement

8    with MISO?

9    A.    As everybody else, of course.

10   Q.    And your software can use that confidential data from

11   MISO?

12   A.    Yes.

13   Q.    Do you believe that MISO has any ownership in your tools?

14   A.    My tools?

15   Q.    Yes.

16   A.    No.

17   Q.    So if we go to your software and go to your map --

18   A.    Yes.

19   Q.    -- you clicked on your map and you pulled up some

20   information?

21   A.    No.  I prefer to do it different way.  What is happening?

22   I don't know.  Just a second.  No, I don't do it this way.  Me

23   personally --

24   Q.    I'm just asking you to recreate what you previously did on

25   your direct examination.  You went to the map, you clicked on

1    it and some information pulled up.

2    A.    I did it just a few minutes ago.

3    Q.    Correct.

4    A.    Yes.

5    Q.    I would like to go back to that screen, please --

6    A.    Okay.

7    Q.    -- or one similar to it.

8    A.    Okay.  Okay.  Here is an example.  Let's see for a few

9    seconds.  Okay.  Give me a second.  Okay.  You want to see this

10   way?

11   Q.    Yes.

12   A.    Okay.  This condition.

13   Q.    This is showing binding constraints conditions?

14   A.    No, not conditions, binding conditions.  Shadow prices and

15   some other information.

16   Q.    So it's got pricing information?

17   A.    Yes.

18   Q.    Does it have on here flow information?

19   A.    It does not.

20   Q.    Does it have generator information?

21   A.    On this map, it does not.

22   Q.    Does it have load level information?

23   A.    Can I answer in a little bit of extended fashion?

24   Q.    Just a "yes" or "no."

25   A.    No.

1    Q.    Now, you indicate you have the ability to pull up time

2    series flow information?

3    A.    Without a doubt.

4    Q.    Can you show me how you pull up flow information for this

5    element that you're looking at right here?

6    A.    Again --

7    Q.    So pick a branch, pick a branch on your map and show us

8    how you pull up flow information for that branch.

9    A.    I think I have shown it in this folder.  I sincerely

10   believe it relates to the way business is performed.  As the

11   points of power of our business, young guys, they prefer

12   computer simulation.  They load data and compute those

13   distribution factors.  Their code runs for eight hours and then

14   they have the full database.

15          I myself work completely differently.  So if -- if -- by

16   the way, their map shows everything.  But, again, I created

17   this map for myself.  It shows -- I cannot -- by words of

18   Frank Sinatra, I do it my way.

19   Q.    If it's all right, let's get back to the task at hand.

20   A.    Okay.

21   Q.    On your map, let's pick a transmission.

22   A.    Okay.  This line, okay.  Let me -- okay, this line.

23   Q.    Okay.  Show me how you pull up time series information for

24   flow on that transmission line.

25   A.    Just a second.  I think we have shown, but let's do it

1    again.  Again, I am doing this -- if you want to show me how to

2    do it manually, this is the way I do it.

3    Q.    I want you to show me the quickest way to get there.

4    A.    Okay.  Here is the line, okay?  Let me open this.  Okay.

5    Here is the line.  Here is power flow.  You see?  And now I can

6    do whatever I want.  I can pull it through the map, et cetera.

7    Q.    Okay.  So this is the power flow information that you just

8    pulled up?

9    A.    Yes.

10   Q.    So this is a --

11   A.    I won't disclose it.  I don't want to give away my

12   calculations.

13   Q.    It's a long table, correct?

14   A.    Yes.

15   Q.    How long is this table?

16   A.    Okay.  Let's take -- we have four, five -- four snapshots

17   for every day.  You see?

18         Hour 0, 5, 12, 18.

19         0, 5, 12, 18.

20         Because we have 1500 days, 1500 times 4, 6000.  Because I

21   specifically try to show you how I'm doing it, in this case

22   it's not fully done yet, but I will think we will have what,

23   2016.

24   Q.    So we have thousands of lines of data in here?

25   A.    Thousands of lines, yes.  6,000 to be precise.

1   Q.    Now, how are we able to see this flow information

2   graphically in some sort of graphic chart?

3   A.    You want me to show you the way graphs are plotted in

4   Excel?

5   Q.    The quickest way to create a graph using your tool.

6   A.    I myself don't look at this very often.  Typically, I will

7   just look with my eyes.

8   Q.    Your eyes at the columns of data?

9   A.    Yes.  If you like, I can -- let me think.  Probably in

10  about -- I don't know.  It may be one hour of my time, I would

11  create two, which would bring information direct to the map.  I

12  prefer not to see because to me, it's too much.  I prefer to

13  put this information aside, me.  Young guys, they like it.  Me,

14  I want to be at arm's length.  But, again, if you want to do it

15  the same way as I began to run it on Friday, on Sunday, I can

16  in literally one hour, every single point on the map.  In

17  literally one hour -- give me one hour, every single point on

18  the map.

19  Q.    If you wanted to pull up time series information of

20  generation values --

21  A.    Yes.  Yes.

22  Q.    -- do you do something similar as you just --

23  A.    Sure.

24  Q.    -- went through?

25  A.    Yes.

1   Q.   If you want to pull up load information, do you do

2   something similar again?

3   A.   Yes, again.  Load, I would -- we look only at large load,

4   not on small load.

5   Q.   And so for every time that you want to search for power

6   flow or generation or demand load, you would go to your file --

7   A.   Just a second.  If I want this, it is very important.

8   Q.   Correct, if you want it.

9   A.   If I want this.  And I don't really want this very often.

10  Young guys, they like it.  Me, I just don't care.  So

11  information is more important.

12  Q.   So --

13  A.   Allow me to repeat again.  I did it my way.  Not Saracen's

14  way.  My way.

15  Q.   And your way --

16  A.   Yes.

17  Q.   -- when you want to go to power flow and you go to your

18  power flow file --

19  A.   The way I want, yes.  If I want, yes.

20  Q.   -- you have to search for that branch --

21  A.   Yes.

22  Q.   -- and then you pull up your table of information for you

23  to look at?

24  A.   Yes.  I -- I -- I -- if you want to challenge me in one

25  hour, every point on the map.  You will see all those points on

1    the map.  I don't use this functionality.  It's too much, but

2    it doesn't mean that it's such a big deal to bring this

3    information to the map.  If everything else is already there,

4    it's in a heartbeat.

5    Q.    Let's move on to a different topic.

6    A.    Sure.

7    Q.    Shift factors.  It's not a term you like to use.  You use

8    something similar, but something you call different, correct?

9    A.    Yes.

10   Q.    And to you, that's your secret way of doing things?

11   A.    Not secret, but my way.

12   Q.    It's not something that you're willing to share with us

13   how you do?

14   A.    No.

15   Q.    Orienting flow, you indicated it's something you focus on,

16   correct?

17   A.    Yes.

18   Q.    You indicated that was something that -- the most

19   important thing to get right?

20   A.    Yes.

21   Q.    And still, some people still get it wrong, correct?

22   A.    Well, people -- you know, people make mistakes.

23   Q.    Make mistakes that lose them a lot of money because it

24   wasn't oriented right?

25   A.    Sure.  I myself make mistakes, so I cannot judge anybody.

1    Q.    Now let's talk about time series in general.

2    A.    Okay.

3    Q.    I believe your testimony is that time series was simple,

4    correct?

5    A.    Sure.  Absolutely.

6    Q.    In this case, counsel for Marginal Unit asked to see your

7    program specifically with respect to how it shows time series,

8    correct?

9    A.    Repeat again.  I'm not sure.

10         MR. WALKER:  Well, let's go to Plaintiffs' Exhibit 90.

11   A.    Okay.

12         MR. WALKER:  Okay.  Let's go to the third page, top of

13   the third page.

14   **BY MR. WALKER:**

15   Q.    Here we have an e-mail.  Just to give us some variance

16   here, this is an e-mail from Mr. Cab Connor for Marginal Unit's

17   counsel to you asking you -- trying to set up a discussion and

18   meeting about your software, correct?

19   A.    Sure.  Yes, okay.

20   Q.    And your response --

21         MR. WALKER:  If we go to Page 2, you go at the bottom

22   to the bottom down there.

23   **BY MR. WALKER:**

24   Q.    Your initial response was a full version of the code was a

25   little too far for you, correct?

1   A.    Yes.

2   Q.    And then Mr. Connor in this give-and-take says:  Well, not

3   everything.  The relevant portions, for example, that download

4   MISO cases generate time series.

5   A.    Yes.

6   Q.    Okay.  So let's go to Page 1 and see your response to

7   that.

8   A.    Okay.

9   Q.    So at the bottom, this is an e-mail from you to counsel

10  for Marginal Unit, correct?

11  A.    Yes.

12  Q.    And here, you're saying:  It is easy to say, but much

13  harder to do, generate time series, correct?

14  A.    Correct.

15  Q.    This is a seriously involved and complex step.

16  A.    Yes.

17  Q.    First, it is necessary to continuously load MISO SE files

18  and store them.

19  A.    Correct.

20  Q.    This is not hard.  But then, it is necessary to read the

21  data from the files.  This involves data about buses of the

22  electrical system, generators, load, shunts, lines, transformer

23  zones, areas, interchanges between zones.

24      All of this data is written in different PSS/E formats.

25  It starts with Format 26, and the latest is 33.  It is

1    necessary to have manuals for all.

2        Correct?

3    A.    All this is correct.

4    Q.    Okay.

5        After all that, the data should be processed.  Though this

6    is supposedly written in a textbook, there are some exotic

7    cases, which really make a difference.  Unified processing of

8    data for phrase shifters, for instance, so-called zero lines,

9    lines with extremely small impedance and --

10   A.    Correct.

11   Q.    Next page, as we continue with your description.

12   A.    Yes.  This is correct.

13   Q.    Okay.  And you state here further that you perceive that

14   even understanding of what should be corrected compared to

15   textbook is your trade secret, correct?

16   A.    It is correct.

17   Q.    And then you go on with your recitation of the complexity

18   of generating time series by saying algorithms of computation

19   of power flow, there are few; and it is necessary to carefully

20   choose the right one.

21       Correct?

22   A.    No.  I sincerely believe you push -- you put words in my

23   mouth.  I said it's seriously involved step.  Seriously

24   involved, intense.  And there are --

25   Q.    It's a seriously involved and complex step?

1    A.    Yes.  Just a second.  Seriously involved and complex step,

2    the way I want to be put in perspective.

3    Q.    We'll get to that in a moment, but let's just finish with

4    your thoughts here.

5    A.    Okay.

6    Q.    Then you continue:  Only after all that, the power flow on

7    the lines and transformers is computed and then only it may be

8    assembled into a time series, correct?

9    A.    Yes.  The -- it describes the full -- the full -- the

10   business in full form, correct.

11   Q.    And then in your next paragraph, you tell Marginal Unit

12   counsel:  All that constitutes an involved piece of code, which

13   we would not like to disclose.  This is our trade secret.

14        That's correct?

15   A.    Yes, that's correct.

16        MR. WALKER:  That's all the questions I have.  Thank

17   you.

18        THE COURT:  Are you almost done?

19        MR. CONNOR:  Yes.

20        THE COURT:  Finish.  Then we'll take a brief afternoon

21   break.  Are we okay to do that?  Okay.

22                      **REDIRECT-EXAMINATION**

23   BY MR. CONNOR:

24   Q.    The code --

25   A.    Yes.

Q.    -- is that what you consider your trade secret?

A.    Yes.  With your permission, can I put things in a little more context?

Q.    Sure.

A.    Because otherwise, I believe the words taken out of context, they -- I misrepresent.

THE COURT:  Slow.

A.    They misrepresent.  What I describe here in this e-mail is full description of the business.  I considered request to look at the previous e-mail by Cab.

He said:  Can I take a look at the piece?

And I say -- I basically described the entire business of the company.  So while this is indeed complex things and we indeed do possess things that I may perceive as our trade secret and it indeed involved a complex step, no doubt about that, yes.  Nevertheless, in the same way, I was synching out the server.  It's hard, it's maybe annoying; but it's not mysterious.  It's very important thing.  It's hard, annoying; but not mysterious.

That's it.  That's what I wanted to say.

BY MR. CONNOR:

Q.    You said earlier that you also wanted to say something more about the Svetlana code.  Do you remember you weren't able to finish your explanation?  I wanted to give you an opportunity to do that.

1    A.    Again, we're talking about things which -- you know, about

2    which is gone a long time ago.  We have spoken about code of

3    Svetlana half a year ago.  Code is five years ago.  Now, I'm

4    seriously afraid to say something which will be misrepresented

5    or mis-whatever -- misprecisely construed to what I said

6    before.  I sincerely do not remember.  It's my sincere answer.

7    I do not remember.

8    BY MR. CONNOR:

9    Q.    I think we all do appreciate that.

10        Last question:  Do you recall in dollar terms how much you

11   have been compensated for the time you spent last year helping

12   Mr. Ross and Marginal Unit?  What's the total amount of money

13   that you've been paid?

14   A.    7,200.  $7,200.

15   Q.    Seven thousand --

16   A.    -- two hundred.

17        MR. CONNOR:  No further questions, Your Honor.

18        THE WITNESS:  That's it.

19        THE COURT:  All right.  Thank you.

20            Ladies and gentlemen, we'll take an afternoon

21   break.  Thank you.  15 minutes until 4:00 and then we'll work

22   till 5:00.

23            (The jury exited the courtroom.)

24        THE COURT:  You may step down, sir.  You're fine.

25            Did that take less time than we thought it would,

1    or was that about right.

2          MR. CONNOR:  It's about right, Your Honor.  I think

3    we're on schedule.

4          THE COURT:  Your next witness?

5          MR. CONNOR:  Our next witness is Mr. Rawad Al-Awar.

6          THE COURT:  All right.  And he's here?

7          MR. CONNOR:  He should be in the hallway.

8          THE COURT:  Okay.  Fine.  So we'll give you a revised

9    copy of the charge probably at the end of the break.  We'll

10   look at any authority you have on whether there is a heightened

11   showing for willful and malicious.  I need it pretty quick and

12   we'll go from there.

13                All right.  Thank you.

14                     (Court is in recess.)

15         THE COURT:  All right.  Are we ready.

16         MR. CONNOR:  We have one.  Hopefully it's not much of

17   an issue.  It's probably something that we can resolve if we

18   can confer.

19         THE COURT:  All right.

20         MR. CONNOR:  But we've got some counter-designations to

21   the short clip of Mr. Maurizi's deposition that we wanted to

22   play.  Our cuts are about 13 minutes.

23         MR. DAVILA:  Just around 14 minutes.

24         MR. CONNOR:  And the counter-designations bring the

25   total up to 45 minutes.

1        MR. DAVILA:  No.  Number 22.

2        THE COURT:  Whatever it is.

3        MR. CONNOR:  So, you know, we've got objections to

4   these because they're not responsive to the --

5        THE COURT:  Let's play them all.  We'll just play them

6   if we can.

7        MR. CONNOR:  We'll try to get all of that squeezed

8   today, Your Honor.

9        THE COURT:  You know, we'll do what we can.  It sound

10  like it's going to extend the day -- or the trial by about five

11  minutes.  I think that's okay.

12       MR. CONNOR:  Okay.  Well, then, we're ready to go.

13       THE COURT:  Okay.  Tell them to bring in the jury.

14       A general objection of nonresponsiveness of

15  counter-designations is generally not persuasive.  It's a form

16  of cross-examination.  There's always the completeness argument

17  that can be hard to counter.

18       I think we're ready.

19       THE COURTROOM MANAGER:  All rise for the jury.

20           (The jury entered the courtroom.)

21       THE COURT:  Please be seated, ladies and gentlemen.

22       MR. CONNOR:  Defendants call Mr. Rawad Al-Awar.

23       THE COURT:  Raise your right hand and be sworn.

24           (The oath was administered.)

25       THE COURT:  Take the stand.  Speak closely and directly

1    into the microphone.  It does not pick up from a distance.

2              MR. CONNOR:  It really like it about that far away.

3              THE WITNESS:  Got it.

4                        **RAWAD AL-AWAR**,

5    having been first duly sworn, testified as follows:

6                     **DIRECT EXAMINATION**

7    **BY MR. CONNOR:**

8    Q.    So good afternoon Mr. Al-Awar.  Tell us who you are.

9    A.    My name is Rawad Al-Awar.  I'm an engineer with

10   Marginal Unit.  I've been there for about three years.

11   Q.    We're going to try to move very quickly through this; so

12   if I need to slow down any question, you'll let me know and

13   we'll see if we can get it moving, okay?

14   A.    I'll let you know.

15   Q.    Okay.  Very briefly, your education?

16   A.    So I have a petroleum engineering degree from UT Austin.

17   I graduated in 2013.

18   Q.    What did you do after that?

19   A.    So after that I worked for an oil service company here in

20   town called Trican.  I did that for about a year.  There was a

21   downturn in oil around then, so they laid me off.  Then they

22   called me back about five months later to go to East and West

23   Texas to do some fracking and drilling.  I did that --

24             THE COURT:  Slower.

25             THE WITNESS:  I'm sorry.

1      THE COURT:  Thank you.

2  A.   I did that for about five months and then there was

3  another downturn and so they laid me off again and after that I

4  decided I was kind of done with oil.  I went overseas, went to

5  New Zealand, learned how to code.  One of my friends was

6  affiliated with a coding factory there, so I learned how to

7  code in New Zealand for a few months, came back to --

8      THE COURT:  Slower.

9      THE WITNESS:  I'm sorry, Judge.

10      THE COURT:  This jury has been listening to testimony

11  all day.  Please slow down.

12      THE WITNESS:  Yes, ma'am.

13  A.   So I came back to the states, formed a company with a few

14  of my software engineering buddies.  We did that for about a

15  year.  Then we split up.

16      I opened a few restaurants with my brother, did that for

17  an about a year, sold those restaurants on our employees; and I

18  have been with Sylvain since about them.

19  BY MR. CONNOR:

20  Q.   Mr. Ross?

21  A.   Yes.  Mr. Ross.  I'm sorry.  Yes.

22  Q.   And what was the first thing that you did when you came to

23  work at Marginal Unit with Mr. Ross?

24  A.   So I did a number of things but I worked on the website

25  initially.  I also worked on the GIS mapping coordinates, so

1   mapping certain elements in the network model, which is a

2   physical location, you know, on the map and also helped recruit

3   some of our earliest employees.

4   Q.   How does Marginal Unit attract people?

5   A.   We attract people in a number of ways, but mostly we

6   are -- you know, when it comes to tech, we are very

7   tech-focused.  We have very strong software fundamentals and we

8   tend to use the latest and greatest tech that we can and that

9   in and of itself just seems to attract the right people so a

10  lot of our engineers, they're attracted by working with the

11  latest technologies.

12  Q.   When you say the latest technologies, are we talking about

13  software development technologies?

14  A.   I am.  I'm talking about some of the cutting edge

15  languages such as Rust, some of the more popular languages

16  nowadays, even Python or Crystal or Mr. Dages will use

17  TypeScript or things of that nature.

18          THE COURT:  Slow down.

19          THE WITNESS:  I'm sorry.

20  BY MR. CONNOR:

21  Q.   And Mr. Dages is Kris Dages?

22  A.   Yes.

23  Q.   And we're going to hear from him shortly.  His last name

24  is spelled D-A-G-E-S?

25          THE COURT:  Mic.

1          MR. CONNOR:  Yes, Your Honor.

2     A.    Yes, that is how you spell it.

3     BY MR. CONNOR:

4     Q.    Do you work with Mr. Dages?

5     A.    I do.

6     Q.    What do you do now at Marginal Unit?

7     A.    So the majority of what I do now, especially in the past

8     six months or so, I mostly work with clients so I have a lot of

9     exposure to our products just by the mere fact of being there

10    for almost three years.  So I do a lot of work with clients.  A

11    lot of the demos, really learning about what they need, looking

12    at their work flows, seeing how much it overlaps with what we

13    do and then also where there is overlap, throwing that back to

14    the engineering team and letting them know, like, hey, guys, we

15    have some suggestions from clients, you know.  This could

16    probably go into the product.  It might help make a sale.

17    Stuff like that.

18    Q.    Does it happen that customers of Marginal Unit software

19    request changes to the software or features to be added to the

20    software?

21    A.    They do that very regularly.

22    Q.    Ands what's your job when it comes to receiving a request

23    like that?

24    A.    Usually, you know, I'll give it a first glance, assess,

25    share it with the team, get their thoughts on it and then we'll

1    all try to decide together does this fit with our product

2    roadmap and our vision of where we want to be.

3    Q.    Who is Nicholas?

4    A.    Nicholas.  He is a client of ours, one of our earliest

5    clients.

6    Q.    And do you recall any requests that Nicholas made early on

7    in your interactions with him?

8    A.    I do.  He made one particular request related to how we

9    present flow data.  So I believe there was some type of issue

10   with the flow data where if you just presented it raw, it

11   wouldn't look good on the charts.  It would be pretty hard to

12   decipher so --

13        THE COURT:  Slower.

14   A.    It would be pretty hard to deliver, so we looked into

15   fixing that for him.

16   **BY MR. CONNOR:**

17   Q.    And what did you do?

18   A.    We came up with some of our other internal methods just

19   related to like making the data -- normalizing the data

20   essentially, making it look good on the charts.

21   Q.    What does normalizing do?

22   A.    So it depends on the context, but I believe in this

23   particular case it had a lot to do with, you know, in one case,

24   it was from A to B.  What we would kind of want to present

25   maybe that data always is from A to B.

1    Q.    So it's about direction?

2    A.    It was.

3    Q.    And that suggestion originated with a client or a customer

4    of Marginal Unit?

5    A.    To the best of my recollection that came from Nicholas.

6    Q.    Let's talk about the project that you participated in or

7    that you did to map data in case files.  Tell us:  What did you

8    do and how long did it take?

9    A.    Okay.  So in 2018 I really made a shift within the company

10   to be more focused on development, software development; and my

11   main role at that time was to develop a server or an API that

12   took data from one data source and related it to data from

13   another data source and that product is called RMS.  And that

14   is what I spent the majority of 2018 doing.  So y'all may have

15   heard of body constraints and outages earlier.  What it does

16   essentially is, you know, it takes some of that ISO and that

17   market data and it relates it back to those network models.

18   Q.    And did you have any help from Mr. Ross in that whole

19   process?

20   A.    So the extent to which I had help from Mr. Ross had a lot

21   to do with either he would tell me you could use this file

22   potentially or I believe he also uploaded a server file in the

23   early days.

24   Q.    Okay.  When you say you should be able to use this file,

25   do you remember what he was referring to?

1    A.    I do.  It was very specifically, because in the early days

2    we only did two ISOs.  It was ERCOT and MISO, I believe, were

3    the first two.

4    Q.    MISO, Midcontinent -- Midwest continent?

5    A.    Midwest continent and ERCOT.

6          And MISO actually publishes a file that they specifically

7    designate as a mapping file, so it's published on their

8    website.  It's for all users to see.  It's called the MISO --

9    it's called the BC supplemental file.  So he pointed me in that

10   direction.  He didn't necessarily tell me to use it or not to

11   use it; but, you know, it is very clearly a mapping file and,

12   as a matter of fact, on MISO's website at some point in time

13   they specifically said, you know, this be can be used for

14   mapping.

15   Q.    And when you say mapping, we're not talking about putting

16   the grid on the -- on a geographical map.  We're talking about

17   a different kind of mapping right?

18   A.    That is correct.

19   Q.    Can you explain to us what kind of mapping we're talking

20   about?

21   A.    I'll do my best.

22         So this particular type of mapping is called a binding

23   constraint mapping.  So there are elements in the system that

24   might cause, like, price imbalances and they're reported

25   publicly and what we do is -- you know, so that would kind of

1  be a binding constraint.  So that's publicly-reported elements

2  that's causing a price imbalance and its important to, you

3  know, know what element in the network model it is and also to

4  know the direction and that file provided you with both of

5  those data sources.

6  Q.   So generally speaking, you have to map components in the

7  grid to be able to link the cases and analyze over time?

8  A.   I don't know if I would word it like that, but you would

9  just want to use ISO data and you would want to know what it is

10  in the case.

11  Q.   When you say what it is in the case, you mean the

12  component in the grid?

13  A.   I do.

14  Q.   Okay.  And are branches and buses and generators examples

15  of those?

16  A.   They could be, yes.

17  Q.   So equipment names?

18  A.   Yes.

19  Q.   Let's -- let's look at a slide.  And while that's getting

20  pulled up, we're going to look at Mr. Rosenberg's slide.

21        MR. CONNOR:  Slide Number 20, I think.

22  BY MR. CONNOR:

23  Q.   Let's switch now to PJM.  PJM is another grid operator,

24  right?

25  A.   It is.

1    Q.    Did you do mapping in PJM?

2    A.    I did.

3    Q.    Did you use any publicly-available information to do that?

4    A.    I did use a lot of publicly-available information.

5    Q.    Okay.  Now, do you recall what the name of the file was?

6    A.    I do.

7    Q.    What was it called?

8    A.    It was called the PSS/E branch model file, something along

9    those lines.

10    Q.    Okay.  And that was a publicly-available file that is out

11    there for everybody to use?

12    A.    That is available to any market participant.

13    Q.    What did it tell you?

14    A.    That file -- I mean, specifically what it told you is it

15    would tell you this equipment name is this from -- it will

16    pretty much is this branch in the model.

17    Q.    Okay.

18        MR. CONNOR:  Can we go to Slide 26, please.  PDGF slide

19    26.

20    **BY MR. CONNOR:**

21    Q.    Now, this is as presentation that you haven't seen

22    Mr. Al-Awar; but do you recognize the source code we're looking

23    at here at the top?

24    A.    I don't recognize the source code, but I do recognize the

25    PJM PSS/E, the branch mapping files.

1          THE COURT:  Slower.  I do recognize...

2    A.    I do recognize the PSS/E branch mapping file name.

3    **BY MR. CONNOR:**

4    Q.    And is that the publicly-available file that you used to

5    create the mappings for PJM?

6    A.    That is.

7    Q.    Let's look at some other tables.

8          MR. CONNOR:  We can go to the PowerPoint now,

9    Ms. Yastic.

10   **BY MR. CONNOR:**

11   Q.    In the computer source code that you wrote for the

12   Marginal Unit software you have names for things, for variables

13   and for fields and databases.  Are you familiar with things

14   like you are seeing up here?

15   A.    I am certainly familiar with ID, name, memo, slack bus ID.

16   I am familiar with --

17   Q.    Let's go to the next slide and look at another table of

18   these.  Do you see those is in the column on the right?

19   A.    I see those.

20   Q.    Do you recognize those?

21   A.    I do recognize those, yes.

22   Q.    Let's go to the next one.  There's another table, more

23   variables.  These are names in the source code of Marginal Unit

24   software, right?

25   A.    I believe so.

1    Q.    Let's go to the last one.  And, again, we see some of the

2    same ones and some new ones?

3    A.    They look similar, yes.

4    Q.    Okay.  Here is the question:  Where do these names come

5    from?

6    A.    So those are just elements within a case, you know.  It's

7    just common knowledge that a PSS/E case has certain -- I mean,

8    it is what it is, you know.  This is the PSS/E case, this is

9    the file, this is the nature of the format of the file.  These

10   are just things in the case.

11   Q.    So these are the commonly-used names for the things

12   they're representing?

13   A.    I would say so.

14   Q.    And they come from the PSS/E format?

15   A.    They come from the case.  The case has these things in it.

16   That's just what's in the case.

17   Q.    Now, you testified as a corporate representative in this

18   case earlier.  Do you remember that?

19   A.    I do.

20   Q.    How much money does Mr. Ross make for the business of

21   Marginal Unit each month?

22   A.    So he makes $2,000 a month.

23   Q.    Has it ever been different?

24   A.    Not to the my recollection, no.  Although we -- it's done

25   for the purpose of reinvesting into the business.  I mean,

1    we're trying to grow it.

2    Q.    Do you know when MISO started archiving cases so that

3    anybody could download them from the site?

4    A.    So if I'm not mistaken, they started archiving them

5    January of 2017.

6    Q.    So after January 2017 there's no reason to scrape MISO by

7    a certain time to preserve the data, because it's available?

8    A.    I mean you wouldn't need to scrape it.  You could just go

9    and download it.  It's all there.

10   Q.    Does the Marginal Unit software, Panorama and Reflow --

11   and this is probably in Reflow -- invert a matrix in

12   calculation of the shift factors?

13   A.    So we do not invert a matrix in the calculation of shift

14   factors.  We calculate shift factors using a sparse, a sparse

15   matrix solution.

16   Q.    Why?

17   A.    I can't tell you exactly why, but that is just the way we

18   do it.  Well, actually I do recall.

19         So this is from my recollection of our intern discussions

20   on the team; but if you were to invert a matrix just the

21   regular way, it would just take way too long and -- it would

22   just take too long.

23   Q.    Why is that?

24   A.    I'm not sure.

25   Q.    Does Marginal Unit use bus names in the algorithm to

1    orients power flow like you were talking about earlier?

2    A.    So we actually use the station name, not specifically the

3    bus name.  So we use the station name.

4         MR. CONNOR:  I pass the witness.

5                        **CROSS-EXAMINATION**

6    **BY MR. KITCHEN:**

7    Q.    Good afternoon Mr. Al-Awar.  I'm going to try to be quick

8    as well.  It's been a long day.

9         THE COURT:  But you don't need to try to be quick.

10   **BY MR. KITCHEN:**

11   Q.    Mr. Al-Awar, you began at Marginal Unit in May of 2017.

12   Does that sounds about right?

13   A.    That sounds about right.

14   Q.    Okay.  And you were the first full-time employee?

15   A.    I was.

16   Q.    Before that it was Mr. Ross and some interns?

17   A.    I believe so.

18   Q.    Okay.  And you're not an energy trader?

19   A.    I am not.

20   Q.    And you don't have any experience in energy trading?

21   A.    No.

22   Q.    And you don't really primarily work on Panorama; is that

23   correct?  You work on RMS?

24   A.    I -- nowadays I primary work with clients.

25   Q.    Okay.  But when you first started it off, you were primary

1    tasked with RMS, but not Panorama, correct?

2    A.    In 2018 I was tasked with RMS.

3    Q.    But you testified as a corporate representative in this

4    case for Marginal Unit?

5    A.    I did.

6    Q.    Okay.  Marginal Unit began development of Panorama in late

7    2016; is that correct?

8    A.    I'm not sure.  You may be referring to version one of

9    Panorama.  That's before my time at Marginal Unit.

10    Q.    It is, but you testified in this case as the corporate

11    representative.  So I know it was before you came there, but do

12    you recall what you testified?

13    A.    I do not with regard to that.  You know, that was about

14    seven months ago.

15    Q.    Okay.  Will you take my word for it that it was in May

16    of -- that it was late 2016 when Marginal Unit began?

17    A.    I'll take your word for it.

18    Q.    Okay.  And you said before you joined, right -- this is

19    before that time -- there were just a couple of interns?

20    A.    Yes.  There was two interns.

21    Q.    And Mr. Ross?

22    A.    Yes.

23    Q.    And so Panorama began development in late 2016 and then do

24    you recall a 2017 nodal conference that you attended?

25    A.    I do.

1    Q.    And that Panorama was displayed at that conference?

2    A.    Yes.

3    Q.    So Marginal Unit, if I understand this right, began

4    development in late 2016 of Panorama and by October 2017 had a

5    working enough version of Panorama that they could display it

6    at this nodal conference, correct?

7    A.    I think that's a slight mischaracterization of how things

8    happened.

9         So back in those days in 2016 there was a version zero

10   built by interns and then I don't exactly remember what

11   happened, but we more or less didn't do that.  When I joined

12   that was -- like, there was no real Panorama.

13   Q.    So, when did real Panorama begin being developed?

14   A.    So what I would call the Panorama that we know today, that

15   was developed by -- primarily by Mr. Dages; and that started

16   when he joined.

17   Q.    And Mr. Dages joined in the late summer 2017; is that

18   correct?

19   A.    That sounds right, yes.

20   Q.    So Mr. Dages, from late summer 2017 until October 2017, a

21   few months, created VisualNode -- or excuse me -- created

22   Panorama?

23   A.    Well, created what he created up to that point, yes.

24   Q.    All right.  But something that could be displayed and

25   shown to customers, potential customers at the nodal

1    conference?

2    A.    Yes.

3    Q.    In just a few months?

4    A.    Yes.

5    Q.    Are you aware that Mr. Ross -- or excuse me -- Mr. Miller

6    testified in this case that it took Saracen almost three years

7    with the assistance of Mr. Ross and many experienced energy

8    traders, not just interns, to develop VisualNode at Saracen?

9    A.    I am not aware of Mr. Miller's testimony whatsoever.  And

10   could you remind me?  I'm sorry.  What was your name one more

11   time?

12   Q.    My name is Mr. Kitchen, you can call me.

13   A.    Mr. Kitchen?

14   Q.    Kitchen, yes.  But you don't have to refer to me by name.

15   A.    Mr. Kitchen, I just want to pause right there.  I'm not

16   aware of what it took Saracen to develop it.

17   Q.    I understand.  I understand.

18   A.    Kris is -- you know, he has, like, 18 years of experience.

19   Q.    But does he have any energy trading experience?

20   A.    He has a lot of experience just --

21   Q.    In energy trading?  Does he have any energy trading

22   experience?

23   A.    No.  But may I explain?

24   Q.    No, but you can ask your attorney to after I'm finished.

25         Mr. Al-Awar, one of your primary responsibilities is

1    assisting in sales at Panorama; is that correct?

2    A.    That is correct.

3    Q.    Okay.  And going back to the 2017 nodal conference where

4    you displayed Panorama, correct, you also attended the 2018

5    nodal conference?

6    A.    I did.

7    Q.    But you chose not to display Panorama --

8    A.    That's correct.

9    Q.    -- at that conference; is that correct?

10        And you didn't display Panorama at the 2018 node

11   conference because you were concerned that Saracen was going to

12   show up and see what you-all were doing, correct?

13   A.    Yes.  But may I explain?

14   Q.    Well, let me just ask this question.  It was Mr. Ross's

15   decision to not show Panorama at the nodal conference in 2018,

16   correct?

17   A.    You would have to ask him.

18   Q.    Well, in fact, let's look at that.  Again, do you recall

19   we took your deposition in this case?

20   A.    I do.

21   Q.    All right.  I'm just going to read question and answer.

22   A.    Okay.

23   Q.    The question is:  Why was the decision made not to market

24   Panorama and Reflow in 2018 when it had been marketed in 2017?

25        Answer:  Right.  So, you know, my understanding was that

1    Saracen had sent us a letter and, you know, we just decided,

2    like, you know, just to be safe and we don't have to show this

3    just to be safe; but once again kind of speculation here -- I

4    say we -- but it wasn't really my decision.  So that's a

5    question you'd have to ask Sylvain because I don't really know.

6         So it was Sylvain's decision.  You don't know why, but you

7    know that you received a letter and that to be safe you didn't

8    want to show Panorama at the 2018 nodal conference?

9    A.    I'm not sure if it was Sylvain's decision or he talked

10   with our attorneys.  That's why.  It would have been his

11   decision.

12   Q.    Perhaps it was more his attorney's decision as well?

13   Okay.

14        But either way, you didn't want to show Panorama at the

15   2018 nodal conference?

16   A.    Yes.

17   Q.    And that was after some of the litigation communication

18   had begun already?

19   A.    Yes.

20   Q.    Mr. Al-Awar, part of your duties, like you testified to,

21   are to link MISO SE case data together; is that correct?  Or

22   just link cases together?

23   A.    Are you asking part of my duties was to link cases

24   together?

25   Q.    As part -- with RMS?

1    A.    So RMS -- I mean, I wouldn't word it as you worded it.  It

2    just links ISO data to the cases.

3    Q.    Okay.  And you use comment fields, as you testified to, to

4    link data together, or memo fields?

5    A.    So the comment field can be used to do this, yes.

6    Q.    Okay.  And is that the way that Panorama does it, or

7    Reflow?

8    A.    I believe so.  They'll use the branch comments as part of

9    it.

10   Q.    Understood.

11         And another data field that you just testified that exists

12   is something called an ID field, correct?

13   A.    Yes.

14   Q.    What does ID stand for?

15   A.    So what I would take ID to mean is like a bus ID.

16   Q.    So the identifier is that what ID is short for?

17   A.    Yes.

18   Q.    Could you use the ID field to link at least some data

19   together?

20   A.    I -- I'm not sure.  I haven't specifically looked at that.

21   Q.    Okay.  Can we look at that MU source code image?  So this

22   is some Marginal Unit source code, 899.  If we can scroll down

23   just a little, let's look at Line 3736.

24         It says:  Content.

25         Yes, absolutely.  We should never match on the ID as it

1    creates false matches, (i.e. bad).  Memos are good and won't

2    produce false matches, although sometimes it won't show a match

3    at all.

4         And then if you look at Line 3738, what does that say,

5    Mr. Al-Awar?  Who created that?

6    A.   So MU Ross.  That's Ross.

7    Q.   And is that Mr. Ross?

8    A.   It is.

9    Q.   Mr. Ross is the one who, at least in this bus comment,

10   writing in Panorama code instructed to use the memo field and

11   not the ID field?

12   A.   Yes.

13   Q.   Just one more quick question.

14        Traders have told you before that Panorama is a superior

15   product to what's commercially available out there, correct?

16   A.   Can you repeat that?

17   Q.   Traders in the industry have told you that Panorama is a

18   superior product to other commercially-available software?

19   A.   I don't know if they used that exact wording, but that was

20   the general implication.

21   Q.   So you agree with that?

22   A.   I'm sorry.  Could you rephrase that?

23   Q.   Do you agree with that statement?

24   A.   That Panorama is a superior trading platform?

25   Q.   Yes.  And that traders would consider it so.

1    A.    I -- I -- yes, for the most part, I agree.

2              MR. KITCHEN:  Okay.  No further questions.

3              THE COURT:  Go ahead.

4                        **REDIRECT EXAMINATION**

5    BY MR. CONNOR:

6    Q.    Mr. Al-Awar, you wanted to provide an explanation that

7    Saracen's lawyer said you should wait for?

8    A.    Yes.

9    Q.    What was that?

10   A.    I don't even recall what it was about.

11   Q.    I understand.

12   A.    I wanted to.  But I do recall I suppose I could clarify

13   one thing about this branch comment.

14   Q.    Sure.

15   A.    That's not some esoteric field in the file.  That is

16   literally just a -- I mean, it's just something you see when

17   you open a file.  Like, I opened it this morning and I saw the

18   branch comment.  It's not -- you know, it's just there.  It's

19   just --

20   Q.    It's not hidden?

21   A.    It's not hidden.

22   Q.    It's not secret?

23   A.    It's not secret, no.  It is just there.  That's it.

24   Q.    I will provide you some context, perhaps refresh your

25   memory.  You were asked about something and I think you were

1    cut off when you were talking about what Mr. Dages did.  Do you

2    remember now?

3    A.    I recall.

4    Q.    Is there something else you would like to add?

5    A.    I would.  So Mr. Dages isn't some novice software

6    developer and we -- and I don't want to talk too much here.  I

7    know it's late.  But this guy has been developing software for

8    the past almost 20 years and he used APIs to develop a software

9    which is exactly what we used in-house.  Like, Reflow is API.

10   It is something where you send in a request and it sends you

11   back data and so you don't have to be an energy trader to build

12   around an API.  Like, it's just something Kris has been doing

13   for the last 20 years.  That's what I wanted to clarify.

14          MR. CONNOR:  Thank you.  No further questions.

15          MR. KITCHEN:  No further questions.

16          THE COURT:  May this witness be excused?

17          MR. CONNOR:  Yes.  No objection from the defense.

18          MR. KITCHEN:  No objection from the plaintiff.

19          THE COURT:  You're free to leave, sir.  Thank you very

20   much.

21          THE WITNESS:  Thank you, Judge.

22          MR. CONNOR:  Defendants call Mr. Kris Dages.

23          THE COURT:  Come on up, please, sir.

24          MR. CONNOR:  It's over here, the hot seat.

25          THE COURT:  Keep coming.  Stop.  Just pause for a

1    second.  Raise your right hand.

2                      (The oath was administered.)

3            THE COURT:  Take the stand, please.  That means be

4    seated.

5                  And as you testify, lean close to the mic, pull

6    it towards you, speak directly and closely into the mic.  Don't

7    rush.

8            THE WITNESS:  Okay.

9            THE COURT:  And the jury will be able to hear you, all

10   right?

11           THE WITNESS:  Is that good.

12           THE COURT:  A little closer.

13                          **KRISTOPHER DAGES**,

14   having been first duly sworn, testified as follows:

15                          **DIRECT EXAMINATION**

16   BY MR. CONNOR:

17   Q.    Introduce yourself, and we'll see if it works.

18   A.    Okay.  My name is Kristopher Dages.

19   Q.    What do you do for a living right now?

20   A.    I'm a software developer at Marginal Unit.

21   Q.    How long have you been there?

22   A.    Since September of 2017 -- I mean -- sorry -- July 2017.

23   Q.    So for a little over two years, two and a half years?

24   A.    Yes.

25   Q.    Tell us a little bit about your background, Mr. Dages.

1    A.    I studied computer science at UT Austin.  I graduated in

2    2002.  For the next ten years or so I worked on a variety of

3    data-driven web applications, most of them for TxDOT, the

4    Department of Transportation.

5    Q.    What did you do there?

6    A.    I was the lead developer on a project for doing continuous

7    statistical analysis on QA/QC data for data for concrete and

8    soil testing.

9    Q.    So you wrote a computer program to model the quality

10   testing or --

11   A.    I built a bunch of different input forms for the lab

12   technicians to, you know, enter the data, perform calculations

13   and then process the data and run statistical lab tests and

14   t-tests and then plot those over time to ensure that there were

15   no anomalies in the compliance.

16   Q.    What did you do after that, after working for TxDOT?  By

17   the way that's Texas Department of Transportation, right?

18   A.    Yes.

19   Q.    What did you do next?

20   A.    I worked for a small consulting company for a couple of

21   years.

22   Q.    Doing software development?

23   A.    Yes.

24   Q.    And then take us up to when you started at Marginal Unit

25   in July of '17.

1    A.    Okay.

2    Q.    What did you do next?

3    A.    Well, there was a lot of flux, I guess, in the tech world,

4    at least as far as web development; and so I took a couple of

5    years off to sort of let things stabilize.

6    Q.    What did you do?

7    A.    I drove for Uber Eats.

8    Q.    Okay.

9    A.    And did Amazon Prime deliveries.

10    Q.    I think an interesting -- if I may, I think there's an

11    interesting fact about you that I'd like to share today.  Tell

12    us about your experience on television, if you're comfortable

13    with it.

14    A.    I guess I'm not ashamed of it.  No, no.  In 2015 I was a

15    contestant on Jeopardy.

16    Q.    What was that like?

17    A.    It was exciting.  It was a little bit nerve-wracking, sort

18    of like right now, but...

19    Q.    Was the lighting like this?

20    A.    No, no.  It was, like -- I couldn't see anything to the

21    left here.  It was pitch black and bright white spotlights.

22    Q.    Let's talk about what did at Marginal Unit.

23    A.    Okay.

24    Q.    What was your first project?

25    A.    My first project at Marginal Unit was to produce a

1    prototype of an application called Panorama.

2    Q.    And did you do that?

3    A.    Yes, I did.

4    Q.    And describe for the jury what you did.

5    A.    Okay.  Well, my initial meeting with Sylvain was very

6    informal.  Rawad was, you know, like, running restaurants and I

7    was one of the delivery drivers and he was, like, come and meet

8    my boss.  I came and met Sylvain; and Sylvain say, hey, you

9    know, we've got a couple of screens for a -- you know, tables

10   and things like that, you know, our interns have developed to

11   show the data from our API.  We wanted to make that a little

12   bit more robust and make it -- turn it into a product that we

13   can actually do something with.

14        And so sort of on a probationary basis I was given, like,

15   about a month or maybe a little longer to just go and produce

16   an application that was, I guess, better looking and more

17   maintainable than the one that we -- that the intern built to

18   start our project.

19   Q.    What was the instruction that Mr. Ross gave you?

20   A.    I mean, it was -- it was basically just, like, let's see

21   how things go.

22        You know, it's just look clean, have a dark theme and

23   basically, like, have -- you know, tabs that you can put

24   anywhere that you want.

25   Q.    Like, any Windows program essentially?

A.    Like any Windows program, like browser tabs.  I mean,
every tab in Panorama is a browser tab basically.  It's just
that in the system that I built for arranging the windows or
the tabs and placing them on the screen, just it lets you put
them anywhere you want to make sure that they're next to each
other so you don't have wasted space in between.  You know,
like Windows you would have on your desktop.

Q.    What does it mean to use a library or API library?  Have
you heard that phrase?

A.    Yes, a library is -- it's any piece of reusable code that
you bring into your applications so that you don't have to
write it yourself.

Q.    So did you use any libraries when you wrote Panorama?

A.    Yes, a lot of them.  It's very typical in the JavaScipt
world.

Q.    Why is that?

A.    A lot of the problems that people need to solve are
problems that lots of people need to solve and generally
there's a solution out there already.

      And so we try to make use of those as much as we can.

Q.    What library did you use for the maps?

A.    It's called Mapbox GL.

Q.    What are some of the features of Mapbox GL?

A.    It's 3D-accelerated.  It provides the base layers of a
global map and also different styles.  It lets you put your own

1   features that you describe, like you give it coordinates and it

2   will show it.  It has -- it lets you zoom in and out, jump or

3   fly to specific coordinates.

4   Q.    So those actions you just described, panning, flyTo.

5        Are those something that's already in the Mapbox library?

6   A.    Yes.  And actually in those exact terms, generally panTo,

7   flyTo.

8   Q.    What about the scrolling?

9   A.    Yes.  Actually the scrolling and panning are pretty much

10  the same.

11  Q.    What about zooming in and out?

12  A.    Yes.  Like, there's a couple of different ways with the

13  keyboard or the mouse.  The controls in Panorama are exactly

14  the same as the default ones; and if you go to Mapbox's

15  website, you will see plenty of their, actually, like, demo

16  code.  They're built almost exactly like our map and works the

17  same.

18  Q.    Did you use a lot of the demo code from Mapbox?

19  A.    Yep.

20  Q.    What about pinning?  Do you know what pinning refers to?

21  A.    In Panorama?

22  Q.    Yes.

23  A.    Pinning was a metaphor that we came up with a little bit

24  later on in the project, probably in 2018 sometime.

25  Q.    Did you write that?

1    A.    Yes.

2    Q.    Did you use a library for that, or did you write that code

3    yourself?

4    A.    I wrote that code myself.

5    Q.    Okay.  And when the different charts, maps and tables in

6    Panorama are viewed, is there some piece of software that

7    controls how they all work together?

8    A.    Yes.

9    Q.    What's that called?

10    A.    We call them selections.  Like, it's pretty much just a

11    metaphor for any kind of user input or choice, whether they

12    click a button or open a dialogue, like clicking a clicker

13    button.

14          And there's a library that we use to basically make

15    those -- to connect all those data flows and it's all RxJS.

16    Q.    RxJS.  Who makes RxJS?

17    A.    It's an open-source project, but Microsoft was the

18    original sponsor.  And it has --there's lots of variations.

19    Basically there's a version in every programming language

20    almost.  It's just a pattern.

21    Q.    A pattern.  What is it used for again?

22    A.    It's used for combining and streaming events.

23    Q.    And is that what gives Panorama the pinning functionality?

24    A.    Sort of, yes.

25    Q.    How does that work?

1    A.    Well, by default.  Like, user inputs are broadcast
2    everywhere.  Pinning is basically like a pause button in a
3    specific component, to say that I don't want to change.
4        When a user says pin this, it basically means when
5    everything else is receiving these broadcast events to
6    subscribe to, the pinned moves don't change.
7    Q.    So, again, this interactivity is something that is driven
8    by open-source library?
9    A.    Absolutely.
10   Q.    Now let's talk about specifically the tables -- the tables
11   of data that are shown in windows in Panorama.
12       Did you have any -- are you responsible for building that?
13   A.    Yes.  And I built that almost from scratch.
14   Q.    Okay.  And when you say you built that almost from
15   scratch, tell us what that means.
16   A.    So, like, they have the rendering of the tables, like the
17   way that they look is based on the Bootstrap which is a theme
18   from Twitter.
19   Q.    What do you mean a theme from Twitter?
20   A.    So Twitter has, like, style sheets to basically make
21   applications look sort of consistent to be theme-able so you
22   can change colors and fonts and whatnot.
23       So the look and feel of the table comes from Bootstrap.
24   Q.    Is that open-source?
25   A.    That's open-source, yes.

1    Q.    Okay.

2    A.    The data that goes into the table and then the mechanism

3    for generating a table from any data source, that was written

4    by me.

5    Q.    Okay.  And did you do anything different, anything unique

6    when you wrote that table generation or table software?

7    A.    I mean, in general I really don't like rewriting things or

8    copying and pasting.  So I was trying to -- I mean, when I

9    started the project I didn't really understand anything about

10   the domain in which we were working with.  I didn't really know

11   anything about power systems.

12        But as far as, you know, creating libraries of reusable

13   components, I've done that a lot.  And so the goal was to

14   create a way that any table that we might need in the future

15   could be done much faster and avoid bugs along the way.

16        And so I built a structure for defining the data and

17   validating the data and pushing it into the table with

18   automatic support for free text filtering and sorting.

19   Q.    And what's the upside of all that?

20   A.    It means I'm basically, you know, after the first couple

21   of tables that we built, anything else that we need that's

22   tabular, we can create a new one from a data set in, like,

23   15 minutes.

24   Q.    So if the customer requests a specific data table in

25   Panorama, you can create one in how long?

1    A.    15 minutes usually.

2    Q.    How much help did Mr. Ross provide in building that piece

3    of software you just described?

4    A.    None.  That was all me.

5    Q.    From the sound of it, we've got a Mapbox and RxJS?

6    A.    Uh-huh.

7    Q.    Did you mention D3 or something like that?

8    A.    D3 is just for -- is a library for building charts.

9    Q.    Is that used the in Panorama?

10    A.    Yes.  Like, that would be the time series charts that we

11    have, scout plots, all of those are based on D3.

12    Q.    And what is D3 again?

13    A.    It's a library -- again, a framer for transforming data

14    into charts on the web.

15    Q.    So you got a library for charts, a library for maps, a

16    library for tables?

17    A.    Yes.

18    Q.    All open-source software?

19    A.    Yes.

20    Q.    And those are responsible for what you see in Panorama,

21    the look and feel of the graphical user interface?

22    A.    Yes.

23            MR. CONNOR:  Pass the witness.

24            THE COURT:  Do you have a lot of cross of this witness?

25            MR. WALKER:  No.

1          THE COURT:  Let's see if we can get him done by 5:00.

2     Can you get it done by 5:00?

3          MR. WALKER:  Yes.

4          THE COURT:  Go for it.

5                        **CROSS-EXAMINATION**

6     **BY MR. WALKER:**

7     Q.    Mr. Dages, you own a small part of Marginal Unit, correct?

8     A.    Yes.

9     Q.    Some of the other employees also own small portions,

10    correct?

11    A.    I believe so.

12    Q.    Mr. Sylvain Ross owns the majority of the company,

13    correct?

14    A.    To my knowledge, yes.

15    Q.    Now, when you started in the summer of 2017, there was

16    already a prototype of Panorama, correct?

17    A.    Yes, there was.

18    Q.    Referred to as Panorama version zero?

19    A.    Yes, that was the name that we gave to it at some point.

20    Q.    And it had been developed by Mr. Sylvain Ross and some

21    interns, correct?

22    A.    Yes.

23    Q.    And you had the ability to take a look at it before you

24    started your project on Panorama?

25    A.    Correct.

1    Q.    And it had at least some of the functions and features

2    that you incorporated into your version of Panorama?

3    A.    Parts of the map and the chart, yes.  They appeared to be

4    copied from the examples for the most part.

5    Q.    And you were looking to develop it in a different user

6    interface framework, correct?

7    A.    Yes.

8    Q.    Essentially you wanted to write it in a different

9    language?

10    A.    Correct.

11    Q.    A language that you were more familiar with?

12    A.    Not exactly.

13    Q.    A language you thought would be better for the product?

14    A.    Yes.

15    Q.    Coming into Marginal Unit, you didn't have any experience

16    as an energy trader, correct?

17    A.    Correct.

18    Q.    Did you have any experience with FTRs?

19    A.    No.

20    Q.    Do you even know what they were?

21    A.    No.

22    Q.    Were you aware of what congestion analysis was?

23    A.    Not exactly, but it seemed pretty straightforward like...

24    Q.    Coming into Marginal Unit, did you know what type of

25    information was important to a trader, an FTR trader in a

1    congestion analysis?

2    A.    No.

3    Q.    Did you know how an FTR trader would prefer to see the

4    information organized on his screen?

5    A.    No.

6    Q.    Did you know any of the features or functionalities that

7    would speed up the process of congestion analysis for an FTR

8    trader?

9    A.    Not when I joined, no.

10   Q.    When you joined Marginal Unit and during that time period

11   where you developed Panorama, Sylvain Ross was the only person

12   there with experience in FTR trading, correct?

13   A.    I'm not sure.  I guess.  I mean, I don't know about the

14   interns, whether they had any prior experience but I didn't

15   have much interaction with them at the beginning.

16   Q.    Are you aware of anyone else besides Mr. Sylvain Ross with

17   any experience in FTR trading when you were developing Panorama

18   in 2017?

19   A.    No.

20   Q.    Now, you've been doing computer programming for how long

21   now?

22   A.    More than 20 years.

23   Q.    And you're good at taking people's ideas and converting it

24   to code?

25   A.    Yes, and my own ideas.

1    Q.    Someone needs to tell you what it is you need to create

2    for you to do the code, correct?

3    A.    No, not exactly.

4    Q.    So you need to understand what features and functions of

5    the program should be before you start coding, correct?

6    A.    From a high level, yes.

7    Q.    There's a design phase of creating structure -- of

8    creating a software program, correct?

9    A.    Yes.  But, I mean, it's often interweaved.  Like, you do a

10   small bit and then, you know, you design some more.  Like, the

11   agile programming has sort of taken over from the original

12   design everything and then go code.

13   Q.    Part of the focus in designing a software program is to

14   make sure it's giving the user what they want, correct?

15   A.    Yes, although sometimes it's figuring out what the user

16   might even want just by trying something and seeing where it

17   goes from there.

18   Q.    It's helpful to know what would be important to the user

19   when developing the software, correct?

20   A.    Yes.

21   Q.    Again, the only person at Marginal Unit in 2017 with

22   trading experience that you knew about was Sylvain Ross?

23   A.    Yes.  But I wouldn't say the application was only designed

24   for trading.

25   Q.    It is designed for use in FTR trading congestion analysis,

1  correct?

2  A.   Some of our clients, yes, and some are not.  Like, there's

3  uses outside of trading.

4  Q.   The focus of your clients is on FTR trading, correct?

5  A.   Yes, somewhat.

6  Q.   Are you involved in the sales?

7  A.   No.

8  Q.   Okay.  We'll leave that for others then.  Thank you.

9  A.   Okay.

10      MR. CONNOR:  I think I can do this before 5:00,

11  Your Honor.

12                      REDIRECT EXAMINATION

13  BY MR. CONNOR:

14  Q.   Let's just put up a picture of Panorama.  I want to ask

15  you a couple of questions.

16  A.   Okay.

17  Q.   Here it is, right?

18  A.   Yes.

19  Q.   Is that what you built?

20  A.   Uh-huh?

21      THE COURT:  Is that a "yes" or "no"?

22  A.   I'm sorry.  Yes.

23  BY MR. CONNOR:

24  Q.   If you took away the map data and you took away the chart

25  data and you took away the table data -- in other words, if you

1   took away the information that comes from the case file, what

2   have you got left?

3   A.   I'm sorry.  Could you rephrase that?

4   Q.   Sure.

5       So if you took the data away, took the map data away, the

6   chart data away and the table data, if you took the values that

7   were provided in the case files out of the program right now,

8   what would you have left?

9   A.   Like in the specific screenshot?

10  Q.   Uh-huh.

11  A.   I hope I'm not interpreting this too literally, but you

12  would still have an empty map that had all the names of the

13  cities and the zooming controls and heading and zooming and

14  everything.  You would have an empty chart where you could

15  still drag the chart around.

16  Q.   Exactly.  You would have the geography, right?

17  A.   Yes.

18  Q.   But you wouldn't have any grid topology?

19  A.   Right.

20  Q.   You would still have axes and labels on the map and the

21  charts; but you wouldn't have anything relevant to trading,

22  would you?

23  A.   Correct.

24      And the system -- Panorama could be used for essentially

25  any other subject matter, like anything where people needed

1    charts, analytics or you know...

2    Q.    It's a data visualization tool, right?

3    A.    Yes.

4    Q.    Fundamentally that's what it does?

5    A.    Yes.

6    Q.    It presents data from the database.  Do you agree with

7    that?

8    A.    Yes, a database or any other data source like plain text

9    files even.

10   Q.    And that's what you've been doing since you graduated from

11   UT in 2002?

12   A.    Correct.

13        MR. CONNOR:  No further questions, Your Honor.

14           Thank you, Mr. Dages.

15        THE COURT:  Any more questions of this witness?

16        MR. WALKER:  No, Your Honor.

17        THE COURT:  Very good.

18           Ladies and gentlemen, sometimes timing works out.

19           So we will resume tomorrow morning at 9:00.  I

20   anticipate that we will finish presenting the evidence to you

21   by about lunchtime tomorrow.

22           I anticipate that in the afternoon, I will

23   instruct you on the law that you must follow in deliberating to

24   a verdict in this case which will take the form of answering

25   specific questions that will be put to you with instructions on

1    the law that applies to each of those questions.  And then the

2    attorneys will argue, and then the case will be yours to

3    decide.

4                So you can count on coming back probably Thursday

5    morning, unless you want to work really late tomorrow night and

6    that's up to you.

7                But I don't want to pressure you to finish

8    prematurely just to avoid coming in on Thursday.  Just the

9    opposite.  You will need time to do this right, and I know you

10   want to after having invested this much time already.

11               So continue to follow all the instructions.  We

12   will do our best to meet our schedule and our goal of

13   continuing to be efficient in the use of your time.

14               Thank you very much, ladies and gentlemen, for

15   your patience, your good humor and your showing up every day

16   and paying attention.

17               I will see you at 9:00 tomorrow morning.  Enjoy

18   the evening.

19                    (The jury exited the courtroom.)

20          THE COURT:  You may step down, sir.

21          THE WITNESS:  Thank you.

22          THE COURT:  And may this witness be excused?

23          MR. CONNOR:  Yes.

24          MR. WALKER:  Yes.

25          THE COURT:  All right.  So I'm going to get you a fresh

1    copy of the draft.  I would like to meet you here at 8:30

2    tomorrow morning to continue our review.

3              Any cases you have on a heightened standard of

4    proof or the absence of one for willful and malicious, I need

5    to see promptly.

6              MS. LEE:  I have them, Your Honor.

7              THE COURT:  All right.  What are the cites?

8              MS. LEE:  I actually have copies.

9              THE COURT:  All right.  If you can give them to

10   Mr. Mooney, that would be great.

11             Do you have cites or copies for opposing counsel?

12             MS. LEE:  I believe I do, but they're also cited in our

13   original submission in Footnote Number 3.

14             THE COURT:  Do you guys know how many submissions you

15   have submitted?

16             MS. LEE:  I can provide the piece of paper if that

17   would be helpful.

18             THE COURT:  If you can give me the cases for us and the

19   cites for them, I think that will be the most helpful.  I'm not

20   fussing at you.  It's just a lot of material to sort through.

21             MS. LEE:  I can't find anything either, Your Honor.

22             THE COURT:  My point precisely.

23             So your next witness?

24             MR. CONNOR:  We have three more, Your Honor.  And

25   depending on where we are on the deposition testimony, we may

1    call Brian Maurizi by deposition next by video, and then

2    Dr. Legatt and then Cary Ferchill and then we'll be finished.

3            THE COURT:  Do you have any rebuttal that you think

4    you're going to have?

5            MR. WALKER:  Not that we're anticipating at this time.

6            THE COURT:  All right.  We'll be finished before noon.

7            MR. CONNOR:  We're trying to, Your Honor.  That's the

8    goal.  I think we can.

9                We'll start at 9:00 tomorrow morning, Your Honor?

10           THE COURT:  We're going to go over the charge starting

11   at 8:30.

12           MR. CONNOR:  Yes.  I think we can.

13           THE COURT:  Okay.  That would be terrific.

14           MR. WALKER:  Does that mean we can release our

15   witnesses?

16           THE COURT:  Especially Mr. Kelley.

17           MR. CONNOR:  Yes.

18           THE COURT:  Does that help?

19           MR. WALKER:  It does.

20           THE COURT:  Okay.  See you tomorrow morning.

21           MR. CONNOR:  I'm so sorry.  There's one other witness.

22   Mr. Childress is under subpoena.

23           THE COURT:  That's fine.

24           MR. CONNOR:  He may come tomorrow.  We're still --

25           THE COURT:  He's not coming any other day.

1      MR. CONNOR:  He's not here now so, yes.  So he may be,

2  but he will be very short.

3      THE COURT:  All right.  Very good.  Thank you.  And I

4  think we made good progress on the charge.  I don't think

5  there's going to be a lot once we get this one point clarified.

6      MS. LEE:  Your Honor, we have a few more issues with

7  the charge.  Are we going to do the formal tomorrow --

8      THE COURT:  No.  We're going to have an informal charge

9  conference.

10      MS. LEE:  Okay.

11      THE COURT:  We're going to iron out everything, remove

12  all typos, get it as far to agreed on as we can.  You will all

13  have your formal objections that we will make before we give it

14  to the jury.

15      MS. LEE:  Okay.

16      THE COURT:  But we're going to get it cleaned up and 25

17  copies made so the jury can have it, each of you can have it,

18  you can argue the charge and it will be clean and ready for the

19  jury so we don't have to keep them waiting while we copy and

20  pull it.  Okay?

21          That's the plan.  Does that make sense?

22      MS. LEE:  It does.

23      THE COURT:  The goal is not to keep the jury waiting

24  while we putz around here.

25      MS. LEE:  Understood.

1          THE COURT:  Very good.  But, yes, you will have a

2    formal charge conference where you will have a chance to state

3    all your objections on the record in one place.

4               (The proceedings were adjourned.)

5                         *  *  *  *

REPORTER'S CERTIFICATE

     I, Lanie M. Smith, CSR, RMR, CRR, Official Court Reporter, United States District Court, Southern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.


                                 /s/ Lanie M. Smith
                                 Official Court Reporter